UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| )<br>)<br>BLOOMBERG L.P.,      )<br>)<br>    Plaintiff,    )<br>)<br>    v.      )<br>)<br>)<br>BOARD OF GOVERNORS OF  )<br>THE FEDERAL RESERVE  )<br>SYSTEM,     )<br>    Defendant.  )<br>) | Civ. No. 08 CV 9595 (LAP) |

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Katherine H. Wheatley (KW7931)
Associate General Counsel
Yvonne F. Mizusawa (YM5081)
Senior Counsel
Board of Governors of the Federal
  Reserve System
20th and C Streets, N.W.
Washington, D.C.  20551
Ph: (202) 452-3436
Fax: (202) 736-5615

March 4, 2009

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES .............................................................................................. iii

BACKGROUND ................................................................................................................. 2

ARGUMENT ....................................................................................................................... 6

   A.    SUMMARY OF ARGUMENT ................................................................................. 6

   B.    SUMMARY JUDGMENT STANDARD IN FOIA CASES ..................................... 7

   C.    THE BOARD CONDUCTED AN ADEQUATE SEARCH ..................................... 8

     1)   The Applicable Legal Standard ....................................................................... 8

     2)   The Board Conducted an Adequate Search in Response to the Loan Request ................ 9

     3)   The Board Conducted an Adequate Search in Response to the Bear Request ............... 13

   D.    THE BOARD PROPERLY WITHHELD LOAN INFORMATION ON
         INDIVIDUAL BORROWERS UNDER EXEMPTIONS 4 AND 5 OF FOIA ............. 15

     1)   The Applicable Exemption 4 Standard ......................................................... 15

       (a)   Disclosure of Loan Information on Individual Borrowers is Likely to Cause
            Substantial Competitive Harm to Borrowers at the DW, TAF, PDCF or TSLF .... 18

       (b)   The Loan Information on Individual Borrowers was Properly Withheld under the
            Third Prong of <u>National Parks</u> Because Disclosure Would Impair the Board's
            Ability to Provide Liquidity Through the DW, TAF and SCLFs, and to Promote
            Maximum Employment, Stable Prices, and Moderate Long-Term Interest Rates, as
            Required by Statute ................................................................................. 23

     2)   The Board Properly Withheld Loan Information on Individual Borrowers Under FOIA
         Exemption 5 ................................................................................................ 30

E.     RESPONSIVE DOCUMENTS AT THE FRBNY ARE NOT BOARD RECORDS SUBJECT TO FOIA ................................................................................................... 34

1)    Responsive Documents at the FRBNY were Neither Created nor Obtained by the Board and are not "Agency Records" Subject to FOIA ........................................................... 35

2)    The Structure of the Board and the Federal Reserve Banks .......................................... 37

3)    Responsive Documents at the FRBNY do not Fall Within the Narrow Category of Reserve Bank Documents that are Board Records by Regulation ................................. 40

CONCLUSION .................................................................................................................... 47

# TABLE OF AUTHORITIES

## CASES

9 to 5 Org. for Women Office Workers v. Board of Governors,
  721 F.2d 1, 10 (1st Cir. 1983). ........................................................................... 23, 30

Africa Fund v. Mosbacher,
  1993 U.S. Dist. LEXIS 7044 (S.D.N.Y. 1993)........................................................ 24

American Airlines, Inc. v. National Mediation Board,
  588 F.2d 863 (2d Cir. 1978) .................................................................................. 16

Amnesty International USA v. CIA,
  2008 U.S. Dist LEXIS 47882 (S.D.N.Y., June 19, 2008) ........................... 7, 8, 9, 12

Bowles v. Seminole Rock & Sand Co.,
  325 U.S. 410 (1945). ............................................................................................ 41

Bruh v. Bessemer Venture Partners III L.P.,
  464 F.3d 202 (2d Cir. 2006), cert. denied, 549 U.S. 1209 (2007)........................... 41

Carney v. U.S. Dep't of Justice,
  19 F.3d 807 (2d Cir.), cert. denied, 513 U.S. 823 (1994)................................. 7, 8, 15

Celotex Corp. v. Catrett,
  477 U.S. 317 (1986) ............................................................................................... 7

Ciba-Geigy Corp. v. Mathews,
  428 F. Supp. 523 (S.D.N.Y. 1977) ......................................................................... 36

Clarke v. U.S. Dep't of Treasury,
  1986 U.S. Dist. LEXIS 29989 (E.D. Pa. Jan. 28, 1986)............................... 25, 26, 30

Comstock Int'l (U.S.A.), Inc. v. Export-Import Bank,
  464 F. Supp. 804 (D.D.C. 1979)............................................................................. 25

Continental Stock Transfer & Trust Co. v. SEC,
  566 F.2d 373 (2d Cir. 1977) (per curiam) .............................................................. 17

Critical Mass Energy Project v. NRC,
  975 F.2d 871 (D.C. Cir. 1992) (en banc), cert. denied, 507 U.S. 984 (1993). .......... 24

Evans v. U.S. Office of Personnel Mgmt.,
  276 F. Supp. 2d 34 (D.D.C. 2003)........................................................................... 7

Fasano v. Federal Reserve Bank of New York,
    457 F.3d 274 (3rd Cir. 2006), cert. denied, 549 U.S. 1115 (2007)...................................... 38, 40

Federal Reserve Bank of Boston v. Comm'r of Corporations,
    499 F.2d 60 (1st Cir. 1974) ....................................................................................... 38

Federal Reserve Bank of St. Louis v. Metrocentre Improv. Dist.,
    657 F.2d 183 (8th Cir. 1981), aff'd, 455 U.S. 995 (1982)....................................... 38

Ferguson v. FBI,
    83 F.3d 41 (2d Cir. 1996) ......................................................................................... 8

First Agricultural Nat'l Bank v. State Tax Comm'n,
    392 U.S. 339 (1968) ................................................................................................. 38

FOMC v. Merrill,
    443 U.S. 340 (1979) ...................................................................................... passim

Forsham v. Harris,
    445 U.S. 169 (1980) .......................................................................................... 36, 37

FTC v. Grolier, Inc.,
    462 U.S. 19 (1983) ................................................................................................... 31

Garcia v. U.S. Dep't of Justice,
    181 F. Supp. 2d 356 (S.D.N.Y. 2002). ................................................................... 9

Government Land Bank v. GSA,
    671 F.2d 663 (1st Cir. 1982) ..................................................................................... 32

Grand Central Partnership v. Cuomo,
    166 F.3d 473 (2d Cir. 1999) ......................................................................... 7, 12, 35

Gulf & Western Industries, Inc. v. United States,
    615 F.2d 527 (D.C. Cir. 1980)................................................................................. 18

Hack v. Dep't of Energy,
    538 F. Supp. 1098 (D.D.C. 1982)........................................................................... 32

Halpern v. FBI,
    181 F.3d 279 (2d Cir. 1999) ..................................................................................... 7

Inner City Press v. Board of Governors,
    380 F. Supp. 2d 211 (S.D.N.Y. 2005), aff'd in part,

remanded in part on other gnds, 463 F.3d 239 (2d Cir. 2006) .................................................. 18

Inner City Press/Community on the Move v. Board of Governors,
   1998 U.S. Dist. LEXIS 15333 (S.D.N.Y.,  Sept. 30, 1998), aff'd,
   182 F.3d 900 (2d Cir. 1999) ............................................................................................. 8, 14

Inner City Press/Community on the Move v. Board of Governors,
   463 F.3d 239 (2d Cir. 2006) ........................................................................................... 16, 17

Jones-Edwards v. NSA,
   196 Fed. Appx. 36 (2d Cir. 2006)................................................................................... 9, 15

Judicial Watch, Inc. v. Export-Import Bank,
   108 F. Supp. 2d 19 (D.D.C. 2000).................................................................................. 25, 27

Kissinger v. Reporter's Committee for Freedom of the Press,
   445 U.S. 136 (1980). ...................................................................................................... 35, 36

Lion Raisins, Inc. v. USDA,
   354 F.3d 1072 (9th Cir. 2004) ............................................................................................. 18

Maynard v. CIA,
   986 F.2d 547 (1st Cir. 1993)). ............................................................................................ 7, 8

Melcher v. FOMC,
   644 F. Supp. 510 (D.D.C. 1986), aff'd in part, vacated in part, 836 F.2d 561 (D.C. 1987),
   cert. denied, 486 U.S. 1042 (1988)................................................................................ 37, 40

Nadler v. FDIC,
   899 F. Supp. 158, 161-63 (S.D.N.Y. 1995), aff'd on other gnds,
   92 F.3d 93 (2d Cir. 1996) .............................................................................................. 24, 25

Nadler v. FDIC,
   92 F.3d 93 (2d Cir. 1996) .............................................................................................. 16, 24

National Parks & Conservation Ass'n v. Kleppe,
   547 F.2d 673 (D.C. Cir. 1976)............................................................................................ 18

National Parks Conservation Ass'n v. Morton,
   498 F.2d 765 (D.C. Cir. 1974)...................................................................................... passim

NLRB v. Robbins Tire & Rubber Co.,
   437 U.S. 214 (1978) ............................................................................................................ 36

NLRB v. Sears, Roebuck & Co.,
  421 U.S. 132 (1975) ............................................................................................. 30

Oglesby v. U.S. Dep't of the Army,
  920 F.2d 57 (D.C. Cir. 1990).............................................................................. 8

Public Citizen Health Research Group v. FDA,
  704 F.2d 1280 (D.C. Cir. 1983)......................................................................... 18

Safecard Services, Inc. v. SEC,
  926 F.2d 1197 (D.C. Cir. 1991)......................................................................... 8, 9

Scott v. Federal Reserve Bank of Kansas City,
  406 F.3d 532 (8th Cir. 2005), cert. denied, 546 U.S. 1216 (2006)...................... 38, 40

Triestman v. U.S. Dep't of Justice,
  878 F. Supp. 667 (S.D.N.Y. 1995) .................................................................... 8

Truitt v. U.S. Dep't of State,
  897 F.2d 540 (D.C. Cir. 1990 ............................................................................ 9, 11

U.S. Dep't of Justice v. Tax Analysts,
  492 U.S. 136 (1989) ........................................................................................... 7, 35

U.S. v. Weber Aircraft Corp.,
  465 U.S. 792 (1984) ........................................................................................... 31

United Technologies Corp. v. FAA,
  102 F.3d 688 (2d Cir. 1996), cert. denied, 521 U.S. 1103 (1997)........................ 17

Utah v. U.S. Dep't of the Interior,
  256 F.3d 967 (10th Cir. 2001) ............................................................................ 18

Vaughn v. Rosen,
  484 F.2d 820 (D.C. Cir. 1973)........................................................................... 2

Wood v. FBI,
  432 F.3d 78 (2d Cir. 2005) ................................................................................. 8

**STATUTES**

5 U.S.C. § 552(a)(4)(B) ........................................................................................ 7, 35

5 U.S.C. § 551(2) .................................................................................................. 16

5 U.S.C. § 552 ................................................................................................ 1

5 U.S.C. § 552(b)(2) ...................................................................................... 32

5 U.S.C. § 552(b)(4)). .................................................................................... 16

5 U.S.C. § 552(b)(5). ...................................................................................... 30

12 U.S.C. § 225a ............................................................................................ 26

12 U.S.C. § 241 .............................................................................................. 37

12 U.S.C. § 248(j) ...................................................................................... 37, 39

12 U.S.C. § 248(k). ..................................................................................... 40, 42

12 U.S.C. § 263 .............................................................................................. 38

12 U.S.C. § 263(a) .......................................................................................... 39

12 U.S.C. § 301 ......................................................................................... 42, 43

12 U.S.C. § 341 ......................................................................................... 39, 40

12 U.S.C. § 343 ........................................................................................ passim

12 U.S.C. § 347b(a). .................................................................................. 42, 43

12 U.S.C. § 347c. ............................................................................................ 43

12 U.S.C. §§ 282, 341 .................................................................................... 39

12 U.S.C. §§ 301, 302 .................................................................................... 39

12 U.S.C. §§ 301, 343, 347b and 347c. ......................................................... 43

12 U.S.C. §§ 341-361 ..................................................................................... 39

Pub. Law 72-302, § 210 of Title 2, 47 Stat. 709 (July 21, 1932) .................. 45

The Federal Reserve Act .......................................................................... passim

## OTHER AUTHORITIES

75 Cong. Rec. 15040-41 (July 11, 1932) ....................................................... 45

18 Fed. Res. Bull. 518-20 (August 1932) ....................................................... 45

1913 House Report ............................................................................................. 44

H.R. Rep. No. 69, 63rd Cong., 1st Sess. 18 (1913) ....................................... 39

The Federal Reserve System Purposes and Functions (Ninth Edition, June 2005)............... passim

**RULES**

Fed. R Civ. P. 26(c)(7) ..................................................................................... 31

Fed. R Civ. P. 56 ................................................................................................ 1

Fed. R. Civ. P. 56(c) ........................................................................................... 7

**REGULATIONS**

12 C.F.R. § 201.4(d) .......................................................................................... 46

12 C.F.R. § 261.2(i)(1)(i).............................................................. 15, 40, 41, 44, 46

12 C.F.R. §§ 261.12-.17 .................................................................................... 37

12 C.F.R. §§ 265.11 ........................................................................................... 39

12 C.F.R. §§ 265.11(a)-(g) ................................................................................ 42

12 C.F.R. §271.5. ............................................................................................... 32

12 C.F.R. § 271.5 (1979). ................................................................................... 31

12 C.F.R. Part 201 ............................................................................................. 44

12 C.F.R. Part 271.............................................................................................. 38

_____
                                    )
                                    )
BLOOMBERG L.P.,                     )
                                    )
            Plaintiff,              )
                                    )
        v.                          )    Civ. No. 08 CV 9595 (LAP)
                                    )
                                    )
BOARD OF GOVERNORS OF               )
THE FEDERAL RESERVE                 )
SYSTEM,                             )
            Defendant.              )
_____)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, the Board of Governors of the Federal Reserve System ("Board"),

respectfully moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure in this Freedom of Information Act case, 5 U.S.C. § 552, on the grounds that no

records have been improperly withheld from the plaintiff, Bloomberg, L.P., and the defendant is

entitled to judgment as a matter of law.  In support of its motion, the Board submits declarations

from: Alison M. Thro, Senior Counsel in the Board's Legal Division; Brian F. Madigan, Director

of the Board's Division of Monetary Affairs ("MA"); Susan E. McLaughlin, Deputy Head of

Market Operations, Market Monitoring and Analysis at the Federal Reserve Bank of New York

("FRBNY"); Lorie K. Logan, Vice President in the Market Operations and Markets Analysis

Function at the FRBNY; and Helen E. Mucciolo, Senior Vice President in the Credit, Investment & Payment Risk Function at the FRBNY, along with a Statement of Material Facts Not in Dispute.

As shown in this memorandum and attachments, the Board is entitled to summary judgment on plaintiff's Amended Complaint because the documents plaintiff seeks are exempt from disclosure under FOIA. Other responsive documents that may be housed at the FRBNY are not agency records within the meaning of FOIA. For the withheld documents, which total 231 pages, defendant has included an index pursuant to Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973) (the "Vaughn Index") and supporting declarations with this motion identifying the legal basis for withholding. Because these documents are exempt under FOIA in their entirety, plaintiff's request for declaratory judgment, requiring the Board to produce the exempt records, should be denied.

## BACKGROUND

This action involves two FOIA requests filed by reporters for the plaintiff. The first, filed May 21, 2008 by Bloomberg reporter Mark Pittman (the "Loan Request"), sought eleven categories of records relating to "[a]ll securities posted between April 4, 2008 and May 20, 2008 as collateral to the Primary Dealer Credit Facility, the discount window, the Term Securities Lending Facility and the Term Auction Facility (the 'Relevant Securities')." Declaration of Alison M. Thro, executed February 26, 2009 ("Thro Decl."), ¶ 5 and Exh. 1. The second, filed April 7, 2008 by Bloomberg reporter Craig Torres (the "Bear Request"), sought "[a]ll documents reflecting or concerning the portfolio of securities (listed on a security-by-security basis, with

CUSIP numbers if available) supporting the loan extended by the Federal Reserve in connection with the proposed acquisition of Bear Stearns Cos. by JP Morgan Chase & Co." Thro Decl., ¶ 22 and Exh. 6.

The Discount Window ("DW") is the basic lending program through which the twelve Federal Reserve Banks lend funds on a short-term basis to eligible depository institutions in their respective districts. Declaration of Brian F. Madigan, executed February 27, 2009 ("Madigan Decl."), ¶ 6. All DW loans are secured by collateral acceptable to the lending Reserve Bank. Extensive information about DW lending can be found on the DW website at www.frbdiscountwindow.org.

The DW is a permanent program of the Federal Reserve Banks. In response to the current financial crisis, the Board has authorized the Federal Reserve Banks to initiate a number of additional, temporary special credit and liquidity facilities ("SCLFs") to relieve severe liquidity strains in the market, reduce risks to financial stability, and strengthen the effectiveness of monetary policy in addressing risks to the outlook for growth and inflation. Several of these temporary, emergency facilities are the focus of the plaintiff's FOIA requests. They are: (1) the Term Auction Facility ("TAF"), a form of DW lending that provides longer than overnight funding to eligible depository institutions through an auction mechanism, Madigan Decl., ¶ 8; (2) the Primary Dealer Credit Facility ("PDCF"), a facility under which the FRBNY makes overnight funds available to its primary dealers, Madigan Decl., ¶ 9; (3) the Term Securities Lending Facility ("TSLF"), a lending facility permitting primary dealers to obtain a 28-day loan of Treasury securities from FRBNY by pledging certain other kinds of securities, Madigan Decl., ¶ 10; and (4) a loan to facilitate the acquisition of the Bear Stearns Cos. by J.P. Morgan Chase &

Co. ("JPMC") (the "Bear Stearns Loan"). While extensive information about these facilities can be found on the Board's public website,[1] neither the Board nor the Federal Reserve Banks have made public the transaction-level information sought by the plaintiffs, for the reasons discussed more fully infra.

As detailed in the attached Thro Decl., in response to the Loan Request, Board staff searched its divisions most likely to have responsive information, and made appropriate inquiries. Board staff determined that it had approximately two pages of documents responsive to item 11 of the Loan Request, and provided these records (with non-responsive portions redacted) to the plaintiff in December 2008. Thro Decl., ¶¶ 15, 17. Board staff determined that it had approximately 231 full pages of records containing limited information responsive in part to item 7 of the Loan Request, which sought, with respect to the Relevant Securities, "records sufficient to show the terms of the loans and the rates that the borrowers must pay." Thro Decl., ¶¶ 5, 11-13 and Exhs. 1 and 5. Board staff reviewed these records and determined that they were exempt under FOIA Exemptions 4 and 5, and contained no reasonably segregable non-exempt information. Thro Decl., ¶ 13.

As discussed more fully below, Board staff determined that responsive transaction-level information regarding collateral pledged for loans under the DW, TAF, TSLF, and PDCF was in the possession and control of the FRBNY. That Reserve Bank, along with the other eleven Federal Reserve Banks, has statutory authority to conduct DW and TAF operations, and FRBNY has statutory authority and Board authorization to administer the PDCF and the TSLF. Thro Decl. ¶¶ 20-21; Declaration of Susan E. McLaughlin, executed March 1, 2009 ("McLaughlin

---

[1] See http://www.federalreserve.gov/monetarypolicy/bst.htm and
http://www.federalreserve.gov/monetarypolicy/bst_supportspecific.htm.

Decl."), ¶¶ 5, 10, 15; Declaration of Lorie K. Logan, executed March 2, 2009 ("Logan Decl."), ¶¶ 5, 15. As set forth at pp. 12-13 and 34-47 below, after careful review, Board staff properly determined that responsive FRBNY documents were not "agency records" subject to FOIA, and would in any case be exempt from disclosure.

By letter dated December 9, 2008, the Secretary of the Board informed the plaintiff of its decision to grant in part and deny in part the Loan Request, and directed the plaintiff to publicly available information regarding the DW, TAF and the SCLFs. Thro Decl., Exh. 5.

In response to the Bear Request, Board staff reviewed a comprehensive electronic document repository containing the bulk of Board records relating to JPMC's acquisition of the Bear Stearns Cos., and the Board's authorization of the Bear Stearns Loan. Thro Decl., ¶¶ 23-25. Staff determined that the repository contained no transaction-specific documents regarding securities posted as collateral for the Bear Stearns Loan responsive to the Bear Request. In addition, staff interviewed staff members in the Board's divisions most likely to have responsive records and confirmed that they did not have any records responsive to the Bear Request. Thro Decl., ¶ 26.

Staff conferred with staff of the FRBNY and determined that documents responsive to the Bear Request were obtained by, and are in the possession of, the FRBNY, which extended the Bear Stearns Loan and administers the Loan on an ongoing basis. Thro Decl., ¶ 27; Declaration of Helen E. Mucciolo, executed March 3, 2009 ("Mucciolo Decl."), ¶¶ 5-8. Staff determined that no Board staff members had obtained copies of these FRBNY records or used them in performing any Board function. Thro Decl., ¶ 28. After careful review and discussion

with Board and FRBNY staff, Board staff determined that responsive documents at the FRBNY were not "agency records" subject to FOIA. Thro Decl., ¶¶ 27-28.

By letter dated September 30, 2008, the Secretary of the Board informed the plaintiff that staff had searched Board records and made suitable inquiries, but found no records responsive to the Bear Request. Thro Decl., ¶ 29 and Exh. 7. By letter dated October 14, 2008, the plaintiff appealed the Secretary's denial of the Bear Request, and by letter dated November 7, 2008, the Board denied plaintiff's administrative appeal. Thro Decl., ¶¶ 30-31 and Exhs. 8 and 9.

On November 7, 2008, plaintiff filed its Complaint seeking declaratory judgment that it was entitled to records sought in the Loan Request. On November 25, 2008, plaintiff filed its Amended and Supplemental Complaint for Declaratory Judgment and Injunctive Relief ("Amended Complaint") adding a request for judgment that it is entitled to records sought in the Bear Request.

**ARGUMENT**

**A.    SUMMARY OF ARGUMENT**

As the <u>Vaughn</u> Index and attached declarations show, the Board conducted an adequate search in response to the Loan Request and the Bear Request. The Board provided two pages of non-exempt records, with non-responsive material redacted, to the plaintiff pursuant to the Loan Request, and properly withheld 231 full pages of documents under FOIA Exemptions 4 and 5. The Board uncovered no Board records responsive to the Bear Request. FRBNY documents responsive to the Loan Request and the Bear Request are not "Board records" subject to FOIA. Because the Board did not "(1) 'improperly' (2) 'withh[o]ld' (3) 'agency records,'" there is no remedy available for the plaintiff under FOIA and the Court should enter summary judgment in

favor of the Board.  <u>Grand Central Partnership</u> v. <u>Cuomo</u>, 166 F.3d 473, 478 (2d Cir. 1999)

(quoting <u>U.S. Dep't of Justice</u> v. <u>Tax Analysts</u>, 492 U.S. 136, 142 (1989)).

**B.      SUMMARY JUDGMENT STANDARD IN FOIA CASES**

Summary judgment is generally granted when there is no genuine issue of material fact

and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Celotex</u>

<u>Corp</u>. v. <u>Catrett</u>, 477 U.S. 317, 330 (1986).  "Summary judgment is the preferred procedural

vehicle for resolving FOIA disputes."  <u>Amnesty International USA</u> v. <u>CIA</u>, 2008 U.S. Dist

LEXIS 47882 at *24 (S.D.N.Y., June 19, 2008) (Preska, J.) (citing <u>Evans</u> v. <u>U.S. Office of</u>

<u>Personnel Mgmt.</u>, 276 F. Supp. 2d 34, 37 (D.D.C. 2003)).  The agency has the burden of proof

on all material issues related to the merits of any claimed FOIA exemptions.  5 U.S.C.

§ 552(a)(4)(B).  The Court exercises <u>de novo</u> review over FOIA matters.  <u>Id</u>; <u>Halpern</u> v. <u>FBI</u>, 181

F.3d 279, 287-88 (2d Cir. 1999).  On a motion for summary judgment in a FOIA case, "the

defending agency has the burden of showing that its search was adequate and that any withheld

documents fall within an exemption to the FOIA."  <u>Carney</u> v. <u>U.S. Dep't of Justice</u>, 19 F.3d 807,

812 (2d Cir.), <u>cert</u>. <u>denied</u>, 513 U.S. 823 (1994); <u>Amnesty International</u>, <u>supra</u>, 2008 U.S. Dist.

LEXIS 47882 at *24.

In making this showing, "the agency may rely on declarations 'indicating that the agency

has conducted a thorough search and giving reasonably detailed explanations' for its non-

disclosure."  <u>Amnesty International</u>, <u>supra</u>, 2008 U.S. Dist. LEXIS 47882 at **24-25 (quoting

<u>Maynard</u> v. <u>CIA</u>, 986 F.2d 547, 560 (1st Cir. 1993)).  A "'satisfactory agency affidavit should, at

a minimum, describe in reasonable detail the scope and method by which the search was

conducted' and should 'describe at least generally the structure of the agency's file system which

makes further search difficult.'"  Id. at *25 (quoting Maynard, supra, 986 F.2d at 559-60)).  "A government agency's FOIA affidavits are 'accorded a presumption of good faith.'"  Carney, supra, 19 F.3d at 812 (quoting Safecard Services, Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991)).  If the agency's submissions are adequate, discovery relating to the agency's search and the claimed exemptions is generally unnecessary.  Wood v. FBI, 432 F.3d 78, 85 (2d Cir. 2005).

Once the agency satisfies its burden, the burden shifts to the plaintiff to "'make a showing of bad faith sufficient to impugn the affidavits,'" Amnesty International, supra, 2008 U.S. Dist. LEXIS 47882 at *25 (quoting Triestman v. U.S. Dep't of Justice, 878 F. Supp. 667, 672 (S.D.N.Y. 1995)), or to argue that the claimed exemptions should not apply.  Ferguson v. FBI, 83 F.3d 41, 43 (2d Cir. 1996); Carney, supra, 19 F.3d at 812.  The opposing party "must submit 'tangible evidence that an exemption claimed by the agency should not apply.'"  Inner City Press/Community on the Move v. Board of Governors, 1998 U.S. Dist. LEXIS 15333 at *14 (S.D.N.Y.,  Sept. 30, 1998), aff'd, 182 F.3d 900 (2d Cir. 1999) (quoting Carney, supra, 19 F.3d at 812).  The plaintiff "cannot rely upon 'mere speculation' that responsive documents have not been produced."  Id. at *9 (quoting Carney, supra, 19 F.3d at 812).  If the plaintiff fails to make the required showing, summary judgment should be awarded in favor of the agency.  Ferguson, supra, 83 F.3d at 43; Carney, supra, 19 F.3d at 812.

## C.  THE BOARD CONDUCTED AN ADEQUATE SEARCH

### 1)  The Applicable Legal Standard

In responding to a FOIA request, an agency is under a duty to conduct a reasonable search for responsive records.  Oglesby v. U.S. Dep't of the Army, 920 F.2d 57, 68 (D.C. Cir. 1990).  If an agency demonstrates that it has conducted a reasonable search, "it has fulfilled its

obligations under FOIA and is entitled to summary judgment on this issue."  Garcia v. U.S.

Dep't of Justice, 181 F. Supp. 2d 356, 366 (S.D.N.Y. 2002).

"A search will be considered adequate if it was 'reasonably calculated to uncover all

relevant documents.'"  Amnesty International, supra, 2008 U.S. Dist. LEXIS 47882 at *26

(quoting Truitt v. U.S. Dep't of State, 897 F.2d 540, 542 (D.C. Cir. 1990)).  An agency "is not

expected to take extraordinary measures to find the requested records, but only to conduct a

search reasonably designed to identify and locate responsive documents."  Garcia, supra, 181 F.

Supp. 2d at 368.  An agency has no obligation to search for documents that are outside of its

possession, custody or control.  Jones-Edwards v. NSA, 196 Fed. Appx. 36, 38 (2d Cir. 2006)

(unpublished).  The adequacy of the search is "dependent upon the circumstances of the case."

Truitt, supra, 897 F.2d at 542.  "Speculation that other documents exist, without more, 'does not

undermine the finding that the agency conducted a reasonable search.'"  Garcia, supra, 181 F.

Supp. 2d at 366 (quoting Safecard Servs., supra, 926 F.2d at 1201).

### 2) The Board Conducted an Adequate Search in Response to the Loan Request

Here, as set forth in the attached Declaration of Alison M. Thro, the Board attorney

responsible for supervising the search, the Board conducted an adequate search for records

responsive to the Loan Request.  See Garcia, supra, 181 F. Supp. 2d at 368 ("[a]n affidavit from

an agency employee responsible for supervising a FOIA search is all that is needed").  Ms. Thro,

who has been responsible for supervising the processing of FOIA requests at the Board for five

years, and Board staff members acting under her direction, contacted employees in the Board's

two divisions most likely to have responsive documents.  Thro Decl., ¶¶ 3, 7, 8, 17, 18.  In

particular, Ms. Thro contacted staff members in Monetary Affairs ("MA"), the division that

supports the Board in the conduct of domestic monetary policy. Thro Decl., ¶ 8. Ms. Thro

reasonably concluded that MA would be one of two divisions most likely to have responsive

information because of its role in compiling data and analysis relating to the DW, TAF and the

SCLFs. Id. Ms. Thro spoke with seven individuals in MA, including the division director,

deputy director, senior associate director and deputy associate director, who she concluded were

most likely to have responsive information, or to know where it would be located. Id. She

provided them with copies of the Loan Request, and asked if they, or anyone on their staffs, had

responsive information. Thro Decl., ¶ 9.

As a result of these discussions, Ms. Thro learned that because the Board itself does not

administer the TAF, TSLF, PDCF or DW (those facilities are administered by the Federal

Reserve Banks), MA had very little specific, transaction-level information responsive to the

Loan Request. Thro Decl., ¶ 10; Madigan Decl. ¶¶ 11-12. Rather, the majority of information in

MA consisted of high level, aggregate data and statistics compiled for use by the Board and

Board staff in formulating monetary policy. Thro Decl., ¶ 10. Ms. Thro determined that one

MA staff member received daily data feeds from the Federal Reserve Banks relating to the DW,

TAF, PDCF and TSLF that were used to generate a daily Primary, Secondary and Other Credit

Extensions Outstanding by Remaining Term report (the "Remaining Term Report"). Thro Decl.,

¶¶ 11, 14 and Exh. 4. These Reports contained limited information responsive in part to item 7

of the Loan Request, including the names of some borrowers at the DW and SCLFs, originating

Federal Reserve district, individual loan amounts, the specific credit facility, and the origination

and maturity date (the term) of some loans. Id.; Madigan Decl., ¶ 13. Although much of the

information on the Reports was carried forward from day to day, and was therefore redundant,

Ms. Thro determined that the Board had 231 pages of responsive information, which were withheld in full under exemptions 4 and 5. Thro Decl., ¶¶ 11, 13. With the exception of these Reports, MA staff did not have specific transaction-level information regarding securities posted between April 4 and May 20, 2008 as collateral for the DW, TAF, PDCF or TSLF. Thro Decl., ¶ 10.

One MA staff member had an e-mail that identified an external firm from which the Federal Reserve Banks purchase pricing data that they review when valuing securities eligible to serve as collateral for DW and TAF loans. Thro Decl., ¶ 15. This document was responsive to item 11 of the Loan Request, and not covered by any FOIA exemption, and was released to the plaintiff. Id.

Through her discussions with MA staff, Ms. Thro learned that the Board's division of Reserve Bank Operations and Payment Systems ("RBOPS"), which oversees the Federal Reserve Banks' provision of financial services to depository institutions, might have responsive information. Thro Decl., ¶ 17. Ms. Thro contacted six staff members in RBOPS who she determined were the most likely to have responsive information, or to know where it would be located. Id. Ms. Thro reviewed certain high level information provided by one staff member, and concluded that it was not responsive, uncovered an e-mail responsive to item 11 of the Loan Request, which was provided (with non-responsive information redacted) to the plaintiff, concluded that another RBOPS staff member had copies of the Remaining Term Reports, which Ms. Thro had determined to be exempt, as set forth above, and that no other RBOPS staff member had detailed, transaction-level information of the type requested by the plaintiff. Id.

Because Ms. Thro contacted the thirteen Board staff members in the two divisions most likely to have responsive information, or to know where responsive information might be located, reviewed the Loan Request with them, and reviewed the documents they provided, her search was "'reasonably calculated to uncover all relevant documents,'" and was adequate for FOIA purposes. See Amnesty International, supra, 2008 U.S. Dist. LEXIS 47882 at *26 (quoting Truitt, supra, 897 F.2d at 542).

Ms. Thro asked individuals in MA if there were other individuals at the Board who might have information responsive to the Loan Request, and learned that MA and RBOPS were the only divisions reasonably likely to have responsive documents, as those are the two divisions responsible for overseeing the Federal Reserve Banks, which administer the DW, TAF, PDCF and TSLF, and for preparing data relating to those credit facilities. Thro Decl., ¶¶ 8, 17-18. As a result, Ms. Thro concluded that no other divisions at the Board were reasonably likely to have information responsive to the Loan Request, and opted not to search other divisions. Thro Decl., ¶ 18. This decision was reasonable under FOIA. Cuomo, supra, 166 F.3d at 489 (agency acted reasonably by searching offices most likely to contain responsive documents); Amnesty International, supra, 2008 U.S. Dist. LEXIS 47882 at *34 (upholding agency decision not to search offices unlikely to possess responsive records because "FOIA does not demand a search that would be futile").

Through her discussions with MA and RBOPS staff members, Ms. Thro learned that documents responsive to the Loan Request were more likely in the possession of the FRBNY, which (along with the 11 other Reserve Banks) administers the DW and TAF and which is solely responsible for operating the TSLF and PDCF. Thro Decl., ¶ 20; McLaughlin Decl., ¶¶ 5, 10,

15; Logan Decl., ¶ 15.  As described more fully at pp. 34-47, <u>infra</u>, Ms. Thro reasonably

concluded, with the concurrence of her supervisors, that responsive documents at the FRBNY

were not Board records subject to FOIA under the Board's regulations, 12 C.F.R.

§ 261.2(i)(1)(i), and that no Board staff member had obtained, reviewed or relied upon these

documents in performing any Board function.  Thro Decl., ¶¶ 20-21.  The Board's decision not

to include the FRBNY documents in the scope of its search was reasonable as an agency has no

FOIA obligation to search records outside of its possession or control.  <u>Jones-Edwards</u>, <u>supra</u>,

196 Fed. Appx. at 38 ("[a]n agency is not obligated to conduct a search of records outside its

possession or control").

### 3)  The Board Conducted an Adequate Search in Response to the Bear Request

Similarly, it is apparent from the Thro Decl. that the Board conducted an adequate search

in response to the Bear Request.  The Bear Request sought records reflecting or concerning the

portfolio of securities (listed on a security-by-security basis, with CUSIP numbers if available),

supporting the FRBNY's extension of the Bear Stearns Loan.  Thro Decl., ¶ 22 and Exh. 6.  The

Board received approximately 23 FOIA requests, and additional Congressional requests, for

information related to JPMC's acquisition of Bear Stearns and the Bear Stearns Loan.  Thro

Decl., ¶ 23.  Some of these requests, like the Bear Request, sought information relating to

securities posted as collateral for the Bear Stearns Loan, and others sought information related to

the Board's decision to authorize the FRBNY to extend the Loan.  <u>Id</u>.  Ms. Thro, working with

other attorneys from the Legal Division, contacted approximately 80 Board staff members from

seven divisions and asked them to provide any information relating to any aspect of JPMC's

acquisition of Bear Stearns or the Bear Stearns Loan, which documents were placed into an

electronic document repository at the Board.  Thro Decl., ¶ 24.  It was Ms. Thro's reasonable

belief that the resulting electronic repository, containing over 28,000 pages, captured all Board

documents responsive to any FOIA request for information relating to the JPMC/Bear Stearns

acquisition or the Bear Stearns Loan, and that any document responsive to the Bear Request

would be contained in the repository.  Thro Decl., ¶¶ 24-25.

Between August 2008 and September 2008, Ms. Thro personally searched the repository,

and reviewed hard copies of those documents, for records responsive to the Bear Request, and

reasonably concluded from the search that the Board had no responsive information.  Thro Decl.,

¶ 25.  In particular, Ms. Thro identified the 34 Board members and Board staff members most

likely to have documents of the type requested, and for each person, reviewed every page of

records they had submitted to the repository.  Id.  In addition to personally searching the

repository, Ms. Thro personally contacted two staff members in MA and the three staff members

in RBOPS who were most likely to have received responsive information, reviewed the Bear

Request with them, and confirmed that neither they nor members of their staff had responsive

information.  Thro Decl., ¶ 26.  Ms. Thro reasonably concluded that these were the only two

divisions likely to have responsive information as they were the divisions responsible for

Reserve Bank oversight (and therefore oversight of the Bear Stearns Loan) and for compiling

statistics relating to emergency lending facilities such as the Bear Stearns Loan.  Id.  Ms. Thro's

search, which included her extensive personal involvement in creation and review of documents

in the repository and interviews of Board staff likely to have responsive records, was reasonable

and adequate to meet the Board's burden under FOIA.  See Inner City Press, supra, 1998 U.S.

Dist. LEXIS 15333 at *9 ("[m]easured by any standard, FRB's search for responsive

documents," which included extensive personal investigation by Board attorney responsible for supervising processing of FOIA requests, was "thorough and adequate").

Ms. Thro's Decl., along with the Mucciolo Decl., make plain why the Board has no information responsive to the Bear Request: specific security-by-security information concerning the portfolio of securities posted as collateral for the Bear Stearns Loan is proprietary information of the FRBNY, which extended the Loan, and not Board information.  Thro Decl., ¶¶ 27-28; Mucciolo Decl., ¶¶ 6-8.  Ms. Thro consulted with FRBNY staff, who confirmed that responsive FRBNY records regarding the Bear Stearns Loan were not Board records subject to FOIA under the Board's regulation, 12 C.F.R. § 261.2(i)(1)(i).  Thro Decl., ¶¶ 27-28.  Ms. Thro confirmed with staff of MA and RBOPS, as well as FRBNY staff, that no Board staff member had obtained, reviewed or relied upon responsive FRBNY documents in performing any function for the Board.  Thro Decl., ¶ 28.  As these records were outside of the Board's possession or control, Ms. Thro reasonably decided that the Board was unable, and not obligated, to search them.  Jones-Edwards, supra, 196 Fed. Appx. at 38.  The Thro Decl., which is "reasonably detailed and reveal[s] that each of the [agency's] subdivisions undertook a diligent search for [responsive] documents,"  Carney, supra, 19 F.3d at 813, demonstrates that the Board conducted an adequate search in response to the Bear Request, and the Board is entitled to summary judgment on the issue.

**D.  THE BOARD PROPERLY WITHHELD LOAN INFORMATION ON INDIVIDUAL BORROWERS UNDER  EXEMPTIONS 4 AND 5 OF FOIA**

**1)  T**he **Applicable Exemption 4 Standard**

Exemption 4 is satisfied if a tripartite test is met: "(1) [t]he information [for which exemption is sought] must be a 'trade secret' or 'commercial or financial' in character...; (2) …

must be 'obtained from a person,' ... and (3) … must be 'privileged or confidential.'" <u>Inner City Press/Community on the Move</u> v. <u>Board of Governors</u>, 463 F.3d 239, 244 (2d Cir. 2006) (quoting <u>Nadler</u> v. <u>FDIC</u>, 92 F.3d 93, 95 (2d Cir. 1996) (quoting 5 U.S.C. § 552(b)(4)).

Here, there is no doubt that the 231 pages of Remaining Term Reports withheld in response to the Loan Request are "commercial or financial" in nature.  These documents include: (i) names of financial institutions that borrowed at the DW, TAF, PDCF or TSLF; (ii) the type of institution (e.g., large commercial bank, small commercial bank); (iii) the originating Federal Reserve district; (iv) the type of credit extended; (v) origination and maturity dates (the "term") of the loans; and (vi) individual loan amounts.  Thro Decl., ¶¶ 11, 12, 14 and Exh. 4.  This information is both "commercial" and "financial" in nature for purposes of Exemption 4.  <u>See</u> <u>American Airlines, Inc.</u> v. <u>National Mediation Board</u>, 588 F.2d 863, 870 (2d Cir. 1978) (broadly defining commercial in Exemption 4 to mean "pertaining or relating to or dealing with commerce").

The second prong of the tripartite test also is easily satisfied.  Board staff obtained information used to prepare the Remaining Term Reports from the Federal Reserve Banks, which in turn obtained and derived that information from records of transactions with institutions borrowing at the DW, TAF or SCLFs.  Thro Decl., ¶ 11 and Exh. 4.  The Federal Reserve Banks and the borrowers are "person[s]" within the meaning of FOIA Exemption 4.  5 U.S.C. § 551(2) (defining "person" to include "an individual, partnership, corporation, association, or public or private organization other than an agency").

Accordingly, the issue for the Court is whether the information on individual borrowers is "privileged or confidential" under the third prong of the tripartite test.

In determining whether a particular document is "privileged or confidential," the Second Circuit uses a two-part test originally formulated by the D.C. Circuit in National Parks Conservation Ass'n v. Morton, 498 F.2d 765 (D.C. Cir. 1974) ("National Parks").  Inner City Press, supra, 463 F.3d at 244; see United Technologies Corp. v. FAA, 102 F.3d 688, 692 (2d Cir. 1996), cert. denied, 521 U.S. 1103 (1997).  Under the National Parks test:

> information is confidential for the purposes of Exemption 4 if its disclosure would have the effect either: '(1) of impairing the government's ability to obtain information - necessary information - in the future; or (2) of causing substantial harm to the competitive position of the person from whom the information was obtained.'

Inner City Press, supra, 463 F.3d at 244 (quoting Continental Stock Transfer & Trust Co. v. SEC, 566 F.2d 373, 375 (2d Cir. 1977) (per curiam)).

If either prong of the alternative National Parks test is satisfied, the information is "privileged or confidential," within the meaning of Exemption 4.  As set forth below, public disclosure of the 231 pages of Remaining Term Reports is likely to cause substantial harm to the competitive position of the persons from whom the information was obtained – namely, borrowers at the DW, TAF or SCLFs.  Thus, the Board properly withheld the 231 pages under the second prong of the National Parks test.

In addition, cases following National Parks have identified a so-called "third prong" test that looks to effectiveness of government operations to authorize withholding.  As discussed, infra, pp. 23-30, the Remaining Term Reports were also properly withheld under this prong.

**(a)** **Disclosure of Loan Information on Individual Borrowers is Likely to Cause Substantial Competitive Harm to Borrowers at the DW, TAF, PDCF or TSLF**

Here, the second prong of <u>National Parks</u> is satisfied as disclosure of the Remaining Term Reports likely would cause substantial competitive harm to borrowers at the DW, TAF, PDCF or TSLF.  To meet the second prong of the <u>National Parks</u> test, it is not necessary to show actual competitive harm.  Rather, "[a]ctual competition and the likelihood of substantial competitive injury is all that need be shown."  <u>Gulf & Western Industries, Inc.</u> v. <u>United States</u>, 615 F.2d 527, 530 (D.C. Cir. 1980) (citing <u>National Parks & Conservation Ass'n</u> v. <u>Kleppe</u>, 547 F.2d 673, 679 (D.C. Cir. 1976) ("<u>National Parks II</u>")).  The court "'need not conduct a sophisticated economic analysis of the likely effects of disclosure.'"  <u>Utah</u> v. <u>U.S. Dep't of the Interior</u>, 256 F.3d 967, 970 (10th Cir. 2001) (quoting <u>Public Citizen Health Research Group</u> v. <u>FDA</u>, 704 F.2d 1280, 1291 (D.C. Cir. 1983)); <u>accord</u> <u>Inner City Press</u> v. <u>Board of Governors</u>, 380 F. Supp. 2d 211, 219 (S.D.N.Y. 2005), <u>aff'd</u> <u>in</u> <u>part</u>, <u>remanded</u> <u>in</u> <u>part</u> <u>on</u> <u>other</u> <u>gnds</u>, 463 F.3d 239 (2d Cir. 2006).  Rather, "evidence demonstrating the existence of potential economic harm is sufficient."  <u>Id</u>.

As set forth in the attached Madigan Decl., ¶ 17, and McLaughlin Decl., ¶ 20, borrowers at the DW and the TAF face competition in the market for retail and commercial banking services from other domestic and international institutions.[2]  Primary dealers[3] eligible to borrow

---

[2]  Because of the Board's unique role in overseeing Reserve Bank lending facilities and stabilizing the financial markets, and the FRBNY's role in administering the DW, TAF and SCLFs, and serving as a lender of last resort to financial institutions, the Board's and FRBNY's declarations attesting to the harm to borrowers through disclosure of details regarding their borrowing is sufficient to show the likelihood of competitive harm for exemption 4 purposes. <u>Lion Raisins, Inc.</u> v. <u>USDA</u>, 354 F.3d 1072, 1079 (9th Cir. 2004) ("[c]ourts can rely solely on government affidavits so long as the affiants are knowledgeable about the information sought

at the PDCF and TSLF face actual competition in the market for securities brokerage services from other primary dealers and domestic and international securities broker dealers. McLaughlin Decl., ¶ 25; Logan Decl., ¶ 21. These institutions are likely to suffer substantial competitive harm if information that they borrowed at the DW, TAF or SCLFs, or information regarding the size or term of loans made in specific Federal Reserve districts, is publicly disclosed.

These competitive harms arise from several sources. First, borrowers are likely to suffer harm if financial analysts, customers or competitors of the financial institutions perceive the institution's borrowing at the DW, TAF or SCLFs as a sign that the institution is experiencing liquidity strains or capital shortfalls. This "stigma" from borrowing at the DW stems from the fact that the DW serves as a back-up source of liquidity for depository institutions that may not have access to ordinary, market sources of funding on a short-term basis. Madigan Decl., ¶ 18; McLaughlin Decl., ¶¶ 5, 19. Institutions may experience short-term liquidity shortfalls for a number of reasons, some of which do not indicate financial instability. For example, a depository institution may be at the DW to obtain late-day funds as the result of routine developments such as an unexpectedly large loan request from a customer, or a runoff in liabilities as a major depositor makes payments to third parties. Madigan Decl., ¶ 18. Borrowers might also experience a late-day shortage of funds because of operational problems that impeded funds receipts or clerical errors that understated its funding position for the day. McLaughlin Decl., ¶ 20.

---

and the affidavits are detailed enough to allow the court to make an independent assessment of the government's claims").

[3] Primary dealers are designated banks and securities broker dealers with whom the FRBNY trades U.S. government securities as counterparties in executing open market operations. McLaughlin Decl., ¶ 10.

However, because the Reserve Banks are the "lenders of last resort," the fact that an institution is borrowing at the DW can fuel market speculation and rumors that the entity's liquidity strains stem from a financial problem at the institution that is not known by the public at large. Madigan Decl., ¶ 18; McLaughlin Decl., ¶ 20.

As a result of this "stigma," which also applies to borrowers at the TAF, PDCF and TSLF, Madigan Decl., ¶ 21; McLaughlin Decl., ¶ 25, Logan Decl., ¶ 21, there is an understanding among the Reserve Banks, borrowers at the DW, TAF or SCLFs, and clearing banks that hold collateral on behalf of the FRBNY, that information regarding their borrowing -- including the names of borrowers, information regarding collateral pledged for specific loans, the terms, rates or documentation for specific loans, the valuation of specific loans vis-à-vis the collateral pledged (the "haircut"), or other information that could lead to the identification of borrowers -- will not be disclosed publicly by the borrower or the FRBNY. McLaughlin Decl., ¶ 18; Logan Decl, ¶ 20. Likewise, the Board, to the extent that it has this information, does not publicly disclose it. Madigan Decl., ¶ 16. Indeed, concern about the "stigma" associated with DW borrowing is so acute that the Federal Reserve Banks not only keep confidential the fact of an institution's borrowing, but even an institution's *eligibility* to obtain primary or secondary DW credit. Madigan Decl., ¶ 23. This is so because primary credit, offered at a lower interest rate than secondary credit, McLaughlin Decl., ¶ 7, is only available to institutions in generally sound financial condition. Id. The fact that a depository institution is not eligible for primary credit therefore reveals non-public information regarding its financial condition that could lead to

the competitive harms described herein.  Id.  In fact, neither the Board nor the Reserve Banks

routinely share information regarding an institution's DW borrowing with other regulators.[4]  Id.

A depository institution's or primary dealer's competitive position can be severely

harmed if the market becomes aware that it obtained funds at the DW, TAF, PDCF or TSLF.

McLaughlin Decl., ¶¶ 20-21, 25; Madigan Decl., ¶¶ 17, 21; Logan Decl., ¶¶ 21, 22.  A rumor that

a financial institution is experiencing liquidity strains could rapidly lead to a loss of public

confidence in the institution, a sudden outflow of deposits (a "run"), a loss of confidence by

market analysts, a drop in the institution's stock price, a withdrawal of market sources of

funding, acceleration of existing loans to the institution, and, in extreme cases, closure of the

institution.  Madigan Decl., ¶ 17; McLaughlin Decl., ¶ 21.  Any of these events is likely to put

the institution in a weakened position vis-à-vis its competitors, likely resulting in substantial

competitive harm to its position in the market for retail or commercial banking or securities

brokerage services.  Id.  The likelihood of competitive harm intensifies during periods of

financial distress, such as the current one, when market participants show heightened concern

that banks or dealers could be in weakened financial condition.  Madigan Decl., ¶ 19.

The harm resulting from disclosure of an institution's DW, TAF or SCLF borrowing is

not simply a theoretical possibility, but has been demonstrated on a number of occasions.  For

example, rumors that Citibank might be borrowing at the DW in the early 1990s reportedly

sparked runs at some of its offices in Asia.  Madigan Decl., ¶ 22.

Even the release of the dollar amounts of individual loans, without the borrowers' name,

could contribute to financial institutions' reluctance to utilize Reserve Bank liquidity facilities.

---

[4]  Regulators may, however, obtain information about an institution's borrowing history when
investigating potential supervisory problems.  Madigan Decl., ¶ 23.

Madigan Decl., ¶ 24.  If the amounts borrowed are large, and the Federal Reserve Bank originating the loan is identified, market participants may speculate that the borrower must be one of the few large banks in that district.  Id.  For very large loans, speculation may center around one of a handful of institutions in the in the country eligible to take out such a large loan.  Id.  This speculation would discourage large banks from utilizing the Federal Reserve's facilities and potentially force large banks publicly to state that they are not borrowing at the DW, TAF or SCLFs.  Id.  These statements may themselves fuel market rumors regarding an institution's liquidity.  Id.  Speculation about the identity of borrowers poses similar problems to actual identification of borrowers, and a greater number of institutions could adversely be affected.  Id.

In addition to likely competitive harm resulting from a loss of public confidence, a financial institution or primary dealer needing access to short-term liquidity, but fearing a market and customer backlash, may avoid turning to the DW, TAF or SCLFs at virtually any cost.  Madigan Decl., ¶¶ 19-20.  These institutions' unwillingness to access Reserve Bank funding facilities could result in the institution's failure to meet short-term funding needs, which could quickly lead to its demise.  Madigan Decl., ¶ 20.  Even if the institution managed to meet its funding needs, it would be at a disadvantage vis-à-vis its competitors because it could be forced to pay very high rates to borrow and might be limited in its ability to issue longer-term debt.  Madigan Decl., ¶ 20.  Potential customers would tend to direct their business to other firms that were thought to be in better financial condition, resulting in substantial competitive harm to the institution that failed to borrow.  Id.  Thus, depository institutions' unwillingness to access the Reserve Bank funding facilities for fear of public disclosure is likely to result in substantial

competitive harm by leaving the institution in a weakened financial condition and making it a less viable competitor in the market for commercial and retail banking services.  Id.

Because of the likelihood of substantial competitive harm, the Board properly withheld the Remaining Term Reports under the second prong of National Parks, and is entitled to summary judgment on the issue.

> **(b) The Loan Information on Individual Borrowers was Properly Withheld under the Third Prong of National Parks Because Disclosure Would Impair the Board's Ability to Provide Liquidity Through the DW, TAF and SCLFs, and to Promote Maximum Employment, Stable Prices, and Moderate Long-Term Interest Rates, as Required by Statute**

In addition to the likelihood of substantial competitive harm, the Board properly withheld the 231 pages under the so-called "third prong" of National Parks, which asks whether "public disclosure of the requested commercial or financial information will harm an identifiable private or governmental interest which Congress sought to protect by enacting exemption 4 of the FOIA."  9 to 5 Org. for Women Office Workers v. Board of Governors, 721 F.2d 1, 10 (1st Cir. 1983).  In enunciating this third prong of Exemption 4, the First Circuit noted "the 'various exemptions included in the [FOIA] serve two interests – that of the government in efficient operation and that of persons supplying certain kinds of information in maintaining its secrecy.'"[5]  Id. (quoting National Parks, supra, 498 F.2d at 767).  The D.C. Circuit has upheld the First Circuit's view, finding "the two interests identified in the National Parks test are not exclusive" and "exemption [4] also protects a governmental interest in administrative efficiency

---

[5] The First Circuit also relied on footnote 17 in National Parks, in which the D.C. Circuit cited FOIA's legislative history to suggest that "the problems of compliance and program effectiveness [are] governmental interests possibly served by this exemption." National Parks, supra, 498 F.2d at 770 n.17; 9 to 5, supra, 721 F.2d at 9.

and effectiveness." <u>Critical Mass Energy Project</u> v. <u>NRC</u>, 975 F.2d 871, 879 (D.C. Cir. 1992) (en banc), <u>cert</u>. <u>denied</u>, 507 U.S. 984 (1993).

A number of courts, including courts in the Southern District of New York, have adopted this so-called program effectiveness analysis to uphold agencies' withholding of information where disclosure would impair the agency's ability to carry out its governmental mandate. For example, in <u>Nadler</u> v. <u>FDIC</u>, 899 F. Supp. 158, 161-63 (S.D.N.Y. 1995), <u>aff'd</u> <u>on</u> <u>other</u> <u>gnds</u>, 92 F.3d 93 (2d Cir. 1996),[6] the district court upheld the FDIC's non-disclosure of a joint venture agreement the agency obtained when it took over a failed bank, finding that disclosure could "hurt the venture's prospects for financial success," which would "reduce returns to the FDIC," and "interfere significantly with the FDIC's receivership program, which aims to maximize profits on the assets acquired from failed banks." <u>Id</u>. at 162. The <u>Nadler</u> court noted that, to invoke the program effectiveness prong, agencies "must identify specific dangers that disclosure will pose to the fulfillment of their statutory responsibilities …[a]nd the burden of persuasion rests, as always, on the agency." <u>Id</u>. Likewise, in <u>Africa Fund</u> v. <u>Mosbacher</u>, 1993 U.S. Dist. LEXIS 7044 at *21 (S.D.N.Y. 1993), a court in the Southern District of New York upheld the Department of Commerce's withholding of documents relating to export license applications based on the agency's unrebutted evidence that disclosure "would interfere with the export control system."

A number of district courts have upheld the non-disclosure of information pertaining to loan agreements, the purchase of Treasury bonds or similar financial transactions with the government, where disclosure would hamper the effectiveness of the government's efforts to

---

[6] The Second Circuit affirmed on the basis of competitive harm to the FDIC (as receiver for a failed bank), and did not reach the "program effectiveness" exemption. 92 F.3d at 96.

stabilize the economy or promote economic growth.  For example, in <u>Comstock Int'l (U.S.A.),</u>
<u>Inc.</u> v. <u>Export-Import Bank</u>, 464 F. Supp. 804, 808 (D.D.C. 1979), relied upon by the district
court in <u>Nadler</u>, <u>supra</u>, 899 F. Supp. at 161-62, the court found that there was no risk of
impairing the Eximbank's access to information in loan agreements, because, as the lender, it
was a party to the agreements.  Nevertheless, the court found documents relating to the loans
exempt under the third prong of <u>National Parks</u> because "disclosure would significantly impair
[the agency's] ability to promote United States exports," could cause potential loan applicants to
"seek financing outside the United States because of their unwillingness to subject themselves to
the possible risk of disclosure," and would "discourage commercial bank participation with
Eximbank on joint loan agreements, thus impairing Eximbank's ability to control overall
financing transactions."  <u>Comstock</u>, <u>supra</u>, 464 F. Supp. at 808.  <u>See</u> <u>also</u> <u>Judicial Watch, Inc.</u> v.
<u>Export-Import Bank</u>, 108 F. Supp. 2d 19, 30 (D.D.C. 2000) (upholding Eximbank's withholding
of information regarding applications for export insurance where disclosure "would impair its
ability to fulfill its statutory purpose, which is to foster domestic economic growth by supporting
United States export transactions that are too risky for private capital financing").

  In <u>Clarke</u> v. <u>U.S. Dep't of Treasury</u>, 1986 U.S. Dist. LEXIS 29989 (E.D. Pa. Jan. 28,
1986), the court found that the U.S. Treasury properly withheld the names and addresses of
institutional owners of Flower Bonds (a form of U.S. Treasury bond), including the dollar
amount, coupon, and maturity date for each owner, under the third prong.  The agency argued
that release of the information would "violate the purchasers' expectations of confidentiality and
harm the Treasury Department's ability to issue bonds in the future."  <u>Id</u>. at *2.  The court
agreed, relying on the uncontroverted affidavit of a Treasury official stating that "releasing the

requested information would harm the national interest because investors would be less likely to purchase government bonds in the future if they knew the details of their purchases would be subject to public disclosure." Id. at *5. The court cited the official's statements that "trading and investment strategies in the Treasury market … depend upon confidentiality … [and] [a]ny market participant with access to data concerning the positions of other participants would have a significant competitive advantage." Id. at *7.

Here, disclosure of borrower names, loan amounts, and terms of individual loans in the Remaining Term Reports would impair the Board's ability -- through Federal Reserve Bank funding facilities -- to address strains in financial markets and to effectively pursue its statutory objectives. See Madigan Decl, ¶¶ 14 and 26-30; McLaughlin Decl. ¶¶ 23, 26; Logan Decl, ¶ 26. In particular, public disclosure of information in the Remaining Term Reports would impair: (i) the Board's ability to carry out its statutory responsibility "to promote effectively the goals of maximum employment, stable prices, and moderate long-term interest rates" specified in section 2A of the Federal Reserve Act, as amended (the "FRA"), 12 U.S.C. § 225a; (ii) its ability effectively to utilize its authority under section 13(3) of the FRA to permit lending by the Reserve Banks to individuals, partnerships or corporations to address "unusual and exigent circumstances" in the domestic economy; and (iii) and its ability under section 10B and related sections of the FRA to utilize DW and TAF lending by the Reserve Banks as a safety valve in relieving liquidity strains for individual depository institutions and the banking system, and to complement open market operations in achieving the target federal funds rate.

First, the Board and the FOMC use monetary policy to carry out their statutory mandate under section 2A of the Federal Reserve Act "to promote effectively the goals of maximum

employment, stable prices and moderate long term interest rates." Madigan Decl., ¶ 27. Monetary policy is the process by which a government, generally through a central bank, affects the level of interest rates and the supply of money in pursuit of policy goals. Id. In the U.S., the FRBNY's open market desk conducts open market operations by buying and selling government securities to adjust the aggregate supply of reserve balances so as to achieve a target rate in the federal funds market (the market for unsecured overnight and term loans in which depository institutions and certain other participants trade deposit balances at the Federal Reserve). Id. DW lending complements open market operations by making Federal Reserve balances available to depository institutions when the aggregate supply of reserve balances in the market falls short of demand. Id. When the demand for reserve balances is high relative to the supply of such balances from other institutions, the federal funds rate tends to move higher and depository institutions then tend to borrow at the DW to obtain needed reserves, thereby reducing upward pressure on the federal funds rate. Id.

If institutions are unwilling to access the DW for fear of public disclosure, this "safety valve" role of the DW will be impaired and the Board's and FOMC's task under section 2A of achieving a desired level of short-term interest rates through open market operations would be greatly complicated. Id. The inability to achieve a desired level of short-term interest rates, in turn, adds to uncertainty in financial markets and makes it more difficult for the Board to achieve its statutory objectives under section 2A of maximum employment, stable prices and moderate long term interest rates. Id.; McLaughlin Decl., ¶ 23. Likewise, as described in the McLaughlin Decl, ¶ 24, and the Logan Decl., ¶ 27, public disclosure of details regarding specific collateral pledged at the DW, PDCF and TSLF, and the FRBNY's valuation of the collateral, could cause

the FRBNY to become a price setter in the market, thereby undermining the market mechanism and undermining the Reserve Bank's mission to promote market stability. As in <u>Judicial Watch</u>, <u>supra</u>, 108 F. Supp. at 30, where the court found loan agreements exempt under the third prong because disclosure would "impair [Eximbank's] ability to fulfill its statutory purpose, which is to foster domestic economic growth by supporting United States export transactions that that are too risky for private financing," the Remaining Term Reports are exempt because disclosure would impair the Board's ability to use the DW as in instrument of monetary policy to achieve a desired level of short-term interest rates and fulfill its statutory objectives under section 2A of the FRA.

Second, section 13(3) of the FRA, 12 U.S.C. § 343, allows the Board "to authorize any Federal reserve bank" to extend credit to "individual[s], partnership[s], or corporations" in "unusual and exigent circumstances," upon the affirmative vote of five members of the Board, if, in the judgment of the Reserve Bank, the individual, partnership or corporation "is unable to secure adequate credit accommodations from other banking institutions." <u>Id</u>. In these times of unprecedented stress in the U.S. financial markets, the Board has used its authority under section 13(3) to create back-up sources of liquidity, such as the PDCF and the TSLF, to ease tight credit conditions and support a resumption of sustainable economic growth. Madigan Decl., ¶ 7. The PDCF provides primary dealers with access to FRBNY funding during this period of liquidity strain, providing a back-up source of liquidity if market sources are unavailable and facilitating the continued functioning of the financial markets and supporting credit availability and overall economic activity. Madigan Decl., ¶ 9; McLaughlin Decl., ¶¶ 10, 26. Likewise, the TSLF promotes liquidity in the financing markets for Treasury and other collateral and fosters the

functioning of financial markets more generally, supports asset prices, and supports economic activity. Madigan Decl., ¶ 10; Logan Decl., ¶¶ 5, 24. If primary dealers are unwilling to access these facilities for fear that non-public information regarding the fact that they borrowed or details regarding their loans will be disclosed, the utility of these facilities in providing liquidity to individual institutions and the capital markets will be undermined. McLaughlin Decl., ¶ 26; Madigan Decl., ¶ 28; Logan Decl., ¶ 24. As a result, the Board's ability under section 13(3) to address "unusual and exigent circumstances" in the financial markets by authorizing the Reserve Banks to lend to individuals, partnerships or corporations will be impaired. Madigan Decl., ¶ 28.

Finally, as discussed, <u>infra</u>, pp. 42-43, the Board has statutory authority under section 10B and related sections of the FRA to oversee the Federal Reserve Banks' lending at the DW and TAF, and the Reserve Banks have statutory authority to lend at the DW. The DW functions as a safety valve in relieving pressures in the interbank funds market to alleviate liquidity strains in a depository institution and in the banking system as a whole. McLaughlin Decl., ¶ 5; Madigan Decl., ¶ 29. The DW helps to ensure the basic stability of the payment system by supplying liquidity during times of systemic stress. McLaughlin Decl., ¶ 5. In the Reserve Banks' role as "lender of last resort," McLaughlin Decl., ¶ 5, the DW serve as an emergency, back-up source of liquidity for institutions that may not have access to ordinary, market sources of funding. Madigan Decl., ¶ 18. Similarly, since 2007, the TAF has complemented the DW's role as a safety valve by providing term funding to depository institutions eligible for primary DW credit through an auction mechanism. Madigan Decl., ¶¶ 7, 8, 29. A reluctance of institutions to borrow at the DW and TAF because of confidentiality concerns would impair the Board's and Federal Reserve Banks' statutory function under section 10B and related provisions

of the FRA to act as a "lender of last resort," and to utilize DW and TAF lending as a safety valve providing liquidity to individual depository institutions and to the banking system as a whole. Madigan Decl., ¶¶ 29-30; McLaughlin Decl., ¶ 23.

As in <u>Clarke</u>, <u>supra</u>, 1986 U.S. Dist. LEXIS 29989 at * 5, where the court found that disclosure of confidential information provided by purchasers of government bonds would "harm the national interest because investors would be less likely to purchase government bonds in the future if they knew the details of their purchases would be subject to public disclosure," disclosure of the names of borrowers at the DW, TAF, TSLF and PDCF, loan amounts, and other information on the Remaining Term Reports would make depository institutions and primary dealers less likely to access these facilities, thereby impairing the Board's and Reserve Banks' ability to provide liquidity to individual institutions and to support the financial markets generally. Accordingly, the Board has met its burden of showing that "disclosure of the requested commercial or financial information will harm an identifiable private or governmental interest which the Congress sought to protect by enacting exemption 4," <u>9 to 5</u>, <u>supra</u>, 721 F.2d at 10, and is entitled to summary judgment under the third prong of <u>National Parks</u>.

### 2) The Board Properly Withheld Loan Information on Individual Borrowers Under FOIA Exemption 5

Exemption 5 of FOIA protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The Supreme Court has construed this language "to exempt those documents, and only those documents that are normally privileged in the civil discovery context." <u>NLRB</u> v. <u>Sears, Roebuck & Co.</u>, 421 U.S. 132, 149 (1975). The coverage of exemption 5 is broad, encompassing both statutory privileges and privileges commonly

recognized by case law, and is not limited to those privileges explicitly mentioned in FOIA's legislative history.  U.S. v. Weber Aircraft Corp., 465 U.S. 792, 800 (1984); see FTC v. Grolier, Inc., 462 U.S. 19, 26-27 (1983).

The Supreme Court has held that exemption 5 includes a privilege analogous to the qualified privilege for confidential commercial information available in civil discovery under Fed. R Civ. P. 26(c)(7).[7]  FOMC v. Merrill, 443 U.S. 340, 359 (1979).  Merrill involved the Federal Open Market Committee's ("FOMC's) current Domestic Policy Directives ("directives"), which summarize the economic and monetary background of the FOMC's monthly meeting and set forth the monetary policy to be followed in the month ahead.  At the time of the Merrill decision, the FOMC delayed public release of the directives until supplanted by another directive.  See 12 C.F.R. § 271.5 (1979).  In Merrill, the Supreme Court held the directives protected under the qualified privilege for confidential commercial information.  443 U.S. at 363.  In that case, the FOMC argued that premature release would make it difficult to implement gradual changes in monetary policy, because it would enable market participants to adjust their holdings of government securities in anticipation of purchases or sales by the government, making it more difficult for the agency gradually to change interest rates, and would give large investors, who could quickly process information in the directives, an unfair advantage over their smaller competitors.  443 U.S. at 348-49.

The Court found "the sensitivity of the commercial secrets involved, and the harm that would be inflicted upon the Government by premature disclosure, should continued to serve as

_____

[7]  Rule 26(c)(7) provides that, "for good cause shown," a district court may order "that a trade secret or other confidential research, development, or commercial information not be disclosed, or be disclosed only in a designated way."

relevant criteria in determining the applicability of this Exemption 5 privilege." Id. at 363. It concluded "if the Domestic Policy Directives contain sensitive information not otherwise available, and if immediate release of those Directives would significantly harm the Government's monetary functions or commercial interests, then a slight delay in publication such as that authorized by 12 C.F.R. § 271.5 would be permitted by Exemption 5." Id. at 363. On remand, the District Court found that immediate release of the directives would harm the government's monetary and commercial interests, and that the directives were exempt under Exemption 5. Merrill v. FOMC, 516 F. Supp. 1028, 1030-31 (D.D.C. 1981).

Subsequent cases have concluded that Exemption 5 "protects the government when it enters the marketplace as an ordinary buyer or seller." Government Land Bank v. GSA, 671 F.2d 663, 665 (1st Cir. 1982) (appraisal report for real property listed for sale by GSA protected under Exemption 5 until the property was sold); see also Hack v. Dep't of Energy, 538 F. Supp. 1098, 1104 (D.D.C. 1982) (DOE conceptual design reports exempt from disclosure under FOIA exemption 5 because premature release would jeopardize selection process for architectural engineering contracts).

Here, there can be little doubt that the Remaining Term Reports are "inter-agency or intra-agency memorandums or letters," under 5 U.S.C. § 552(b)(2) as they are prepared by Board staff using data supplied by the Federal Reserve Banks and distributed to Board staff (with copies to the FRBNY) for use in formulating monetary policy and for Reserve Bank supervision purposes. Madigan Decl., ¶ 13; Thro Decl., ¶ 11; see Merrill, supra, 443 U.S. at 352-53. Likewise, information in the Remaining Term Report is surely confidential, Madigan Decl., ¶ 16, Thro Decl., ¶ 11, and is commercial in nature, as it relates to loans by the Reserve Banks to

financial institutions and primary dealers.  <u>Merrill</u>, <u>supra</u>, 443 U.S. at 361 (information in the directives "is commercial in nature because it related to the buying and selling of securities on the open market").

Moreover, as in <u>Merrill</u>, the Remaining Term Reports "contain sensitive information not otherwise available, and … immediate release … would significantly harm the Government's monetary functions or commercial interests."  443 U.S. at 363.  As set forth, <u>supra</u>, pp. 26-27, in addition to providing liquidity to individual institutions, the Board uses the DW as an instrument of monetary policy to complement open market operations in achieving the target federal funds rate.  If information in the Remaining Term reports is publicly disclosed, and institutions are unwilling to access the DW, the DW's utility as an instrument of monetary policy would be reduced, Madigan Decl., ¶ 27, thereby harming the government's "monetary functions" within the meaning of <u>Merrill</u>.  As in <u>Merrill</u>, where premature release of the FOMC's directives would have made it difficult for the FOMC to implement gradual changes in monetary policy, 443 U.S. at 348, release of the Remaining Term Reports would make it more difficult for the Board to use the DW as a lever of monetary policy.  Madigan Decl., ¶ 27.  The Reports are therefore exempt under exemption 5.[8]

_____

[8]  Although the Board has no responsive collateral specific information regarding securities pledged as collateral for the TAF, PDCF or TSLF or the Bear Stearns Loan, Thro Decl., ¶¶ 10, 25-26, public release of such collateral-specific information "would significantly harm the Government's monetary functions or commercial interests" as set forth in the Madigan Decl., ¶ 25 and the Mucciolo Decl., ¶ 11.  <u>Merrill</u>, 443 U.S. at 363.  This information, if it were an "agency record" subject to FOIA, as the Board believes it is not, <u>see</u>, infra, pp. 34-47, also would be exempt under FOIA exemption 5.

### E. RESPONSIVE DOCUMENTS AT THE FRBNY ARE NOT BOARD RECORDS SUBJECT TO FOIA

Finally, as the Board informed the plaintiff in response to the Bear Request, and as is the case with the Loan Request, the Board has few records responsive to plaintiff's FOIA requests because the transaction-level documents plaintiff is seeking are more likely at the FRBNY which, along with the 11 other Federal Reserve Banks, administers the DW and TAF, which is responsible for operating the TSLF and PDCF, and which extended and administers the Bear Stearns Loan.[9] The Board -- a government agency -- oversees the Reserve Banks' lending activities, but is not itself a bank, does not make loans, and does not maintain or use transaction-level loan documentation in the performance of its agency functions. Because, as set forth below, responsive FRBNY documents are not "agency records" subject to FOIA,[10] the Board did not "improperly withhold" these documents, and the court lacks subject matter jurisdiction to order the Board to provide these documents to the plaintiff.

---

[9] See Thro Decl., ¶¶ 19-21, 27-28 and Exh. 7 at 1 n.1. Plaintiff has argued that documents at the FRBNY responsive to the Bear Request are Board records subject to FOIA. Amended Complaint, ¶¶ 41, 60.

[10] As set forth in the Secretary of the Board's September 30, 2008 letter and the Board's November 7, 2008 letter denying the Bear Request, it is the position of the Board and the FRBNY that, even if these documents are "Board records," they are nevertheless exempt under FOIA exemptions 4 and 5. Thro Decl. ¶¶ 21, 28 and Exh. 7 at 1 n.1 and Exh. 9 at 2-3. Because the documents have at all times been in the possession of the FRBNY, the Board is unable to prepare a Vaughn Index for these documents, and has only included declarations and argument supporting the application of exemptions 4 and 5 to these documents to the extent it has this information available. Should the Court conclude that these documents are subject to FOIA, the Board requests that the FRBNY be given an opportunity to intervene and assert its interest, and the Board reserves its right, if necessary, to submit additional evidence and argument regarding the application of exemptions 4 and 5 to responsive FRBNY documents.

**1) Responsive Documents at the FRBNY were Neither Created nor Obtained by the Board and are not "Agency Records" Subject to FOIA**

FOIA provides jurisdiction to the U.S. District courts to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld …." 5 U.S.C. § 552(a)(4)(B). Federal jurisdiction under FOIA "is dependent upon a showing that an agency has (1) 'improperly'; (2) 'withheld'; (3) 'agency records.'" Kissinger v. Reporter's Committee for Freedom of the Press, 445 U.S. 136, 150 (1980). Only when each of these components has been met may a district court "'force an agency to comply with the FOIA's disclosure requirements.'" Cuomo, supra, 166 F.3d at 478 (quoting Tax Analysts, supra, 492 U.S. at 142).

The Supreme Court has articulated a basic two-part test for determining what constitute "agency records" under FOIA. Tax Analysts, supra, 492 U.S. at 144-45. "Agency records" are records that are: (1) either *created* or *obtained* by an agency, *and* (2) under agency control at the time of the FOIA request. Id. (emphasis supplied). Both parts of the test must be met for documents to be agency records. Cuomo, supra, 166 F.3d at 479. Here, because the Board did not "create or obtain" the FRBNY records, the first part of the test is not met and the Court need not even exam the issue of "control." Because the FRBNY documents are not "agency records," the Court lacks subject matter jurisdiction to order their production.

As set forth in the McLaughlin Decl. and the Logan Decl, the FRBNY obtains and generates collateral and loan documentation through its transactions with borrowers at the DW, PDCF and TSLF and, in the case of PDCF and the TSLF, obtains information from clearing banks. McLaughlin Decl., ¶¶ 9, 16; Logan Decl, ¶¶ 16-17. Documents responsive to the Bear Request were obtained and generated in the course of the FRBNY's extension and administration

35

of the Bear Stearns Loan. Mucciolo Decl., ¶¶ 7-8. These documents are maintained by the FRBNY, are highly confidential, and are not made available to anyone outside of the FRBNY and its agents. McLaughlin Dec., ¶¶ 9, 16; Logan Decl., ¶ 17; Mucciolo Decl., ¶ 8. With the exception of information in the Remaining Term Reports, Board staff has not obtained, reviewed or relied upon responsive FRBNY records in the performance of any Board function. Thro Decl., ¶¶ 20, 28.

"Congress contemplated that an agency must first either create or obtain a record as a prerequisite to its becoming an "'agency record'" within the meaning of the FOIA." <u>Forsham</u> v. <u>Harris</u>, 445 U.S. 169, 182 (1980). FOIA reaches only "'records and material in the possession of federal agencies ….'" <u>Kissinger</u>, <u>supra</u>, 445 U.S. at 151 (quoting <u>NLRB</u> v. <u>Robbins Tire & Rubber Co.</u>, 437 U.S. 214, 221 (1978)). Here, because responsive FRBNY documents were not created or obtained by the Board, and no Board staff member has used or relied upon those documents in the performance of agency functions, they are not agency records subject to FOIA.

Whether or not the Board *could* have requested or obtain copies of responsive FRBNY documents has no bearing on this lawsuit. The Supreme Court in <u>Forsham</u>, <u>supra</u>, held that an agency's mere *right of access* to documents does not transform documents into "agency records" if the right is unexercised. 445 U.S. at 185-86. Rather, "the FOIA applies to records which have been in fact obtained, and not to records which merely could have been obtained." <u>Id</u>. at 186.

Similarly, in <u>Ciba-Geigy Corp.</u> v. <u>Mathews</u>, 428 F. Supp. 523, 531 (S.D.N.Y. 1977), a district court in the Southern District of New York found "[j]ust as the government cannot be compelled to obtain possession of documents not under its control or furnish an opinion when none is written, … it should not be compelled to acquire data it neither referred to directly nor

relied upon in making decisions." Ciba-Geigy, supra, 428 F. Supp. at 531. Thus, responsive FRBNY documents, which were never obtained or relied upon by the Board, are not agency records subject to FOIA, and the Court lacks subject matter to order their production.

**2) The Structure of the Board and the Federal Reserve Banks**

Moreover, although the Amended Complaint collectively refers to the Board and the FRBNY as the "Fed," Complaint, ¶¶ 12-18, it is plain from the FRA and relevant case law that the Board and the Federal Reserve Banks are separate entities which work hand in hand as components of our nation's central bank, but nevertheless maintain separate records.

The Federal Reserve System ("System") includes several components which combine public and private elements. See Melcher v. FOMC, 644 F. Supp. 510, 517-18 (D.D.C. 1986), aff'd in part, vacated in part, 836 F.2d 561 (D.C. 1987), cert. denied, 486 U.S. 1042 (1988). The defendant Board, to which plaintiff's FOIA requests were directed, is a government agency in Washington, D.C. composed of seven members appointed by the president and confirmed by the Senate. 12 U.S.C. § 241; see generally Board of Governors of the Federal Reserve System, The Federal Reserve System Purposes and Functions (Ninth Edition, June 2005) ("P & F") at 4.[11] The Board supervises and regulates the operations of the Federal Reserve Banks, exercises broad responsibility over the nation's payments system, promulgates and administers regulations, and plays a major role in the supervision and regulation of the U.S. banking system. 12 U.S.C. § 248(j); P & F at 4-5. The Board is subject to FOIA and promulgates its own regulations regarding FOIA compliance. 12 C.F.R. §§ 261.12-.17.

---

[11] The Board's P & F publication has been relied upon by a number of courts, including the Supreme Court in Merrill, supra, 443 U.S. at 343 n.2, to explain System operations. It is available at http://www.federalreserve.gov/pf/pdf/pf_complete.pdf.

Similarly, the FOMC, which oversees System open market operations, maintains its own records and is a separate government agency for FOIA purposes, even though it shares offices with the Board and includes members of the Board and Reserve Bank presidents.  See Merrill, supra, 443 U.S. at 352; 12 U.S.C. § 263.  The FOMC publishes its own regulations regarding FOIA compliance.  See 12 C.F.R. Part 271.

In contrast, the twelve regional Federal Reserve Banks and their branches are the operational arm of the nation's central banking system.  P & F at 3.  The Federal Reserve Banks were created by Congress in 1913 as the "'monetary and fiscal agents of the United States.'"  Fasano v. Federal Reserve Bank of New York, 457 F.3d 274, 277 (3rd Cir. 2006), cert. denied, 549 U.S. 1115 (2007) (quoting First Agricultural Nat'l Bank v. State Tax Comm'n, 392 U.S. 339, 356 (1968) (Marshall, J., dissenting)).  The Reserve Banks carry out a variety of System functions including operating a nationwide payments system, distributing currency and coin, supervising and regulating member banks and bank holding companies (under delegated authority from the Board), and serving as banker for the U.S. Treasury.  P & F at 6; see also Scott v. Federal Reserve Bank of Kansas City, 406 F.3d 532, 536 (8th Cir. 2005), cert. denied, 546 U.S. 1216 (2006); Federal Reserve Bank of St. Louis v. Metrocentre Improv. Dist., 657 F.2d 183, 185-86 (8th Cir. 1981), aff'd, 455 U.S. 995 (1982); Federal Reserve Bank of Boston v. Comm'r of Corporations, 499 F.2d 60, 62-63 (1st Cir. 1974).  Besides carrying out System functions, each Reserve Bank acts as a depository for banks within its district, a lender to eligible institutions through the DW and, more recently, the TAF, and a clearing agent for checks, and fulfills other responsibilities for banks within the district.  P & F at 6.

Congress chartered the Reserve Banks for a public purpose, and they combine public and private elements. The Board has broad oversight responsibility for the operations and activities of the Federal Reserve Banks, 12 U.S.C. § 248(j), and has delegated some of its statutory authority to the Reserve Banks, see 12 C.F.R. § 265.11. However, the Reserve Banks also operate under independent grants of authority from Congress. Subchapter IX of the FRA, 12 U.S.C. §§ 341-361, enumerates the powers and duties of the Federal Reserve Banks, which include the power to sue and be sued in their own names, the power to make contracts, to appoint officers, hire and fire employees, and prescribe bylaws through their boards of directors. 12 U.S.C. § 341.

Each Federal Reserve Bank is a separate corporation which issues stock that is held by depository institutions within a particular Federal Reserve district.[12] 12 U.S.C. §§ 282, 341; Fasano, supra, 457 F.3d at 277. Each Reserve Bank has its own 9-member Board of directors, six of whom are elected by member banks within the district, and three appointed by the Board. 12 U.S.C. §§ 301, 302. The Reserve Bank boards "perform the duties usually appertaining to the office of directors of banking associations ...." 12 U.S.C. § 301. Presidents or first vice presidents of five of the Federal Reserve Banks serve as FOMC members, 12 U.S.C. § 263(a),

---

[12] The corporate structure of the twelve Federal Reserve Banks was an integral part of Congress's plan to create a unified central banking system which is responsive to the needs of banks in each district. As stated in the 1913 House Currency and Banking Committee Report accompanying the FRA, each Reserve Bank is "individually organized and individually controlled, each holding the fluid funds of the region in which it is organized and each ordinarily dependent upon no other part of the county for assistance." H.R. Rep. No. 69, 63rd Cong., 1st Sess. 18 (1913) ("1913 House Report"). The House Report went on to state that the "only factor of centralization which has been provided in the committee's plan is found in the Federal reserve board, which is to be a strictly Government organization created for the purpose of inspecting existing banking institutions and of regulating relations between Federal reserve banks and between them and the Government itself." Id . at 18.

but are not "officers of the United States" for purposes of the appointments clause of the Constitution.  <u>Melcher</u>, <u>supra</u>, 644 F. Supp. at 519.  Reserve Bank employees are not civil servants, but are at-will employees of each Reserve Bank.  12 U.S.C. § 341 (Fifth); <u>Scott</u>, <u>supra</u>, 406 F.3d at 536.  Because the Reserve Banks are private corporations serving a public purpose, they have no rulemaking authority, <u>Scott</u>, <u>supra</u>, 406 F.3d at 536, and no published regulations regarding FOIA.  System rulemaking authority is vested in the Board, which may not delegate this function.  12 U.S.C. § 248(k).  No statute designates the Federal Reserve Banks as federal agencies.  <u>Scott</u>, <u>supra</u>, 406 F.3d at 537.  Federal Reserve Banks receive no appropriated funds from Congress, but rather are capitalized by required contributions from member banks.  <u>Scott</u>, <u>supra</u>, 406 F.3d at 537.

Because the Board, the FOMC and the Federal Reserve Banks are each separate entities, each entity maintains separate records that are not interchangeable for FOIA or other purposes. With a very narrow exception defined by Board regulation, and discussed below, records at the Federal Reserve Banks are not Board records subject to FOIA.

### 3) Responsive Documents at the FRBNY do not Fall Within the Narrow Category of Reserve Bank Documents that are Board Records by Regulation

By regulation, a very narrow category of documents located at the Federal Reserve Banks are "Board records" subject to FOIA.  The Board's Rules Regarding Availability of Information provide that Board records include:

> all information coming into the possession and under the control of the Board, any Board member, any Federal Reserve Bank, or any officer, employee, or agent of the Board or of any Federal Reserve Bank in the performance of functions for or on behalf of the Board ….

12 C.F.R. § 261.2(i)(1)(i).

Under this definition, for a document at a Reserve Bank to be a "record of the Board" subject to FOIA, it must relate to a Board function performed by a Reserve Bank acting under delegated authority from the Board.[13] Here, the FRBNY records plaintiff is seeking are not Board records because the extension of credit is a fundamental part of the business of banking, and a commercial activity in which the Reserve Banks are authorized to engage, but the Board is not. Because the Reserve Banks are statutorily authorized to extend credit to depository institutions, and to individuals, partnerships or corporations in unusual and exigent circumstances, upon prior Board authorization, and are not operating under delegated authority, Reserve Bank records obtained or created in the course of these activities are not Board records under 12 C.F.R. § 261.2(i)(1)(i). Although the Board issues regulations and orders governing these extensions of credit and, in the case of the SCLFs and the Bear Stearns Loan, authorized these activities by a special Board action, this exercise of *supervisory* authority does not change these ordinary commercial banking transactions into an agency function. Thus, records at the Reserve Banks relating to the DW, TAF the SCLFs, and the Bear Stearns Loan are proprietary commercial records of the Reserve Banks, and not "Board records" subject to FOIA.

Discount window lending was established by the FRA in 1913. The FRA vests lending authority in the Federal Reserve Banks, and the power to supervise lending in the Board. Section 10B of the FRA provides "[a]ny Federal Reserve bank, under rules and regulations prescribed by the Board of Governors of the Federal Reserve System, may make advances to any member bank on its time or demand notes having maturities of not more than four months and which are

---

[13] The Board's interpretation of its own regulation is entitled to "'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" Bruh v. Bessemer Venture Partners III L.P., 464 F.3d 202, 207 (2d Cir. 2006), cert. denied, 549 U.S. 1209 (2007) (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 413-14 (1945)).

secured to the satisfaction of such Federal Reserve Bank."[14]  12 U.S.C. § 347b(a).  It is apparent from the plain language of section 10B, and related provisions, that Congress has given the Federal Reserve Banks independent statutory authority to lend at the DW, subject to rules and regulations issued by the Board, and that the Board did not "delegate" this authority to the Reserve Banks.[15]

Documentation required to be executed by depository institutions borrowing at the DW makes plain that the Reserve Banks, and not the Board, are the lenders.  The Authorizing Resolution for Borrowers provides that the institution is "borrow[ing] money from a Federal Reserve Bank on the terms and security that such Federal Reserve Bank requires" and is "grant[ing], assign[ing], pledge[ing], and transfer[ing] to any Federal Reserve Bank" a security interest in the collateral, and appoints the Federal Reserve Bank as the borrowers' attorney-in-fact for purposes of "endors[ing], assign[ing], transfer[ing] and sell[ing], … collateral pledged to

---

[14]  Likewise, section 13(2) of the FRA provides "[u]pon the indorsement of any of its member banks … any Federal reserve bank may discount notes, drafts, and bills of exchange arising out of actual commercial transactions… ."  12 U.S.C. § 343.  Section 4 of the FRA provides that the boards of directors of the Federal Reserve Banks "may, subject to the provisions of law and the orders of the Board of Governors of the Federal Reserve System, extend to each member bank such discounts, advancements and accommodations as may be safely and reasonably made …."  12 U.S.C. § 301.

[15]  The FRA authorizes the Board "to delegate, by published order or rule and subject to [the Administrative Procedure Act] any of its functions other than those relating to rulemaking or pertaining principally to monetary and credit policies, to one or more ... Federal Reserve banks."  12 U.S.C. § 248(k).  Because the Board itself lacks statutory authority to lend, it could not "delegate" this authority to the Reserve Banks.  There is no delegation of lending authority to the Federal Reserve Banks in the Board's Rules Regarding Delegation of Authority or elsewhere.  12 C.F.R. §§ 265.11(a)-(g).

such Federal Reserve Bank."[16]  Operating Circular 8, which governs a the pledge of collateral to a Federal Reserve Bank to secure DW or other borrowing, states that collateral is "[p]ledged to this Reserve Bank or another Federal Reserve Bank to secure repayment of an advance made to the Pledgor or to secure repayment of any other indebtedness (including intraday or overnight overdrafts and any penalties and fees thereon) of the Pledgor to a Federal Reserve Bank" and that "the Reserve Bank holds collateral as custodian."[17]

The Board could not delegate lending authority to the Reserve Banks because, as a government agency, it does not have authority to take deposits or extend credit.  Under the structure established by Congress, the Board promulgates rules and regulations with respect to DW lending, authorizes new lending facilities, such as the TAF,[18] within the parameters set by Congress, reviews DW interest rate determinations made by the boards of directors of each Reserve Bank, and takes similar supervisory actions, but does not participate in the day-to-day business of lending.[19]  12 U.S.C. §§ 301, 343, 347b and 347c.  The Board's Regulation A, 12 C.F.R. Part 201, defines the parameters of the Reserve Banks' authority to lend at the DW.

---

[16] This and other documentation required from institutions borrowing at the DW is available on the DW website at http://www.frbdiscountwindow.org/required.cfm?hdrID=19&dtlID=42#auth.

[17] Operating Circular No. 8 is available at http://www.frbservices.org/files/regulations/pdf/operating_circular_8.pdf

[18]  The Board authorized the Reserve Banks to extend credit at the TAF under section 10B of the FRA, the same statute that permits DW lending. The Board's press release can be found at http://www.federalreserve.gov/newsevents/press/monetary/20071212a.htm.

[19]  The Board's authority to supervise DW lending by the Reserve Banks is found in the FRA, which provides that it may "prescribe regulations further defining within the limitations of this chapter the conditions under which discounts, advancements, and the accommodations may be extended to member banks," 12 U.S.C. § 301, "determine or define the character of the paper thus eligible for discount, within the meaning of this chapter," 12 U.S.C. § 343, prescribe "rules

The legislative history of the FRA makes plain that Congress intended the Board to play only a supervisory role in lending, while the Reserve Banks carried on the day to day business of banking. Congress believed that the routine operations of banking required a detailed knowledge of local credit conditions that only the Reserve Banks would have. The 1913 House Report provides:

> The limitation of business which is proposed in the sections governing rediscounts, and the maintenance of all operations upon a footing of relatively short time will keep the assets of the proposed institutions [reserve banks] in a strictly fluid and available condition, and will insure the presence of the means of accommodation when banks apply for loans to enable them to extend to their clients larger degrees of assistance in business. It is proposed that the Government shall retain a sufficient power over the reserve banks to enable it to exercise a directing authority when necessary to do so, *but that it shall in no way attempt to carry on through its own mechanism the routine operations of banking which require detailed knowledge of local and individual credit and which determine the actual use of the funds of the community in any given instance.* In other words, the reserve-bank plan retains to the Government power over the exercise of the broader banking functions, while it leaves to individuals and privately owned institutions the actual direction of routine.

1913 House Report at 18-19 (emphasis supplied). Accordingly, Reserve Bank records relating to DW or TAF lending are proprietary commercial records of the Reserve Bank, and not records obtained "in the performance of functions for or on behalf of the Board," 12 C.F.R. § 261.2(i)(1)(i), subject to FOIA.

Similarly, FRBNY documents responsive to the Bear Request, and FRBNY documents relating to the PDCF and the TSLF, were not obtained "in the performance of functions for or on

---

and regulations" pertaining to Reserve Bank advances to members banks on time or demand notes with short maturities, 12 U.S.C. § 347b(a), and issue "limitations, restrictions and regulations" with regard to Reserve Bank advances to individuals, partnerships or corporations secured by U.S. government obligations. 12 U.S.C. § 347c.

behalf of the Board."  Id.  The Board authorized the FRBNY to make the Bear Stearns Loan,[20]

and to extend credit under the PDCF[21] and TSLF,[22] pursuant to its authority under section 13(3)

of the FRA.  12 U.S.C. § 343.  Section 13(3), added to the FRA in 1932 at the height of the Great

Depression,[23] allows the Board "to authorize any Federal reserve bank" to extend credit to

"individual[s], partnership[s], or corporations" that are not depository institutions in "unusual

and exigent circumstances," upon the affirmative vote of five members of the Board, if, in the

judgment of the Reserve Bank, the individual, partnership or corporation "is unable to secure

adequate credit accommodations from other banking institutions."[24]  Id.

---

[20] The Board's action authorizing the FRBNY to extend the Bear Stearns Loan is discussed in its March 14, 2008 and March 16, 2008 minutes, available at http://www.federalreserve.gov/newsevents/press/other/other20080627a2.pdf and http://www.federalreserve.gov/newsevents/press/other/other20080627a1.pdf.

[21] The Board's press release announcing  the PDCF can be found at http://www.federalreserve.gov/newsevents/press/monetary/20080316a.htm.

[22] The Board's press release announcing the TSLF can be found at http://www.federalreserve.gov/newsevents/press/monetary/20080311a.htm.

[23]  Because section 13(3) was introduced and enacted in just 5 days, there is almost no legislative history accompanying the provision.  Pub. Law 72-302, § 210 of Title 2, 47 Stat. 709 (July 21, 1932).  Section 13(3) was introduced as an amendment to the Emergency Relief and Construction Act of 1932 on the same day President Hoover vetoed legislation which would have given broad lending powers to the Reconstruction Finance Corporation.  75 Cong. Rec. 15040-41 (vetoing bill) and 14981 (introducing amendment) (July 11, 1932).  On July 26, 1932, five days after enactment of section 13(3), the Board issued a circular to all twelve Federal Reserve Banks authorizing them to "discount eligible notes, drafts, and bills of exchange for individuals, partnerships and corporations," that is, lend to non-depository institutions for the ensuing six months pursuant to the authority granted by section 13(3).  See "Discounts for Individuals, Partnerships and Corporations," 18 Fed. Res. Bull. 518-20 (August 1932).

[24] Section 13(3) provides "[i]n unusual and exigent circumstances, the Board of Governors of the Federal Reserve System, by the affirmative vote of not less than five members, may authorize any Federal Reserve bank … to discount for any individual, partnership, or corporation, notes, drafts, and bills of exchange when such notes, drafts, and bills of exchange are indorsed or

The fact that the FRBNY consulted with, and obtained prior authorization from, the Board prior to extending the Bear Stearns Loan under section 13(3), and that the Board authorized the FRBNY to extend credit under the PDCF and TSLF, do not transform these commercial lending transactions into agency functions. As is plain from the language of section 13(3), the PDCF and TSLF and Bear Stearns Loan are an exercise of the Reserve Banks' statutory authority "to discount [lend] for any individual, partnership, or corporation," upon prior authorization of five Board members and under "limitations, restrictions, and regulations" prescribed by the Board. 12 U.S.C. § 343. The conditioning of the Reserve Banks' lending authority in unusual and exigent circumstances does not transform this commercial banking activity into a delegated agency function. Rather, the conditions imposed by section 13(3) and Regulation A, 12 C.F.R. § 201.4(d), serve to protect and preserve the safety and soundness of the Reserve Banks.

Because records at the FRBNY responsive to the Loan Request and the Bear Request were obtained in the course of the FRBNY's statutory authority to lend under section 13(3), with prior Board authorization, and its independent authority to lend at the DW, under regulations and orders issued by the Board, and not "in the performance of functions for or on behalf of the Board," 12 C.F.R. § 261.2(i)(1)(i), those documents are not records of the Board subject to FOIA.

---

otherwise secured to the satisfaction of the Federal Reserve bank: <u>provided</u>, that before discounting any such note, draft, or bill of exchange for an individual, partnership, or corporation the Federal reserve bank shall obtain evidence that such individual, partnership, or corporation is unable to secure adequate credit accommodations from other banking institutions. All such discounts for individuals, partnerships, or corporations shall be subject to such limitations, restrictions, and regulations as the Board of Governors of the Federal Reserve System may prescribe." 12 U.S.C. § 343.

**CONCLUSION**

For the foregoing reasons, the Board's motion for summary judgment should be granted and the Amended Complaint should be dismissed.

Dated: March 4, 2009

/s/Yvonne F. Mizusawa
Katherine H. Wheatley (KW7931)
Associate General Counsel
Yvonne F. Mizusawa (YM5081)
Senior Counsel
Board of Governors of the Federal
  Reserve System
20th and C Streets, N.W.
Washington, D.C.  20551
Ph: (202) 452-3436
Fax: (202) 736-5615