UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BLOOMBERG L.P.,<br><br>Plaintiff,<br><br>v.<br><br>BOARD OF GOVERNORS OF<br>THE FEDERAL RESERVE<br>SYSTEM,<br>Defendant. | Civ. No. 08 CV 9595 (LAP) |

DECLARATION OF BRIAN F. MADIGAN

I, Brian F. Madigan, hereby affirm the following as my testimony in the above-captioned case:

1. I have been employed as an economist with the Board of Governors of the Federal Reserve System ("Board") from 1983 to the present. I am currently the Director of the Board's Division of Monetary Affairs ("MA"). MA supports the Board and the Federal Open Market Committee ("FOMC") in the conduct of domestic monetary policy by providing information and analysis pertaining to open market operations, discount window administration, and reserve requirements, among other things.

2. Before becoming director of MA in 2007, I was Deputy Director, Associate Director, and Assistant Director in MA. In these positions, I was responsible for overseeing and conducting analysis of various monetary policy issues. From 1989 to 1990, while an

1

Assistant Director in MA, I was detailed to the Council of Economic Advisors as a Senior Economist. In this capacity, I was responsible for analysis of issues related to monetary policy and macroeconomics. Prior to my employment in MA, I was Section Chief, Senior Economist, and Economist in the Division of Research and Statistics.

3. Prior to rejoining the Board in 1983, I was employed at the Federal National Mortgage Association (Fannie Mae) as an economist. My responsibilities included analysis of monetary policy and financial markets. Prior to joining Fannie Mae in 1982, I was employed in the Division of Research and Statistics of the Board of Governors of the Federal Reserve System, responsible for analysis of the government securities market and other financial markets and for preparing estimates and analysis of the money supply. I originally joined the Federal Reserve Board in 1979. I received a Ph.D. in Economics from Pennsylvania State University in 1981 and an M.A. in Mathematics from George Mason University in 2003. I received an A.B. in Economics from St. Joseph's College in 1975. I have published in the area of monetary policy, including an article entitled "Proposed Revisions to the Federal Reserve's Discount Window Programs," co-authored with William R. Nelson, published in the *Federal Reserve Bulletin* in July 2002. The article can be found on the Board's public website at http://www.federalreserve.gov/pubs/bulletin/2002/0702lead.pdf.

4. During the course of my career at the Federal Reserve, I have become well versed in the policy and operations of the Federal Reserve's discount window ("DW"). I have drafted several internal memorandums and have participated in many discussions on topics such as the role of discount window borrowing in monetary policy implementation, the effects of stigma on usage of the discount window (discussed below), and the role of the

discount window in failing bank scenarios. Early in this decade, I played a key role in a major restructuring of our discount window facilities and worked closely with Board members and Reserve Bank presidents in that effort. In my current responsibilities as the Director of MA, I have been heavily involved in discussions pertaining to troubled depository institutions and their potential needs for DW loans. In addition, I was actively involved in the establishment of the Term Auction Facility ("TAF") and in the development of many of the other special credit and liquidity facilities ("SCLFs") that the Federal Reserve System has implemented over recent months. These facilities were implemented to address the extraordinary strains in financial markets that have been evident since the summer of 2007 and the potential for those strains to depress overall economic activity.

5. In the course of my duties as Director of MA, I became aware of a Freedom of Information Act request made by reporter Mark Pittman of plaintiff Bloomberg L.P. ("plaintiff") to the Board by e-mail dated May 21, 2008, seeking, among other things, information about collateral pledged for DW and other loans between April 4 and May 20, 2008 (the "Loan Request"). Specifically, I was involved in and consulted in connection with the Board's response to the Loan Request. Accordingly, I have personal knowledge of the facts herein.

6. The DW is a mechanism by which the twelve Federal Reserve Banks lend funds on a short-term basis, secured by collateral, to eligible depository institutions within their respective districts. Since 2003, regular DW lending programs have included a primary credit program, available to depository institutions in generally sound financial condition; a secondary credit program, available to depository institutions not eligible for primary

credit; and a seasonal credit program, designed to help small depository institutions manage seasonal swings in their loans and deposits. Under the structure created by Congress in section 10B of the Federal Reserve Act ("FRA"), 12 U.S.C. § 347b, and elsewhere, the Board issues rules and regulations governing DW lending, and reviews interest rate determinations by the Federal Reserve Banks. The Board's Regulation A, contained at 12 C.F.R. Part 201, establishes policies that Reserve Banks must follow in their DW lending operations. The Federal Reserve Banks carry out the operational side of DW lending for eligible institutions within their districts. Extensive information regarding the DW can be found at the DW website at http://www.frbdiscountwindow.org.

7. Beginning in the latter part of 2007, as a result of a severe reduction in liquidity in wholesale dollar funding markets and the adverse implications for the availability of credit and economic growth, the Board authorized the Reserve Banks to establish a new lending facility for depository institutions – the Term Auction Facility ("TAF"). In light of a further severe deterioration in financial market conditions in early 2008, the Board authorized the Federal Reserve Bank of New York to lend to primary dealers through two new lending programs -- a Primary Dealer Credit Facility ("PDCF") and a Term Securities Lending Facility ("TSLF"). The deterioration in financial market conditions resulted initially from escalating credit problems in the subprime mortgage market and related instruments. The resulting credit losses experienced by many investors led to a broad-based withdrawal from risk-taking by investors in many markets. In addition to the TAF, the PDCF and the TSLF, the Board has established other SCLFs in an effort to ease conditions in credit markets and support a resumption of sustainable economic growth. A number of these programs utilize statutory authority under section 13(3) of the

FRA, which allows Federal Reserve Banks to lend to "individuals, partnerships, and corporations" in "unusual and exigent" circumstances as determined by a vote of at least five members of the Board of Governors. In addition, the Reserve Bank must determine that the borrower is unable to obtain reasonable credit accommodations from other banking institutions.

8. The TAF, authorized under section 10B and related sections of the FRA, is a form of DW lending which provides longer than overnight ("term") funding to depository institutions that are eligible for primary credit through an auction mechanism. The maximum amount of funds provided at each auction is determined by the Board. Subject to that maximum, the amount actually provided as well as the interest rate are determined at auction. Unlike the PDCF and TSLF, which are administered by the FRBNY, all Reserve Banks provide credit under the TAF to depository institutions in their districts.

9. The PDCF is a facility authorized by the Board in March 2008 under section 13(3) of the FRA under which the Federal Reserve Bank of New York ("FRBNY") makes overnight funds available to primary dealers (designated banks and securities broker dealers with whom the FRBNY trades U.S. government and select other securities as trading counterparties in its execution of open market operations). The PDCF was designed to provide the primary dealers, who are not eligible to borrow at the DW, with access to FRBNY funding during this period of liquidity strain. By easing primary dealers' access to credit, the PDCF was intended to facilitate the continued functioning of financial markets and thus support credit availability and overall economic activity. To ease the operational burdens of the PDCF, some of the administrative functions of the program,

such as processing loan requests and handling payments associated with maturing loans, are now performed by the Federal Reserve Banks of Chicago and Atlanta.

10. The TSLF, also established in March 2008 utilizing section 13(3) authority, is a term lending facility which permits primary dealers to obtain a 28-day loan of Treasury securities from the FRBNY by pledging certain other types of securities. Dealers pay a fee for a TSLF loan. The TSLF is conducted through an auction administered by the FRBNY. The TSLF is designed to promote liquidity in the financing markets for Treasury and other collateral and thus to foster the functioning of financial markets more generally and to support economic activity.

11. The Board itself does not have the legal authority to extend credit. All lending is conducted by the Federal Reserve Banks subject to general policies and oversight by the Board. A typical DW borrowing request would be received by the lending officer of a Reserve Bank. Reserve Bank staff would review the request, verify collateral and, if approved, enter the loan in the Reserve Bank's loan and accounting systems. The Federal Reserve Banks, in conjunction with the Board, have established a number of important risk management policies and practices in support of these lending operations. The financial condition of potential borrowers is carefully monitored, often in consultation with a borrower's primary federal regulator. In addition, the Federal Reserve Banks lend only against acceptable collateral. Collateral is generally revalued frequently and margins ("haircuts") are applied in determining the lendable value of the collateral. The Board is only rarely involved in decisions regarding the extension of credit to individual institutions, and would not ordinarily be involved at all in the processing of individual loan requests or the maintenance of loan documents or information regarding specific

collateral pledged as security for a loan. Information of this type generally is maintained by the Reserve Banks or their agents (such as third party custodians that may hold collateral on behalf of a Reserve Bank).

12. The staff of MA is primarily concerned with the policy aspects of the DW and other lending programs. As a result, many of the operational details concerning DW and other lending programs are maintained by the Federal Reserve Banks. Some information requested by the plaintiff, such as loan documents and documents relating to specific securities posted as collateral for loans is maintained by the Federal Reserve Bank extending the loan or by other parties on behalf of the lending Federal Reserve Bank.

13. For the time period covered by the Loan Request, that is, April 4, 2008 through May 20, 2008, MA does have some information on individual borrowers under certain programs such as the primary and secondary credit program of the DW, the TAF, and the PDCF. For example, in connection with its role in assisting the Board with its monetary policy responsibilities, MA produces a report (the "Remaining Term Report") which contains some limited information responsive to item 7 of the Loan Request, which sought "records sufficient to show the terms of the loans and the rates that the borrowers must pay" for the Relevant Securities described in the Loan Request. The Remaining Term Report includes the names of some institutions borrowing at the DW or other lending facilities, the originating Federal Reserve Bank, the type of credit extended, individual loan amounts, and origination and maturity dates of some loans.

14. In my opinion, as described in ¶¶ 17-24 below, public release of information in the Remaining Term Report would be likely to cause substantial competitive harm to the borrowers identified on the withheld Reports. Moreover, as described in ¶¶ 26-30 below,

I believe that public disclosure of information in the Remaining Term Reports would impair the Board's ability to meet its statutory responsibility "to promote effectively the goals of maximum employment, stable prices, and moderate long-term interest rates" specified in section 2A of the FRA, as amended, 12 U.S.C. § 225a. In particular, public disclosure of such information would impair the ability of the Board to limit financial strains by utilizing its authority under section 13(3) of the FRA to authorize lending by the Reserve Banks to non-depository institutions in "unusual and exigent circumstances" and its authority under section 10B and other sections of the FRA to authorize DW and TAF lending by the Reserve Banks. As explained below, the publication of such information would lead to an increased reluctance of borrowers to use such facilities. As a result, the ability of Federal Reserve lending to serve as a safety valve in relieving liquidity strains for individual depository institutions and the banking system, and to complement open market operations in achieving the target federal funds rate by making Federal Reserve balances available to depository institutions when the supply of balances falls short of demand would be reduced. This reduced capacity to mitigate financial strains and to control the federal funds rate could adversely affect the ability of the Federal Reserve to achieve its macroeconomic objectives.

15. The Board, the FRBNY, and the other Federal Reserve Banks publish extensive information about the discount window and the SCLFs on their websites and elsewhere. This information includes terms of, and eligibility for, the lending facilities, interest rates, acceptable forms of collateral, sample lending documentation, collateral margin tables, aggregate current lending data (published weekly and broken down by Federal Reserve district and by credit facility), historical lending data, mechanics of discount window and

SCLF borrowing, and relevant statutory and regulatory provisions. In addition, on February 23, 2009, the Board launched a new section of its public website designed to enhance transparency in its conduct of monetary policy and the new tools developed to address the financial crisis. The website section, entitled "Credit and Liquidity Programs and the Balance Sheet," includes, among other information: a detailed explanation of the Federal Reserve Banks' balance sheets; descriptions of all of the Federal Reserve's liquidity and credit facilities; information on collateral eligibility, information on the valuation and margins ("haircuts") applied to collateral by program; and information on the general types and aggregate value of collateral pledged to the various facilities as of December 2008. That website is available at http://www.federalreserve.gov/monetarypolicy/bst.htm.

16. However, with the exception of lending in connection with certain specific systemically important institutions such as Bear Stearns or AIG, neither the Board nor the Federal Reserve Banks publicly disclose the names of borrowers at the DW or the SCLFs, identify specific collateral pledged for specific loans, the terms, the rates for specific loans (although some general rate information is published), documentation for specific loans, the valuation of specific loans vis-à-vis the collateral pledged (the "haircut"), collateral rejected for specific loans, or other information that could lead to the identification of borrowers by counterparties, market analysts, news media organizations, or the public at large. There are a number of important reasons, described below, that both the Board (to the extent that it has loan-specific information) and the Federal Reserve Banks keep this information confidential.

17. First, release of this information is likely to cause substantial competitive harm to the commercial and financial interests of the borrowers – including depository institutions and other institutions eligible to borrow at the DW and the SCLFs. These institutions face competition in the market for retail and commercial banking and financial services from other domestic and international institutions. In my experience as director of MA, I have observed that depository institutions that may potentially borrow at the DW recognize that their customers, lenders and other counterparties, market analysts, and news media organizations, among others, may draw adverse inferences from their decision to borrow from the Federal Reserve Banks. This stigma, as described in ¶¶ 18-21 below, can quickly place an institution in a weakened condition vis-à-vis its competitors by causing a loss of public confidence in the institution, a sudden outflow of deposits (a "run"), a loss of confidence by market analysts, a drop in the institution's stock price, and a withdrawal of market sources of liquidity. In extreme cases, such developments can lead to closure of the institution.

18. The "stigma" associated with DW borrowing results from the fact that the DW can serve as an emergency, back-up source of liquidity for institutions that may not have access to ordinary, market sources of funding on a short term basis. An institution may experience a sudden funding need for any number of reasons. Some of these reasons, such as an unexpectedly large loan request from a customer or a runoff in liabilities as a major depositor makes payments to third parties, may result from routine developments and may not indicate an underlying capital or liquidity problem. However, the fact that an institution borrowed from the DW may suggest to customers, creditors, analysts, or the

news media that its liquidity shortage stems from a financial problem at the institution that is not known by the public at large.

19. This "stigma" associated with borrowing can, in turn, inhibit borrowers from turning to the DW even if they are in sound financial condition and their funding need is unrelated to any issues of financial condition. Often, the stigma intensifies during periods of financial distress when market participants have a heightened concern that financial firms could be in a weakened condition. For example, the stigma associated with discount window borrowing became very acute during the banking crisis in the early 1990s and again in 1998-1999 amid the global financial market turbulence that followed the Russian debt default. During these periods, the stigma associated with borrowing from the Federal Reserve was evident in the very high rates that banks were willing to pay to borrow money in the private federal funds market rather than borrow at the discount window.

20. Banks were willing to pay such high rates because rumors about their financial condition -- even if unfounded -- could result in customers' withdrawing deposits and private creditors' refusing to lend to these institutions. Such a sudden withdrawal of deposits and drying up of private sources of liquidity could quickly lead to an institution's demise. Moreover, even if the institution managed to meet its funding needs and survive, it would be at a disadvantage vis-à-vis its competitors in the market because it could be forced to pay very high rates to borrow and might be limited in its ability to issue longer-term debt. Potential customers would tend to direct their business to other institutions that were thought to be in better financial condition. In short, there is an important sense in which

rumors about an institution's financial condition can be self-fulfilling, and particularly in an environment in which financial strains are widespread.

21. The likelihood of substantial competitive harm described in ¶¶ 17-20 above also applies to institutions that borrow at the TAF, PDCF, and TSLF. Because these facilities were created in response to severe liquidity strains in the financial markets, the use of these facilities by primary dealers or financial institutions could suggest to customers, creditors, market analysts and news media organizations that the borrower is less financially sound than publicly reported (whether or not that is true), likely leading to the substantial competitive harm described in ¶ 17 above. In designing the TAF, the Federal Reserve took care to reduce the likelihood that borrowing institutions would be concerned about stigma. Nevertheless, borrowers likely would be concerned if they believed that their borrowing would be revealed to the public. Indeed, the rate determined at recent TAF auctions has much lower than comparable-maturity funding from market sources, suggesting that some borrowers remain concerned about borrowing from the TAF.

22. As a result of stigma, if institutions perceive any chance that their DW or SCLF borrowing might be revealed to the public, they may avoid borrowing at virtually any cost. For example, rumors that Citibank might be borrowing at the DW in the early 1990s reportedly sparked runs at some of its offices in Asia. The risks to an institution posed by the possibility of such depositor behavior are likely to cause institutions to be very cautious in borrowing from the DW.

23. In addition to not releasing details regarding specific discount window or SCLF loans, neither the Board nor the Reserve Banks publicly disclose which institutions are *eligible*

for primary or secondary credit at the DW. This is so because primary credit is available only to institutions in generally sound financial condition—those with CAMELS[1] composite examination ratings of 1, 2 or 3 (or equivalent) and that are adequately or well-capitalized. Secondary credit may be made available to institutions that do not qualify for primary credit. The terms of secondary credit are more stringent than those for primary credit; for example, the interest rate is higher, collateral haircuts are higher, and credit is generally extended only on an overnight basis. Revealing an institution's eligibility for primary or secondary credit would therefore reveal non-public information regarding its financial condition, which, if the information is not favorable, could result in substantial competitive harm, as described in ¶ 17 above. In fact, neither the Board nor the Reserve Banks routinely share information regarding an institution's DW borrowing even with Federal Reserve supervisory staff and those from the other banking regulators, though regulators may obtain information about an institution's borrowing history when investigating potential supervisory problems.

24. Even the release of the dollar amounts of individual DW, TAF, or SCLF loans without the borrowers' names could contribute to financial institutions' reluctance to use Reserve Bank liquidity facilities. If the amounts borrowed are large, and the Federal Reserve Bank originating the loan is identified, market participants may speculate that the borrower must be one of the few large banks in that Federal Reserve district or, for very large loans, in the country. This speculation would discourage large banks from using the

---

[1] CAMELS is an acronym for the composite rating scale used by federal banking regulators to rate an institution's soundness on the basis of Capital, Assets, Management, Earnings, Liquidity, and Sensitivity to Market Risk with "1" being a sound institution and "5" being an institution in danger of failure. CAMELS ratings are designated "confidential supervisory information" under the Board's regulations and are not made public by the Board, Reserve Banks, or the institution in question.

13

Federal Reserve Banks' facilities and could potentially force large banks publicly to state that they are not borrowing at the discount window or SCLFs. Experience suggests that such public statements are not always successful, and sometimes fuel rather than dampen market rumors regarding an institution's liquidity. Speculation about the identity of borrowers poses similar problems to actual identification of borrowers, and a greater number of institutions could adversely be affected.

25. In addition to the likelihood of substantial competitive harm to the borrowers, public disclosure of information regarding specific securities pledged as collateral for individual DW, TAF, PDCF, or TSLF loans would significantly harm the Government's monetary functions or commercial interests. Although it is my understanding that Board records do not contain collateral-specific information responsive to the Loan Request, such information likely is in the possession and control of the Federal Reserve Banks (or third party custodians acting on their behalf). Some of the SCLFs are designed to enhance liquidity by allowing borrowers to pledge as collateral a wide range of securities that might not readily be pledged in the private funding markets. These securities might be illiquid in the short term for a variety of reasons, including an excess of similar securities on the markets, difficulties valuing the securities, doubts about the financial stability of the issuer, and similar reasons. Revealing information regarding the specific volume and type of collateral pledged for individual DW, TAF, PDCF, or TSLF loans might create a negative inference in the markets regarding the valuation of this collateral, which in turn could lower the price the Reserve Banks are able to obtain should they need to sell the collateral. This would harm the Reserve Banks' commercial interests, as a seller of

securities in the market place, in maximizing recovery on collateral should securities pledged to the Reserve Banks need to be liquidated.

26. In addition to the harm to individual borrowers and Reserve Banks, public disclosure of information responsive to the Loan Request would impair the Board's ability to carry out the statutory mandates described in ¶ 14 above. In particular, disclosure would have a significant adverse impact on the effectiveness of Federal Reserve Bank lending facilities in addressing strains in the financial markets and in acting as a safety valve for individual depository institutions, primary dealers and the banking system as a whole, and on the Board's conduct of monetary policy.

27. The Board and the FOMC use the instruments of monetary policy to carry out their statutory mandate under section 2A of the Federal Reserve Act "to promote effectively the goals of maximum employment, stable prices, and moderate long term interest rates." Monetary policy is the process by which a government, generally through a central bank, affects the level of interest rates and the supply of money in pursuit of particular policy goals. Open market operations are an especially important tool in monetary policy implementation. In the case of the Federal Reserve, the FRBNY's open market desk conducts open market operations by buying and selling government securities to adjust the aggregate supply of reserve balances so as to achieve a target rate in the federal funds market. The federal funds market is the market for unsecured overnight and term loans in which depository institutions and certain other participants trade deposit balances at the Federal Reserve. DW lending complements open market operations in achieving the target federal funds rate by making Federal Reserve balances available to depository institutions when the aggregate supply of reserve balances in the market falls short of

demand. When the demand for reserve balances is high relative to supply of such balances, the federal funds rate tends to move higher and depository institutions then tend to borrow at the discount window to obtain needed reserves. This increased supply of reserves from the discount window reduces the upward pressures on the federal funds rate. However, if institutions are unwilling to access the DW for fear of public disclosure, this "safety valve" role of the discount window is impaired, and the task of achieving a desired level of short-term interest rates through open market operations is greatly complicated. The inability to achieve a desired level of short-term interest rates, in turn, adds to uncertainty in financial markets and makes it more difficult for the Federal Reserve to achieve its statutory objectives of maximum employment, stable prices and moderate long term interest rates.

28. Releasing non-public information about individual borrowings at the special facilities such as the PDCF and the TSLF would impair the Board's ability under section 13(3) of the FRA to address "unusual and exigent circumstances" in the domestic economy by authorizing the Reserve Banks to lend to non-depository institutions. The effectiveness of the SCLFs depends critically on institutions' willingness to use them. The reluctance to borrow at the SCLFs would undermine the goal of many of these facilities in supporting the liquidity of individual institutions and markets. If eligible institutions are unwilling to use these facilities for fear of the "stigma" described in ¶¶ 17-22 above, important financial institutions and markets will be deprived of critically needed funding. As just one example, the Commercial Paper Funding Facility (CPFF), another of the Federal Reserve's special lending facilities, has extended hundreds of billions of dollars to borrowers in the commercial paper market. Institutions often borrow in the

commercial paper market to meet short-term funding needs such as financing inventories or making payments to employees and vendors. If commercial paper issuers had feared that their usage of the CPFF would become known, many would likely not have borrowed from the CPFF over recent months and would have been forced instead to take other actions such as scaling back production and laying off workers.

29. Finally, a reluctance of institutions to borrow at the discount window because of confidentiality concerns would impair the Federal Reserve's statutory function under section 10B and related provisions of the FRA to act as a "lender of last resort" to depository institutions at the discount window. As described in ¶¶ 6-8 and 18 above, the DW and TAF serve as a safety valve in relieving liquidity strains in individual depository institutions and the banking system. If institutions are reluctant to turn to the DW and TAF for fear of public disclosure of details regarding their borrowing, the Board's and Reserve Bank's ability to use the DW and TAF as an emergency, back-up source of liquidity for depository institutions will be impaired. The adverse impact on the economy could be severe as diminished access to liquidity could result in the failure of some institutions, a further tightening in credit conditions, and a slowing of economic growth.

30. For example, over recent months, many banks have faced unexpected funding needs as securitization markets have shut down and as loans and other assets that had previously been held in off-balance sheet vehicles had to be funded by the bank. At the same time, a number of banks -- despite being well-capitalized -- have experienced difficulties in raising funds as many creditors became very wary of lending to their usual counterparties. In this environment, credit obtained through the primary credit program and the TAF has been extremely useful to depository institutions in meeting such

unexpected funding pressures. If depository institutions were reluctant to use these lending programs, they would likely have been forced to conduct so-called "fire sales" of assets that would, in turn, have depressed asset prices and further impaired the condition of important financial institutions and markets.

I declare under penalty of perjury that the foregoing is true and correct. Executed in the city of Washington, D.C. on this 27th day of February, 2009.

*Brian F. Madigan*
Brian F. Madigan