UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
BLOOMBERG L.P.,

                Plaintiff,         Case No. 08 CV 9595 (LAP)

      -against-

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM,

                Defendant.
-------------------------------------------------------x

## DECLARATION OF SUSAN E. MCLAUGHLIN

**Susan E. McLaughlin**, being duly sworn, says:

    1.    I am a Senior Vice President in the Markets Group at the Federal Reserve Bank of New York (the "New York Fed" or the "Bank"). I submit this affidavit in support of the motion for summary judgment submitted by the Board of Governors of the Federal Reserve System (the "Board of Governors") in the above-referenced matter. I have personal knowledge of the matters set forth herein.

    2.    I have worked in the Markets Group at the New York Fed since March 1995. I am currently the Deputy Head of Market Operations, Monitoring, and Analysis ("MOMA") and am responsible for overseeing the operations of the Discount Window, Monetary Policy Operations, Market Monitoring and Analysis, Treasury Auctions, and Monetary Projections. Prior to becoming the Deputy Head of MOMA, I was the Co-head of Liquidity and Risk Management and prior to that I oversaw Discount Window operations.

    3.    I received a Bachelor of Arts degree from Oberlin College in 1986 and a Masters in Business Administration and a Masters in Public Policy from the University of Michigan in

1993. I was also designated a Chartered Financial Analyst by the Chartered Financial Analyst Institute in 1998.

4. I have been informed that the Board of Governors received a request pursuant to the Freedom of Information Act seeking documents relating to, among other things, the Discount Window and the Primary Dealer Credit Facility (the "PDCF"). As one of the officers at the New York Fed responsible for the oversight of the Discount Window and the PDCF, I am familiar with how they operate, how they are managed and what records are kept at the New York Fed.

**The Discount Window**

5. The New York Fed, like the other 11 Reserve Banks, serves as the operational arm of the Federal Reserve System for Discount Window lending. The New York Fed lends funds to depository institutions at the Discount Window as a lender of last resort. The Bank's Discount Window functions as a safety valve in relieving pressures in the interbank funds market to help alleviate liquidity strains in a depository institution and in the banking system as a whole. It also helps to ensure the basic stability of the payment system by supplying liquidity during times of systemic stress.

6. All financial institutions that are subject to reserve requirements and that are located in the second Federal Reserve district are entitled to borrow at the New York Fed Discount Window. These entities include commercial banks, thrift institutions, and United States branches and agencies of foreign banks.

7. The New York Fed has three Discount Window lending programs for depository institutions: primary credit, secondary credit, and seasonal credit programs. The Bank extends primary credit on a very short-term basis (typically overnight), as a back-up rather than a regular source of funding, to depository institutions with strong financial positions and ample capital, at

a rate above the target federal funds rate. Secondary credit is offered on a very short-term basis to depository institutions that do not qualify for primary credit to meet back-up liquidity needs when its use is consistent with a timely return to market sources of funding or the orderly resolution of a troubled institution. The lending is at a higher rate than the rate offered for the primary credit program. Seasonal credit is offered to small- and mid-size depository institutions that are able to demonstrate a clear pattern of recurring intra-year fluctuations in funding needs. An interest rate that varies with the level of short-term market interest rates is applied to seasonal credit. Further information about Discount Window operations at the New York Fed is available at the Bank's website at http://www.newyorkfed.org/banking/discountwindow.html.

8. Discount Window lending is a Reserve Bank function and all Discount Window operations are handled by and conducted at the Reserve Banks. Although the Board of Governors issues orders and regulations setting parameters for Discount Window lending, the Board of Governors does not play a direct role in the operational side of Discount Window lending. Its primary role in relation to Discount Window lending is in establishing broad policies governing the Federal Reserve's various lending programs and in approving rates for discount window borrowing, as discussed in paragraph 9. The Board of Governors has no input and makes no recommendations with regard to the extension of specific loans at the Discount Window.

9. The interest rate for Discount Window lending is established by each Reserve Bank at least every 14 days, subject to review and determination by the Board of Governors in its oversight role and its role in setting monetary policy. The New York Fed publishes interest rates for Discount Window lending on its website, but no specific information is publicly disclosed relating to names of borrowers, collateral pledged by those borrowers, individual amounts

3

borrowed, or the facility (primary, secondary, or seasonal) under which a borrower borrowed. Loan documents and collateral documentation relating to a specific loan issued pursuant to the New York Fed's Discount Window lending operations are confidential and are maintained at the Bank. These loan and collateral documents are not made available to anyone outside the New York Fed.

**Primary Dealer Credit Facility**

10. On March 16, 2008, the Board of Governors authorized the New York Fed to create the PDCF to improve primary dealers' access to liquidity to, and to promote the orderly functioning of, financial markets more generally. Primary dealers are designated banks and securities broker-dealers with whom the New York Fed engages in transactions in U.S. government securities as trading counterparties in its execution of open market operations to implement monetary policy. The primary dealers with which the Bank does business include many major U.S. and international financial companies and are identified publicly on the Bank's website at http://www.ny.frb.org/markets/pridealers_current.html. Prior to the creation of the PDCF, primary dealers were not able to borrow from the New York Fed's Discount Window and had no other means to access funding from the Bank during liquidity strains. The PDCF was created as a temporary emergency measure and is currently set to expire on October 30, 2009.

11. The PDCF was designed by the New York Fed and is an overnight loan facility that provides funding to primary dealers using the same clearing bank infrastructure for pricing, clearing, and settlement that is used for open market operations. This means that the loans are processed through a clearing bank's systems, rather than directly by the New York Fed. A primary dealer must post collateral to the Bank's account at the clearing bank in order to obtain a loan under the PDCF. The types of collateral eligible to be pledged are determined by the New

York Fed, but the collateral is valued daily by the clearing bank using a variety of third-party pricing services and dealer prices. The amount that can be borrowed under the PDCF is equal to the value of the collateral the borrower can deliver to the New York Fed's account at the clearing bank, including a cushion to reflect the volatility of the price of the collateral's asset type to cover the possible decline in value of collateral overnight (the "haircut").

12. Procedurally, each day, a primary dealer that wants to borrow from the PDCF contacts its clearing bank to advise it of the amount of funding it is requesting. The clearing bank verifies that the primary dealer has sufficient eligible collateral to pledge (i.e., collateral with market value equal to the loan amount plus the haircut) and then notifies the Federal Reserve Bank of Chicago (the "Chicago Fed"), as agent for the New York Fed, of the loan request. Once the Chicago Fed receives notice from the clearing bank that a sufficient amount of haircutted collateral has been assigned to the New York Fed's account for the loan, it credits funds in the amount of the loan to the clearing bank for onward credit to the primary dealer. The next morning, the Federal Reserve Bank of Atlanta (the "Atlanta Fed"), as agent for the New York Fed, makes the reversing entries to reclaim the cash loans and debit the clearing bank's reserve account.

13. A copy of the Terms and Conditions for the PDCF is available on the Bank's website at http://www.newyorkfed.org/markets/pdcf_terms.html.

14. Aggregate information on PDCF borrowing is published each Thursday in the Board of Governors' H.4.1 Statistical Release, which is available on the Board of Governors' website. The release shows the total amount of PDCF credit outstanding as of the close of business on the prior Wednesday and the average daily amounts for each week.

15. Although the PDCF was authorized by the Board of Governors, the Board of Governors does not have a role in the daily operations of the PDCF. The Board of Governors has no input and makes no recommendations with regard to the operation of the PDCF, although it oversees this program through its oversight responsibilities. All PDCF operations are conducted by the New York Fed, and by the Chicago Fed and the Atlanta Fed as agents of the New York Fed.

16. The clearing banks provide the New York Fed with lending and collateral documentation for specific loans. In addition, the New York Fed receives spreadsheets from the clearing banks that contain security-level information on the collateral pledged by each borrower (i.e., security type, CUSIP, rating, etc.). The New York Fed generates various reports and spreadsheets based on the information it receives from the clearing bank. Information and documents relating to the PDCF are maintained by the New York Fed. They are highly confidential and are not made available to anyone outside of the New York Fed and, even within the Bank, access to the records is on a need-to-know and limited basis. The Bank does, however, provide select members and staff of the Board of Governors with daily and weekly reports on PDCF borrowing, which include the names of the primary dealers that have borrowed from the PDCF, individual loan amounts, composition of securities pledged, and rates for specific loans. The interest rate for PDCF loans is the primary credit rate; however, because the date individual loans are made is not public, the interest rate paid on specific loans also is non-public.

**Disclosure of Information**

17. I have been informed that the Board of Governors has received a request pursuant to the Freedom of Information Act seeking various documents relating to, among other things, securities posted between April 4, 2008 and May 20, 2008, as collateral for loans from the PDCF

and the Discount Window. I understand that the request seeks detailed information concerning the specific securities being posted as collateral, documents submitted by financial institutions and primary dealers seeking loans, and information relating to the amounts, term, and rates being charged for specific loans.

18. The information being requested is highly sensitive and confidential commercial information. There is an explicit understanding amongst the New York Fed, the depository institutions that borrow at the Discount Window, the clearing banks, and the primary dealers that borrow at the PDCF that information relating to Discount Window and PDCF borrowing will not be disclosed by either the borrowers or by the New York Fed. Specifically, it is understood that all parties will keep confidential specific information relating to the loan, including the identity of the borrower, the amount of the loan, the collateral pledged and the interest rate of individual loans.

19. This understanding of confidentiality is very important to institutions that borrow from the Discount Window and the PDCF because of the stigma that is associated with borrowing from the "lender of last resort" – the back-up source of liquidity for institutions that are unable to access short-term funding in the market, whether for operational or other reasons.

20. A borrower's competitive position could be severely harmed if the market became aware of the fact that the institution obtained funds at the Discount Window. Institutions borrowing at the Discount Window face competition in the market for retail and commercial banking services from other domestic and international institutions. If the name of an institution that borrowed from the Discount Window were to be made public, there is a real concern that market participants, including financial analysts, customers, and competitors of the borrowing institution, would draw adverse conclusions about the borrowing depository institution that were

7

based on conjecture and speculation. In particular, it would fuel speculation that the institution is experiencing liquidity strains, a shortage of capital, or is less financially sound than publicly reported. These rumors may be unfounded as an institution may simply be at the Discount Window to obtain late-day funds as the result of operational problems that impeded funds receipts, or clerical errors that understated its funding position for the day.

21. These rumors would likely cause substantial competitive harm to institutions borrowing at the Discount Window because, in reaction to the rumors, customers would likely withdraw deposits and private lenders would likely accelerate loans or refuse to provide additional funding to the borrowing institution. This in turn would cause capital and liquidity strains, leaving the borrowing institution in a weakened position vis-à-vis its competitors. Such rumors and speculation about the health of depository institutions would quickly spiral into market turmoil, as has been apparent in recent months in the financial markets.

22. In addition to the likelihood of substantial competitive harm to the financial institutions borrowing at the Discount Window, if details regarding collateral posted as security by an individual institution were publicly disclosed there would also be a likelihood of substantial competitive harm to the institutions whose assets had been pledged as collateral (the "issuers") for Discount Window loans. This would occur because public disclosure of the collateral being pledged at the Discount Window and PDCF would fuel speculation regarding the soundness of the issuers. The market would question the financial condition of the issuers based on the volume of a particular collateral type that was pledged, the value placed on the collateral and the fact that the borrower was unable to readily pledge the issuer's collateral in private financial markets. While the speculation about an issuer might have no basis in fact, the rumors

8

alone could place this institution in a weakened condition vis-à-vis its competitors, particularly in these times of market stress.

23. Public disclosure of details regarding which institutions are availing themselves of the Discount Window and the PDCF would also cause substantial harm to the New York Fed because disclosure would undermine the Bank's ability to achieve its policy mandate and mission. If the names of these institutions were to become public, the stigma that has traditionally been associated with borrowing from the lender of last resort would return. That, in turn, would cause financial institutions to avoid using these liquidity tools – even when needed – to alleviate market pressures, thus rendering the Bank's policy tools ineffective. Without these policy tools, the New York Fed would no longer be able to meet its mandate to promote orderly and well-functioning markets.

24. Finally, public disclosure of details regarding the specific collateral pledged at the Discount Window and the PDCF, and the New York Fed's valuation of the collateral, would be very disruptive to markets. If the market knew the value the New York Fed had assigned to a certain security, that valuation could be perceived as a benchmark for market pricing, even though the valuation was not directly derived from price discovery through trading activity. The New York Fed, and not the market, could then become the price setter, which is not desirable in that it undermines the market mechanism. Once again, this would weaken the Bank's ability to fulfill its mission in that disclosure that disrupts markets undermines our mission to promote market stability.

25. Just as confidentiality is vital to institutions borrowing from the Discount Window, it is equally important for a primary dealer borrowing from the PDCF, which faces competition in the market for securities brokerage services from other primary dealers and

domestic and international securities broker dealers. A primary dealer would similarly suffer competitive and reputational harm if its name and the collateral it posted were disclosed to the public. For the reasons stated in ¶¶ 19-24 above, the mere fact that a primary dealer is coming to the PDCF would lead market participants to inaccurately speculate that the primary dealer was having difficulty obtaining financing in the open market and that the dealer itself must therefore be in financial trouble, or the underlying securities must be difficult to pledge.

26. Because the purpose of the PDCF is to give primary dealers a back-up source of liquidity if market sources are unavailable, the utility of the facility in providing liquidity to the capital markets will be undermined if primary dealers are unwilling to use the facility for fear of public disclosure of specific loan information. Moreover, if the "haircuts" for PDCF loans were disclosed, and the haircuts were different from those prevailing in the market, this could be destabilizing, as it could be interpreted by market participants that the New York Fed has adverse information about the types of assets pledged that the market does not.

I declare under penalty of perjury that the foregoing is true and correct. Executed in New York, New York, on this 1st day of March 2009.

_____
Susan E. McLaughlin