UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
BLOOMBERG L.P.,
                          Plaintiff,      :    Case No. 08 CV 9595 (LAP)

-against-

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM,

                          Defendant.
------------------------------------------------------x

## **DECLARATION OF LORIE K. LOGAN**

**Lorie K. Logan**, being duly sworn, says:

      1.    I am a Vice President in the Market Operations and Markets Analysis Function of the Markets Group at the Federal Reserve Bank of New York (the "New York Fed" or the "Bank"). I submit this affidavit in support of the motion for summary judgment by the Board of Governors of the Federal Reserve System (the "Board of Governors") in the above-referenced matter. I have personal knowledge of the matters set forth herein.

      2.    I have worked in the Markets Group at the New York Fed since 1999. I am currently the Director of Treasury Markets and am responsible for Treasury Auctions, Treasury Markets Policy Staff, System Open Market Account ("SOMA") Operations, Federal Open Market Committee ("FOMC") Policy Analysis and Implementation, Market Surveillance, and the Term Securities Lending Facility (the "TLSF"). Prior to becoming the Director of Treasury Markets, I was a Staff Coordinator in the Markets Group and prior to that, I was a Trader/Analyst in the Markets Group.

3. I received a Bachelor of Arts degree from Davidson College in 1995 and a Masters in Public Administration from the School of International and Public Affairs at Columbia University in 1999.

4. I have been informed that the Board of Governors received a request pursuant to the Freedom of Information Act seeking documents relating to, among other things, the TSLF. As one of the officers at the New York Fed responsible for the oversight of the TSLF, I am familiar with how it operates, how it is managed and what records are kept at the New York Fed.

**The Term Securities Lending Facility**

5. The TSLF is a term lending facility for primary dealers that was established on March 11, 2008 by the New York Fed to promote liquidity in Treasury and other collateral markets. Prior to the TSLF, the repo[1] market showed signs of illiquidity as market participants became unwilling to provide term funding against even high-quality collateral. The TSLF was established to address this illiquidity in the term funding market and foster the functioning of financial markets more generally. The TSLF was created as a temporary emergency measure and is currently set to expire on October 30, 2009.

6. The TSLF is a competitive, single price auction facility that auctions securities in exchange for securities. It allows primary dealers to offer relatively illiquid securities as collateral in exchange for a loan of Treasury securities. Specifically, the TSLF auctions a fixed amount of general collateral Treasury securities from the System Open Market Account (SOMA) in exchange for eligible collateral as determined by the New York Fed. Eligible collateral includes any collateral eligible for repurchase agreements arranged by the Open Market Trading

---

[1] In a repo transaction, the borrower of cash agrees to immediately sell a security to a lender and simultaneously agrees to buy the same security back from the lender at a fixed price at a fixed later date.

Desk (collectively referred to as "Schedule 1 Collateral"). In addition to Schedule 1 Collateral, the TSLF separately auctions general collateral Treasury securities in exchange for a second schedule of eligible collateral which consists of Schedule 1 Collateral plus all investment-grade debt securities (collectively referred to as "Schedule 2 Collateral").

7. The New York Fed currently auctions a set amount of Treasury general collateral weekly for Schedule 2 operations and bi-weekly for Schedule 1 operations. The term of a TSLF loan is 28 days. The New York Fed announces TSLF auctions one business day before the auction. The announcement generally includes the par value of Treasury securities being offered, the schedule of eligible collateral to be pledged, the minimum bid rate, the auction start and close times, settlement date and loan maturity date, and the specific breakdown of general Treasury collateral being allocated in the auction.

8. The resulting rate on the collateral loan is set through a competitive auction process, and limits are imposed on the share of the auction allocated to each winning bidder in order to ensure that the lending is distributed across multiple institutions. Dealers are allowed to submit two propositions in each term general collateral auction but each bid and each dealer's overall auction award may not exceed 20 percent of the offering amount. Dealers are allowed to bid for a minimum of $10 million in par value and in increments of $10 million in par value to the maximum allowed per dealer according to program limits.

9. The New York Fed reviews and accepts bids at the highest rate through successively lower rates. All accepted bids are awarded at the same fee rate, which is the lowest rate at which any bid was accepted. On auction date, the New York Fed determines the total lending fee, in dollars, which is charged to each winning bidder and owed at the end of the loan (auction clearing prices are expected to reflect the spread between the Treasury general collateral

rate and the general collateral rate for the pledged collateral over the term of the TSLF loan).[2] Dealers' clearing bank accounts are charged for the fees due on the maturity date.

10. The terms and conditions of the TSLF can be found on the Bank's website at http://www.newyorkfed.org/markets/tslf_terms.html. Aggregate results of each auction, including the stop-out rate, total propositions submitted and accepted, as well as the bid-to-cover ratio are posted on the New York Fed's website at http://www.newyorkfed.org/markets/tslf/termseclending.cfm.

11. Procedurally, the actual transfer of securities is done via the clearing banks. A dealer receiving an award at auction is required to pledge auction-eligible collateral from its clearing bank custodial account and all transfers of securities are made through the borrower's clearing bank account. After each auction, on the loan settlement date, the New York Fed transfers to the clearing banks a basket of general collateral Treasury securities totaling the par amount awarded at auction with instructions to the clearing banks to accept collateral with a market value, adjusted for margin, to equal the value of pledged Treasury securities. Once the clearing banks receive the eligible securities from the winning bidders, the clearing banks then transfer to the New York Fed's account at the clearing bank an equivalent value of eligible collateral, adjusted for margin, from the winning bidders' clearing bank accounts. Margin requirements are determined by the New York Fed. The haircut schedule is provided directly to the primary dealers and the clearing banks. It is the clearing bank's responsibility to adjust for margin and value the collateral, and to check that the collateral is acceptable and meets the Bank's eligibility requirements. The clearing banks have price sources they utilize to value the

---

[2] The lending fee is calculated by multiplying: a) the total quoted price of the borrowed securities excluding accrued interest (i.e. the "clean" price) as of the close of business on the day before the auction, by b) the stop-out fee rate, by c) the term of the loan, in days, divided by 360.

4

collateral. For example, if the margin is 2 percent, they will require that the value of the collateral pledged to the Bank be 2 percent greater than the value of the Bank's general collateral Treasury securities. The prices for the general collateral Treasury securities and pledged collateral are determined by the clearing banks.

12. Each morning thereafter, the borrower's collateral is returned to the borrower and the general collateral Treasury securities are returned to the New York Fed's account. At the end of the day, the Treasury securities go back to the borrower against the receipt of the borrower's collateral. Collateral is valued daily by the clearing bank and adjustments to collateral levels are required to maintain the designated margin amounts. Upon maturity of the loan, the clearing bank transfers general collateral Treasury securities from the New York Fed's account at the clearing bank to the New York Fed.

13. Because the collateral is returned daily, the Bank does not specify which specific securities must be posted by the primary dealers as collateral for the loan. If the primary dealer should pledge a different kind of collateral than the day before, the margin requirement would change to match that asset's margin. What is most important to the New York Fed is that each day, the securities that are posted are eligible securities and are adjusted to maintain the adequate margin.

14. By lending Treasuries in weekly auctions, the TSLF has increased the supply of liquid securities, which has improved conditions in the Treasury general collateral markets (in which the Bank conducts its open market operations). It has also allowed primary dealers to fund more illiquid assets such as Schedule 2 eligible securities, alleviating their own funding pressures. Additionally, it has provided primary dealers with a more certain source of funding and an increased confidence in primary dealers as counterparties.

5

15. Although the TSLF was authorized by the Board of Governors, the Board of Governors does not have a role in the daily operations of the TSLF. The Board of Governors and FOMC approved the basic parameters of the program and the Board has oversight responsibility for the TSLF as part of its general oversight responsibilities for all Reserve Bank operations. But the Board is not involved in the daily operations of the TSLF; those operations are handled by and conducted at the New York Fed.

16. The clearing banks provide the New York Fed with collateral and pricing information for each winning bidder on a daily basis. Specifically, the information from the clearing bank includes very detailed and specific information for each security pledged by each dealer. For example, for each security, the Bank receives, among other things, the CUSIP numbers, asset type code, description, rating(s), market price, accrued interest, haircutted value, denomination/currency, start date of transaction, end date of transaction, loan amount, par, price source, and borrower name.

17. The Bank stores the data it receives from the clearing banks in an electronic database maintained at the New York Fed. The Bank generates various reports based on the information it receives from the clearing bank. Except as discussed herein, data and documents relating to the TSLF are maintained by the New York Fed. This information is highly confidential and is not made available to anyone outside of the New York Fed and, even within the Bank, access to the records is on a need-to-know and limited basis. The Bank does, however, provide select members and staff of the Board of Governors with daily aggregate TSLF lending information, which does not contain any individual borrower information. This aggregate information is published each Thursday in the Board of Governors' H.4.1 Statistical Release, which is available on the Board of Governors' website. The release shows the total amount of

TSLF loans outstanding as of the close of business on the prior Wednesday and the average daily amounts for each week.

**Disclosure of Information**

18. I have been informed that the Board of Governors has received a request pursuant to the Freedom of Information Act seeking various documents relating to, among other things, securities posted between April 4, 2008 and May 20, 2008, as collateral for TSLF loans. I understand that the request seeks detailed information concerning the specific securities being posted as collateral, documents submitted by financial institutions and primary dealers seeking loans, and information relating to the amounts, term, and rates being charged for specific loans.

19. As discussed above, certain aggregate information regarding the results of each TSLF auction, including the stop-out rate, total propositions submitted and accepted, as well as the bid-to-cover ratio, is posted on the New York Fed's website at http://www.newyorkfed.org/markets/tslf/termseclending.cfm.

20. The information being requested is highly sensitive and confidential commercial information. It is not market practice to disclose such detailed information. There is an implicit understanding based on this market practice that information relating to TSLF borrowing will not be disclosed by any of the parties involved in the loan and that all parties will keep confidential specific information relating to the loan, including the identity of the borrower, the amount of the loan, and/or the collateral pledged.

21. This understanding of confidentiality is very important to primary dealers borrowing from the TSLF, which face competition in the market for securities brokerage services from other primary dealers and domestic and international securities broker dealers. A primary dealer would suffer competitive and reputational harm if its name and the relevant collateral it

7

posted were disclosed to the public. Indeed, the Bank would also suffer reputational harm for violating market practice if it disclosed this information. If the name of a primary dealer that borrowed from the TSLF were to be made public, there is a real concern that market participants would draw adverse conclusions about the primary dealer based on conjecture and speculation. These rumors would likely cause substantial competitive harm to primary dealers borrowing at the TSLF because the mere fact that a primary dealer is coming to the TSLF would lead market participants to inaccurately speculate that the primary dealer was having difficulty finding term funding against its collateral in the open market and that the dealer itself must therefore be in financial trouble.

22. There would also be serious competitive harm to releasing individual bids, as it would provide the market with information about the perceived health of a dealer. For example, if at auction, four primary dealers were each to bid for $5 billion at 25 basis points and another primary dealer, Dealer X, bid for $5.9 billion at 1,000 basis points, the fact that Dealer X bid at 1,000 basis points is not relevant to the results of the auction, as Dealer X would be awarded the same stop-out rate of 25 basis points. If the Bank were to disclose the fact that Dealer X submitted a bid at 1,000 basis points, the market would view that as a sign of extreme weakness, and counterparties would likely pull away, perhaps pushing the firm out of business.

23. Also, if "haircuts" for TSLF loans were disclosed, and the haircuts were different from those prevailing in the market, this could be destabilizing, as it could be interpreted by market participants that the New York Fed has adverse information about the types of assets pledged that the market does not.

24. The purpose of the TSLF is to give primary dealers a back-up source of liquidity when the repo market shows signs of illiquidity and market participants are unwilling to provide

term funding against even high-quality collateral. The facility provides a better balance in collateralized funding markets between the supply of and demand for Treasury securities and other eligible collateral, and leads to a reduction in forced deleveraging and associated downward asset price spirals. If primary dealers were unwilling to use the facility for fear of public disclosure and associated stigma, then these market stability goals will be undermined.

25. In addition to the likelihood of substantial competitive harm to the primary dealers coming to the TSLF, if details regarding specific securities posted as collateral were publicly disclosed there would also be a likelihood of substantial competitive harm to the institutions whose assets had been pledged as collateral (the "issuers"). This would occur because public disclosure of the specific securities being pledged for the TSLF loans would fuel speculation regarding the soundness of the issuers. The market would question the financial condition of the issuers based on the volume of a particular security that was pledged, the value placed on the specific security and the fact that the borrower was unable to readily pledge the issuer's security in private financial markets. While the speculation about an issuer might have no basis in fact, the rumors alone could place this institution in a weakened condition vis-à-vis its competitors, particularly in these times of market stress.

26. Public disclosure of details regarding which institutions are availing themselves of the TSLF would also cause substantial harm to the New York Fed because disclosure would undermine the Bank's ability to achieve its policy mandate and mission. If the names of these institutions were to become public, the stigma that has traditionally been associated with borrowing from the lender of last resort would return. That, in turn, would cause financial institutions to avoid using these liquidity tools – even when needed – to alleviate market pressures, thus rendering our policy tools ineffective. Without these policy tools, the New York

Fed would no longer be able to meet its mandate to promote orderly and well-functioning markets.

27. Finally, public disclosure of details regarding the specific collateral pledged for TSLF loans, and the New York Fed's valuation of the collateral, would be disruptive to markets. If the market viewed the value that the New York Fed's clearing bank had assigned to a certain security as an "official" price, and ascribed to this valuation the New York Fed's approval and acceptance of this price, this valuation could be perceived as a benchmark for market pricing. The New York Fed, and not the market, could then become the price setter, which is not desirable in that it undermines the market mechanism. Once again, this would weaken the Bank's ability to fulfill its mission in that disclosure that disrupts markets undermines our mission to promote market stability.

I declare under penalty of perjury that the foregoing is true and correct. Executed in New York, New York, on this 2 day of March, 2009.

_____
Lorie K. Logan