UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

BLOOMBERG L.P.,                                    :

                     Plaintiff,          :

         - against -          :          Case No. 08 CV 9595

BOARD OF GOVERNORS OF THE                         :
FEDERAL RESERVE SYSTEM,
                             :

               Defendant.

------------------------------------------------------------x

PLAINTIFF BLOOMBERG L.P.'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT

Dockets.Justia.com

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ................................................................................. 1

PARTIES ...................................................................................................................... 3

BACKGROUND ......................................................................................................... 5

1. The Governmental Actions In Question ...................................................... 5
   A. The Bear Stearns Financing ................................................................. 5
   B. The Fed's Expansion Of Its Lending Facilities ................................... 5
2. Bloomberg's FOIA Requests ...................................................................... 8
   A. The Bear Request ................................................................................. 8
   B. The Loan Record Request .................................................................. 10
3. Bloomberg's Complaint And The Board's Motion For Summary Judgment ............. 12

ARGUMENT ............................................................................................................. 12

I. THE LOAN RECORDS AND BEAR RECORDS HELD BY THE NY FED ARE SUBJECT TO FOIA AND SHOULD BE PRODUCED. ..................... 14

   A. The Board's Regulations Show That Its Distinction Between Board Records And NY Fed Records Is Chimerical. ................................. 14

   B. Reserve Banks Are Agencies And Therefore Their Records Are Subject To FOIA. ................................................................................. 17

   C. The Board Should Not Be Allowed To Further Delay The Release Of The Loan Records Or Bear Records By "Reserv[ing] Its Right" To Save Arguments For Later. ............................................................. 19

II. THE REQUESTED INFORMATION IS NOT PROPERLY SECRET UNDER EITHER OF THE EXEMPTIONS ON WHICH THE FED RELIES. ......................................................................................................... 20

   A. The Board Cannot Show That Exemption 4, Covering Confidential Commercial Information, Applies Here. ................................. 21

      1. The Board Cannot Show That The Release Of The Requested Information Would Be Likely To Cause Substantial Competitive Harm To Borrowers. ................................................. 22

         a. The Board's Arguments Concerning "Stigma" Are Entirely Speculative. ......................................................... 24

         b. Recent Market Activity Shows That Disclosures Actually Boost, Not Damage, Public Confidence In The Financial Institutions. ....................................................... 25

c.  The Board's Arguments Reveal That The Supposed Competitive Harm Would Be Based On Adverse Public Reaction, Which Is Insufficient As A Matter Of Law To Invoke Exemption 4. ...................................................26

d.  The Board's Argument That The Market Will Misconstrue The Information Is Contrary To Economic Theory And To The Full Disclosure Philosophy Of Our Securities Laws. ...................................................28

1.  The Board's Alleged Speculative Harm Is Inconsistent With Fundamental Economic Theory............28

2.  The Board's Argument That Borrowers' Shareholders Should Be Kept In The Dark Is Inconsistent With SEC Disclosure Rules...........................31

e.  The Requested Information Is Not Subject To Exemption 4 To The Extent The Fed Did Not Collect It From A Third Party. ...................................................35

2.  The Board Cannot Withhold The Requested Information Under The "Program Effectiveness" Theory. ...................................36

B.  Exemption 5 Does Not Apply. ...................................................38

CONCLUSION...................................................39

# TABLE OF AUTHORITIES

## FEDERAL CASES

*9 to 5 Organization for Women Office Workers v. The Board of Governors of the Federal Reserve System*, 721 F.2d 1 (1st Cir. 1983) ........................................................................... 22

*American Airlines, Inc. v. National Mediation Board*, 588 F.2d 863 (2d Cir. 1978) .................... 22

*Bridgeway Corp. v. Citibank*, 45 F. Supp. 2d 276, 278 n.2 (S.D.N.Y. 1999) ................................ 5

*B.T. Produce Co. v. Robert A. Johnson Sales, Inc.*, 354 F. Supp. 2d 284 (S.D.N.Y. 2004) ........... 5

*Buffalo Evening News, Inc. v. Small Bus. Admin.*, 666 F. Supp. 467 (W.D.N.Y. 1987) ........ 35, 37

*Burka v. U.S. Department of Health and Human Services*, 87 F.3d 508 (D.C. Cir. 1996) ........... 17

*CNA Finance Corp. v. Donovan*, 830 F.2d 1132 (D.C. Cir. 1987) ............................................... 27

*Christensen v. Harris County*, 529 U.S. 576 (2000) .................................................................... 16

*City of Chicago v. U.S. Dep't of the Treasury*, No. Civ. 01 C 3835, 2002 WL 370216 (N.D. Ill. 2002) ........................................................................................................................ 24

*Clarke v. U.S. Dep't of the Treasury*, No. 84-1873, 1986 WL 1234 (E.D. Pa. Jan. 28, 1986) ................................................................................................................................. 37, 38

*Comstock International (U.S.A.) Inc. v. Export-Import Bank*, 464 F. Supp. 804 (D.D.C. 1979) ..................................................................... 21, 23, 24, 37, 38

*Defense of Animals v. National Institute of Health*, 543 F. Supp. 2d 70 (D.D.C. 2008) .............. 17

*U.S. Department of Justice v. Tax Analysts*, 492 U.S. 136 (1989) ............................................... 13

*U.S. Dep't of Justice v. Reporters Comm. For Freedom of the Press*, 489 U.S. 749 (1989) ........ 12

*Fasano v. Federal Reserve Bank of New York*, 457 F.3d 274 (3d Cir. 2006) ............................... 18

*Federal Open Market Committee of the Federal Reserve System v. Merrill*, 443 U.S. 340 (1979) .................................................................................................. 13, 38, 39

*Gilmore v. U.S. Department of Energy*, 4 F. Supp. 2d 912 (N.D. Cal. 1998) ............................... 23

*Government Land Bank v. General Services Admin.*, 671 F.2d 663 (1st Cir. 1982) ..................... 39

*Hack v. Department of Energy*, 538 F. Supp. 1098 (D.D.C. 1982) ............................................... 39

*Iglesias v. CIA*, 525 F. Supp. 547 (D.D.C. 1981) ........................................................................ 23

*Inner City Press/Community on the Move v. Board of Governors of the Federal Reserve System*, 380 F. Supp. 2d 211 (S.D.N.Y. 2005) ........................................................ 23

*Inner City Press/Community on the Move v. Board of Governors of the Federal Reserve System*, 463 F.3d 239 (2d Cir. 2006) ........................................................................ 21

*James v. U.S. Customs & Border Protection*, 474 F. Supp. 2d 154 (D.D.C. 2007) ..................... 20

*Kaggen v. Internal Revenue Serv.*, 71 F.3d 1018, 1021 (2d Cir. 1995) .......................................... 5

*Lee v. Federal Deposit Insurance Corp.*, 923 F. Supp. 451 (S.D.N.Y. 1996) ........................ 13, 21

*Lin v. U.S. Department of Justice*, 459 F.3d 255 (2d Cir. 2006) ...................................................16

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,* 272 F. Supp. 2d 243, (S.D.N.Y. 2003) ...................................................................................................................5

*Nadler v. Federal Deposit Insurance Corp.*, 92 F.3d 93 (2d Cir. 1996) ......................................22

*National Parks and Conservation Association v. Kleppe*, 547 F.2d 673 (D.C. Cir. 1976) ..........21

*National Parks and Conservation Association v. Morton*, 498 F.2d 765 (D.C. Cir. 1974)..........22

*PETA v. U.S. Dep't of Agriculture*, No. Civ. 03 C 195-SBC, 2005 WL 1241141 (D.D.C. 2005) ................................................................................................................22, 24, 37

*Petroleum Information Corp. v. U.S. Department of the Interior*, 976 F.2d 1429 (D.C. Cir. 1992). ...............................................................................................................13

*Public Citizen Health Research Group v. FDA*, 704 F.2d 1280 (D.C. Cir. 1983) .......................23

*Public Citizen Health Research Group v. FDA*, 964 F. Supp. 413 (D.C. Cir. 1997) ........22, 23, 27

*Silverberg v. HHS*, Civ. A. No. 89-2743, 1991 WL 633740 (D.D.C. 1991) ..........................23, 37

*Teich v. FDA*, 751 F. Supp. 243 (D.D.C. 1990)......................................................................23, 25

*Trulock v. U.S. Department of Justice*, 257 F. Supp. 2d 48 (D.D.C. 2003)..................................21

*Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973) .................................................................13, 21

*Worthington Compressors, Inc. v. Costle*, 662 F.2d 45 (D.C. Cir. 1981).....................................23

## DOCKETED CASES

*Fasano v. Federal Reserve Bank of New York*, No. 05-4661, 2006 WL 5439217 (3d Cir. Jan. 26, 2006)..........................................................................................................18, 19

## RULES AND STATUTES

5 U.S.C. § 551 .........................................................................................................................18, 35

5 U.S.C. § 552(a) ...........................................................................................................................18

5 U.S.C. § 552(a)(4)........................................................................................................................13

5 U.S.C. § 552(a)(6)........................................................................................................................11

5 U.S.C. § 552(b) ............................................................................................................................21

5 U.S.C. § 552(b)(4) ................................................................................................................21, 35

5 U.S.C. § 552(b)(5) .......................................................................................................................38

12 C.F.R. §§ 201.1-5.....................................................................................................................4, 6

12 C.F.R. § 201.2(c)..........................................................................................................................6

12 U.S.C. § 248(j) .............................................................................................................................4

12 C.F.R. §§ 261.10-12.....................................................................................................................9

12 C.F.R. § 261.2(i)(1).........................................................................................................14, 15, 17

12 C.F.R. § 261.3(a)...........................................................................4, 15, 19, 20

12 U.S.C. § 301.................................................................................................4

12 U.S.C. §§ 343, 347b.................................................................................4, 6

15 U.S.C. § 78m(a)...........................................................................................32

H.R. Rep. 73-1383...........................................................................................32

H.R. Rep. No. 89-1497 (1966).........................................................................13

H.R. Rep. No. 93-876 (1974)...........................................................................18

S. Rep. 73-1455...............................................................................................32

S. Rep. No. 89-813...........................................................................................13

Plaintiff Bloomberg L.P. ("Bloomberg"), the owner and operator of Bloomberg News, respectfully submits this memorandum of law in opposition to the motion for summary judgment filed by Defendant Board of Governors of the Federal Reserve System (the "Board"), and in support of Bloomberg's cross-motion for summary judgment. For the reasons that follow, Bloomberg respectfully submits that the Board should be ordered to disclose, without further delay, the documents sought by Bloomberg concerning the Board's use of public money to assist private financial institutions.

## PRELIMINARY STATEMENT

Bloomberg brought this action under the Freedom of Information Act ("FOIA"), seeking to vindicate the public's right to obtain government records maintained by the Board and the Federal Reserve Bank of New York (the "NY Fed," and with the Board, the "Fed") concerning the Fed's lending of public money to private financial institutions and its contribution of financing for JPMorgan Chase's acquisition of Bear Stearns.

The public needs the information that Bloomberg seeks because it is central to understanding and assessing the government's response to the most cataclysmic financial crisis in America since the Great Depression. The effects of that crisis on the American public have been and will continue to be devastating. Major employers are facing bankruptcy, being acquired, and eliminating tens of thousands of jobs. To counter those effects, the Fed has made unprecedented use of taxpayers' money. Two examples are the vast expansion – trillions of dollars – of the Fed's loans to private financial institutions and the Fed's contribution of financing to JPMorgan Chase's acquisition of Bear Stearns. These governmental actions, which have been shrouded in secrecy, are at the heart of Bloomberg's FOIA requests.

The Fed's lending programs require borrowers to post collateral in order to obtain access to public money, ostensibly to provide some protection to the taxpayers in the event of default. Despite the manifest public interest in such matters, the Board argues that the recipients of the loans, the amounts of the loans, the posted collateral, and the Fed's methods in valuing that collateral should be secret. Thus, taxpayers lack any meaningful knowledge regarding this use of their money.

Further, as part of the Bear Stearns acquisition by JPMorgan Chase, the Fed took control of a portfolio of assets valued at around $30 billion. Those assets were pledged as security for $29 billion in financing for the acquisition. Under this arrangement, JPMorgan Chase absorbs the first $1 billion of losses in value of the assets, and the remaining losses are borne by the taxpayers. So far, the assets have decreased in value by almost $3 billion. The public has the right to know the details of those arrangements to be able to meaningfully assess whether they are appropriate.

Bloomberg submitted to the Board two FOIA requests seeking access to information related to these governmental activities. After the Board failed to disclose the information that Bloomberg requested, Bloomberg brought this action to compel the Board to discharge its obligations under FOIA, so that the public can make meaningful assessments of, and engage in informed debate regarding, the Fed's efforts to safeguard the public's money.

The Board insists that FOIA does not require it to disclose the information in question. In that regard, and despite admitting that the Board effects the government's monetary policy through the Federal Reserve Bank lending programs at issue here, the Board argues that documents held by the NY Fed are not subject to FOIA because the NY Fed was not acting on behalf of the Board in connection with those lending programs. The Board also argues that

disclosure would supposedly cause competitive injury to the various financial institutions that availed themselves of those programs, and would in turn make those institutions less likely to borrow, thereby interfering with the Fed's ability to help them. As discussed below, the Board's arguments are based on wispy speculation, lack evidentiary support, and are contradicted by economic theory. Further, the Board's arguments in many respects defy logic – indeed, recent experience shows that stock prices have increased upon news that companies have received TARP and other similar funding from the government. Accordingly, Bloomberg respectfully submits that the Board's motion for summary judgment should be denied, and that Bloomberg's cross-motion for summary judgment should be granted.

## PARTIES

Bloomberg is a limited partnership organized and existing under the laws of the State of Delaware, with its principal place of business at 731 Lexington Avenue, New York, New York. (Glasser Decl., ¶ 2.)[1] Bloomberg supplies real-time business, financial, and legal news and information to more than 250,000 subscribers worldwide. (Id. at ¶ 3.) Among other things, Bloomberg operates Bloomberg News, a 24-hour global news service with more than 2,200 employees in 145 bureaus around the world. (Id. at ¶ 4.) As a wire service, Bloomberg provides news to more than 400 newspapers globally. (Id. at ¶ 4.) Bloomberg also provides television and radio programming throughout the world through its 24-hour news television stations and radio affiliates. (Id. at ¶ 5.) It publishes a monthly magazine and more than 50 books each year, and its website receives 3.5 million visits each month. (Id. at ¶ 6.) In total, Bloomberg distributes news, information, and commentary to millions of people each day, and has published more than one hundred million stories. (Id. at ¶ 7.)

---

[1] References to "Glasser Decl." are to the Declaration of Charles J. Glasser, Jr., Esq., sworn to on April 15, 2009, and submitted herewith.

Defendant Board is an agency of the United States of America, and oversees the government's central banking system. Its objectives include: "to promote effectively the goals of maximum employment, stable prices, and moderate long-term interest rates"; "to address unusual and exigent circumstances in the domestic economy"; and to relieve liquidity strains through lending. (Br. 26 (internal quotations and citations omitted).)[2]

The Board admits that it attempts to accomplish its objectives in large part through the lending programs administered by the various Federal Reserve Banks ("Reserve Banks"), including the lending programs at issue here. (Br. 26, 33.) Those Reserve Banks, which include the NY Fed, are the operational arm of the government's central banking system. (Br. 26, 38-39.) Congress created the Reserve Banks as the monetary and fiscal agents of the people of the United States. (Br. 38-39.) They operate "subject to the provisions of law and the orders of the Board of Governors of the Federal Reserve System." 12 U.S.C. § 301. The Board has broad oversight responsibility for the Reserve Banks' operations and activities. See Br. 38-39; 12 U.S.C. § 248(j). Specifically, the Board authorized and oversaw the NY Fed's secret lending at issue here. Br. 26-33, 39-44; 12 U.S.C. §§ 343, 347b; see also 12 C.F.R. §§ 201.1-5.

Under regulations promulgated pursuant to FOIA, Reserve Bank records are accessible through requests to the Board: "The Secretary of the Board is the official custodian of all Board records, including records that are in the possession or control of . . . any Federal Reserve Bank . . . or Reserve Bank employee." 12 C.F.R. § 261.3(a).

---

[2] Unless otherwise indicated, "Br." refers to the Board's March 4, 2009, Memorandum of Law in Support of its Motion for Summary Judgment.

1. The Governmental Actions In Question

    A. The Bear Stearns Financing

    In March 2008, JPMorgan Chase agreed to acquire Bear Stearns (Rose Decl.,

Exs. 1-4)[3] in an arrangement approved by the Board (Rose Decl., Exs. 5-9). As part of the

acquisition, the NY Fed, through a limited liability company, took control of a portfolio of assets

valued, as of March 14, 2008, at $30 billion. (Id., Exs. 10-11.) The assets were pledged as

security for $29 billion in term financing from the NY Fed at its primary credit rate. (Id.,

Exs. 10-11.) The NY Fed retained BlackRock Financial Management Inc. to manage and

liquidate the assets. (Id., Exs. 10-11.) Under this arrangement, JPMorgan Chase absorbs the

first $1 billion of losses in value of the assets, and the remaining losses belong to the NY Fed −

and therefore to the taxpayers. (Id., Exs. 10, 52.) The Fed announced that as of October 22,

2008, the value of the portfolio had decreased by almost $3 billion. (Id., Exs. 12-13.)

    B. The Fed's Expansion Of Its Lending Facilities

    The Fed uses various methods to regulate the banking and financial system in the

United States. (Rose Decl., Ex. 14, at 1.) One method is the lending of money to private

financial institutions by Reserve Banks. (Id., Ex. 14, at 1, 3, 35, 45-50.) As of November 2007,

---

[3] References to "Rose Decl." are to the Declaration of Scott S. Rose, Esq., sworn to on April 15, 2009, and submitted herewith. The Court may take judicial notice of the documents attached to the Rose Decl., which reflect facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned" and/or are "generally known within the territorial jurisdiction" of this Court. Fed. R. Evidence 201(b); see also Kaggen v. Internal Revenue Serv., 71 F.3d 1018, 1021 (2d Cir. 1995) ("Courts in general have long taken judicial notice of facts of common knowledge relating to banks and banking procedure."); B.T. Produce Co. v. Robert A. Johnson Sales, Inc., 354 F. Supp. 2d 284, 285 n.2 (S.D.N.Y. 2004) (taking judicial notice of government report); In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 272 F. Supp. 2d 243, 254 n.9 (S.D.N.Y. 2003) (on motion to dismiss, taking judicial notice of public quotations of stock prices); Bridgeway Corp. v. Citibank, 45 F. Supp. 2d 276, 278 n.2 (S.D.N.Y. 1999) (on motion for summary judgment, taking judicial notice of facts contained in various newspaper reports).

the Fed lent money to private financial institutions primarily through its "discount window." (Id., Ex. 15.)[4] The Board regulates and oversees discount window lending, and the various Reserve Banks administer the day-to-day lending activities. See Br. 26-33, 39-44; Rose Decl., Exs. 18-19; 12 U.S.C. §§ 343, 347b; 12 C.F.R. §§ 201.1-5. The discount window allows the Fed to lend money, usually on an overnight basis, to so-called "depository institutions," which are financial institutions that obtain their funds mainly through deposits from the public. (Rose Decl., Ex. 20.) Depository institutions include banks and credit unions. See 12 C.F.R. § 201.2(c)(1).

Starting in or around August 2007, in an effort to improve market functioning, the Board authorized the Reserve Banks to expand discount window lending by extending the loans from overnight to as long as 90 days.[5] In addition, the Board authorized the Reserve Banks to establish three new lending facilities: the Primary Dealer Credit Facility, the Term Securities Lending Facility, and the Term Auction Facility. (See Br. 3.) These four lending facilities (the "Lending Facilities") provide loans of taxpayers' money ranging in duration from overnight to 90 days. (Rose Decl., Exs. 20-26.) The changes to the discount window lending and the three new facilities were designed to enhance the Fed's ability to lend to depository institutions and to create the ability to lend to so-called "primary dealers" (Id., Exs. 17, 20, 24-27) – banks and securities broker-dealers that trade in U.S. government securities with the NY Fed. (Br. 3; Rose Decl., Exs. 28-30.) During 2008, the Board included on its list of primary dealers Bear, Stearns & Co., Lehman Brothers Inc., Banc of America Securities LLC, Barclays Capital Inc., Goldman,

---

[4] In March 2008, the Fed created the Term Securities Lending Facility. (Rose Decl., Ex. 16.) In March 2008, the Fed also created the Primary Dealer Credit Facility. (Id., Ex. 17.)

[5] Primary credit is typically available through the discount window on an overnight basis. (Rose Decl., Ex. 14, at 46.) In August 2007, the Board extended discount window lending to 30 days. (Id., Ex. 21.) In March 2008, the Board extended discount window lending to 90 days. (Id., Exs. 17, 21.)

Sachs & Co., HSBC Securities (USA) Inc., J. P. Morgan Securities Inc., Merrill Lynch Government Securities Inc., and Morgan Stanley & Co. Inc. (Rose Decl., Ex. 31.)

The discount window for depository institutions and the Primary Dealer Credit Facility for primary dealers are effectively "standing" facilities that provide daily access to funding for eligible institutions. (Br. 3; Rose Decl., Ex. 32.) Access to funds through these facilities occurs at the initiative of the borrowing institution, in an amount determined by the borrowing institution's needs and collateral. (See Br. 3.) The Fed charges a fixed interest rate set at a premium to market rates on this kind of facility to discourage institutions from the unnecessary use of Fed lending. (Rose Decl., Ex. 51.)

The Term Auction Facility for depository institutions and the Term Securities Lending Facility for primary dealers are a second kind of facility in which longer-term funding is made available, also using taxpayer money. (Rose Decl., Exs. 20, 23-24.) These facilities are designed to improve overall liquidity conditions in term and secured funding markets, rather than to satisfy the needs of a particular institution on a particular day. (Id., Exs. 23 ("[The TSLF] is intended to promote liquidity in the financing markets for Treasury and other collateral and thus to foster the functioning of financial markets more generally"), 24 ("By allowing the Federal Reserve to inject term funds through a broader range of counterparties and against a broader range of collateral than open market operations, [the Term Auction] facility could help ensure that liquidity provisions can be disseminated efficiently even when the unsecured interbank markets are under stress").)

Private institutions that seek public money from the Fed must post collateral. (Rose Decl., Exs. 35-36.) The amount of the loan supposedly corresponds with the value

assigned to the collateral. (Id., Ex. 36.) The method of valuing the collateral is one of the crucial pieces of information that the public is being denied by the Fed's insistence on secrecy.

Before the changes to the Fed's lending programs, during the week of August 9, 2007, the Fed had an average outstanding lending balance through the discount window of approximately $1 million. (Rose Decl., Ex. 37.) After changes to the Fed's lending programs, during the week of October 8, 2008, the Fed had an average outstanding lending balance of over $400 billion. (Id., Exs. 22, 31.) The Fed refuses to provide information that would assist in explaining this ballooning effect.

## 2. Bloomberg's FOIA Requests

### A. The Bear Request

On April 7, 2008, Bloomberg reporter Craig Torres submitted through the Board's website an electronic FOIA request (the "Bear Request") seeking certain records (the "Bear Records") concerning the Bear Stearns transaction. (Thro Decl., ¶ 22, Ex. 6.)[6] In particular, the Bear Request sought "[a]ll documents reflecting or concerning the portfolio of securities (listed on a security-by-security basis, with CUSIP numbers if available), supporting the loan extended by the Federal Reserve in connection with the proposed acquisition of Bear Stearns Cos. by JP Morgan Chase & Co." (Id., ¶ 22, Ex. 6.)

Following the submission of the Bear Request, telephone calls were exchanged between Mr. Torres and Alison Thro (Senior Counsel and FOIA Public Liaison of the Fed), and between Bloomberg's outside counsel and Ms. Thro. The Fed eventually responded to the Bear Request by issuing a denial dated September 30, 2008. (Thro Decl., ¶ 29, Ex. 7.) In that denial, the Fed stated: "Staff searched Board records and made suitable inquires, but found no

---

[6] References to "Thro Decl." are to the Declaration of Alison M. Thro, sworn to on February 26, 2009, and submitted in support of the Board's motion.

documents that are responsive to your request." (Id., ¶ 29, Ex. 7.)  In a footnote to that sentence, however, the Fed admitted that:

> documents responsive to [Bloomberg's] request are located at the Federal Reserve Bank of New York, [but] these documents are not "records of the Board" under the Act.  Nevertheless, even if they were deemed to be "records of the Board," ... the documents would be exempt in full from disclosure under exemption 4 of the Act.

(Id., ¶ 29, Ex. 7.)

Bloomberg appealed that denial in a letter dated October 14, 2008.  (Thro Decl., ¶ 30, Ex. 8.)  In its appeal, Bloomberg argued that under 12 C.F.R. §§ 261.10-12, even if the records were in the possession of the NY Fed, the Board was still required to produce them in response to the Bear Request.  (Id., ¶ 30, Ex. 8.)  Bloomberg also argued that Exemption 4 did not apply to the requested records.  (Id., ¶ 30, Ex. 8.)  In a letter dated November 7, 2008, the Board denied Bloomberg's appeal.  (Id., ¶ 31, Ex. 9.)  In doing so, the Board conceded that some records in the possession of the NY Fed were indeed Board records, but still claimed that the Bear Records were not Board records, stating:

> [The NY Fed] obtained the [Bear Records] as part of its administration of a loan extended by the [NY Fed] to facilitate the acquisition of Bear Stearns by J.P. Morgan Chase & Co. (JPMC). Although the loan was made under emergency and other circumstances necessitating Board involvement, these circumstances did not convert an otherwise commercial action into a Board (agency) function.  At no time did the Board or Board staff obtain, review, or rely upon these documents.  Accordingly, I conclude that the documents are not 'records of the Board' subject to [FOIA].

(Id., ¶ 31, Ex. 9.)  The Board went on to claim that even if the Bear Records were Board records, they would be exempt from disclosure under FOIA Exemption 4, which allows agencies to withhold certain specified types of confidential commercial information.  (Id., ¶ 31, Ex. 9.)  In addition, for the first time, the Board argued that the documents were immune from disclosure

under FOIA Exemption 5, which allows agencies to withhold from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." (Id., ¶ 31, Ex. 9.)

B.     The Loan Record Request

On May 20, 2008, Bloomberg reporter Mark Pittman submitted to the Board a FOIA request (the "Loan Record Request") seeking certain records (the "Loan Records"). The Loan Record Request stated:

> For all securities posted between April 4, 2008 and May 20, 2008 as collateral to the Primary Dealer Credit Facility, the discount window, the Term Securities Lending Facility, and the Term Auction Facility (the 'Relevant Securities'), we request copies of:
>
> 1.     all forms and other documents submitted by the party posting the Relevant Securities as part of the application for the loan;
>
> 2.     all receipts and other documents given to the party posting the Relevant Securities as part of the application for the loan;
>
> 3.     records sufficient to show the names of the Relevant Securities;
>
> 4.     records sufficient to show the dates that the Relevant Securities were accepted and the dates that the Relevant Securities were redeemed;
>
> 5.     records sufficient to show the amount of borrowing permitted as compared to the face value, also known as the 'haircut';
>
> 6.     records sufficient to describe whether valuations or 'haircuts' for the Relevant Securities changed over time;
>
> 7.     records sufficient to show the terms of the loans and the rates that the borrowers must pay;
>
> 8.     records sufficient to show the amount that the Federal Reserve has accepted of each of the Relevant Securities;
>
> 9.     records sufficient to show which, if any, Relevant Securities have been rejected as collateral and the reasons for the rejections;
>
> 10.     all databases and spreadsheets that list or summarize the Relevant Securities; and

11.    records, including contracts with outside entities, that show the employees or entities being used to price the Relevant Securities and to conduct the process the lending.

(Thro Decl., ¶ 5, Ex. 1.)

Under FOIA, the Board was required to respond to the Loan Record Request by June 18, 2008, which was 20 business days after the date on which Bloomberg submitted the Loan Record Request. 5 U.S.C. § 552(a)(6)(A). One day after a response was due, in a letter dated June 19, 2008, the Board acknowledged that it had received the Loan Record Request, and unilaterally delayed its response time to July 3, 2008. (Thro Decl., ¶ 6, Ex. 3.) Ignoring that deadline as well, on or around July 8, 2008, Ms. Thro informed Bloomberg that the Board was processing the Loan Record Request. (Glasser Decl. ¶ 9.) On or around August 15, 2008, Ms. Thro and a Board colleague, Ms. Pam Wilson, informed Bloomberg that the Board expected that it would provide a formal denial of the Loan Record Request by the end of September 2008. (Id. ¶ 10.) Finally, in a letter dated December 9, 2008, the Board informed Bloomberg that it had located 231 responsive documents (the "Remaining Term Reports") which allegedly disclose the names of borrowers, the type of institution, the originating Federal Reserve district, the type of credit extended, the origination and maturity dates of the loans, and the individual loan amounts. (Br. 16.)

The Board took the position that all of the information in the Remaining Term Reports was exempt from disclosure under FOIA Exemption 4 because it constituted confidential commercial information. (Thro Decl., ¶ 16, Ex. 5.) The Board also maintained that the documents were exempt from disclosure under FOIA Exemption 5. (Id.) Finally, the Board also took the position that documents held by the NY Fed are not subject to FOIA. (Id., ¶¶ 16, 21, Ex. 5.)

Thus, with the exception of two documents produced in response to the Loan Record Request, the Board refused to provide Bloomberg with any documents in response to either of Bloomberg's FOIA requests.

3.    Bloomberg's Complaint And The Board's Motion For Summary Judgment

On November 7, 2008, Bloomberg filed its Complaint in this case, seeking to compel disclosure of the Loan Records. On November 25, Bloomberg filed its Amended Complaint, adding a claim seeking disclosure of the Bear Records. The Board filed its Answer on December 10, 2008.

On March 4, 2009, the Board filed its Motion for Summary Judgment. In it, the Board again argues that certain requested records are in the possession of the NY Fed and therefore are not subject to disclosure under FOIA. The Board also argues that the requested records are exempt from disclosure because they reflect confidential commercial information, the disclosure of which would cause public uncertainty about the borrowers and would chill further borrowings, thereby both causing competitive harm to the borrowers and interfering with the Fed's ability to effect monetary policy.

For the reasons discussed below, Bloomberg respectfully submits that the Board's Motion for Summary Judgment should be denied, Bloomberg's cross-motion should be granted, and the Board should be directed to provide immediately to Bloomberg (and therefore the public) the Loan Records and the Bear Records, whether held by the Board or by the NY Fed.


ARGUMENT

By allowing the public to know "what the government is up to," FOIA leads to a better-informed citizenry with greater confidence in its public institutions. U.S. Dep't of Justice v. Reporters Comm. For Freedom of the Press, 489 U.S. 749, 750 (1989). The Supreme Court of

the United States recognized that in enacting FOIA, "Congress sought to open agency action to the light of public scrutiny. Congress did so by requiring agencies to adhere to a general philosophy of full agency disclosure. Congress believed that this philosophy, put into practice, would help ensure an informed citizenry, vital to the functioning of a democratic society." U.S. Dep't of Justice v. Tax Analysts, 492 U.S. 136, 142 (1989) (internal quotations and citations omitted); see also H.R. Rep. No. 89-1497, at 33 (1966) ("a democratic society requires an informed, intelligent electorate, and the intelligence of the electorate varies as the quantity and quality of its information varies").

FOIA also reflects the view that greater disclosure will engender greater public confidence in our government: "A government by secrecy benefits no one. It injures the people it seeks to serve; it injures its own integrity and operation. It breeds mistrust, dampens the fervor of its citizens, and mocks their loyalty." S. Rep. No. 89-813, at 45 (1965).

The agency's interpretation of FOIA is entitled to no deference. Vaughn v. Rosen, 484 F.2d 820, 824 (D.C. Cir. 1973). FOIA empowers the District Court to order the production of agency records improperly withheld in response to a FOIA request. 5 U.S.C. § 552(a)(4)(B); see also Federal Open Mkt. Comm. of the Fed. Reserve Sys. v. Merrill, 443 U.S. 340 (1979). The District Court reviews the matter de novo. Vaughn, 484 F.2d at 824. In doing so, the Court is obliged to assess whether the agency's determination was correct, not merely reasonable. See Lee v. Federal Deposit Ins. Corp., 923 F. Supp. 451 (S.D.N.Y. 1996). And the Court's decision should be made with FOIA's "dominant disclosure direction always in view." Petroleum Info. Corp. v. U.S. Dep't of the Interior, 976 F.2d 1429, 1439 (D.C. Cir. 1992).

I.    THE LOAN RECORDS AND BEAR RECORDS HELD BY THE
      NY FED ARE SUBJECT TO FOIA AND SHOULD BE PRODUCED.

        The Board takes the position that it was not obligated to produce (or even search

for) responsive documents held by the NY Fed because those documents were not "created or

obtained by the Board."[7]  (Br. 36).  In making this argument, the Board ignores the plain

language of its own regulations, as well as its Brief's lengthy protestations that the NY Fed's

lending activities in issue were undertaken as part of the Board's efforts to effect monetary

policy.

        A.    The Board's Regulations Show That Its Distinction Between
              Board Records And NY Fed Records Is Chimerical.

        The plain language of the Board's own FOIA regulations shows that records of

the NY Fed are indeed subject to public scrutiny under FOIA, and are properly obtained through

requests to the Board.  Those regulations provide two separate categories of documents that

constitute "Records of the Board," only one of which the Board mentions.  First, as noted in the

Board's Brief, they define "Records of the Board" to include:

> (i) In written form, or in nonwritten or machine-readable form; all
> information coming into the possession and under the control of
> the Board, any Board member, any Federal Reserve Bank, or any
> officer, employee, or agent of the Board or of any Federal Reserve
> Bank, in the performance of functions for or on behalf of the Board
> that constitute part of the Board's official files.

12 C.F.R. § 261.2(i)(1) (emphasis added).  But the regulations also contain an independent

clause that defines "Records of the Board" to include records:

> (ii) [t]hat are maintained for administrative reasons in the regular
> course of business in official files in any division or office of the
> Board or any Federal Reserve Bank in connection with the
> transaction of any official business.

Id.  The Board's brief ignores this aspect of the definition entirely.

---

[7] Consequently the Board's search was not adequate.

The Board's regulations also provide that "[t]he Secretary of the Board is the official custodian of all Board records, including records that are in the possession or control of . . . any Federal Reserve Bank . . . or Reserve Bank employee." 12 C.F.R. § 261.3(a).

Ignoring both the second prong of the definition of "Records of the Board" and the fact that the Secretary of the Board is, for FOIA purposes, the custodian of Reserve Bank records, the Board engages in a lengthy recitation of the differences between its role and a Reserve Bank's role, and argues that the NY Fed's records are not Board records because they did not come into the NY Fed's possession in the performance of functions for or on behalf of the Board. (Br. 34-46.) This argument fails for two reasons. First, it overlooks the fact that the Board's regulations define "Records of the Board" to include records maintained in "official files in any division or office of . . . any Federal Reserve Bank in connection with the transaction of any official business." 12 C.F.R. § 261.2(i)(1)(ii). The Board does not – and cannot – suggest that the Loan Records and Bear Records, to the extent held by the NY Fed, are not maintained in the NY Fed's "official files . . . in connection with the transaction of any official business."

Second, the Board's Brief makes clear that the NY Fed was in fact acting "on behalf of the Board" in connection with the generation of the Loan Records and the Bear Records. Indeed, the Board argues that disclosure of those records would interfere with the Board's ability to effect monetary policy. In that regard, the Board argues that:

- "disclosure of borrower names, loan amounts, and terms of individual loans in the Remaining Term Reports would impair the Board's ability – through Federal Reserve Bank funding facilities – to address strains in financial markets and to effectively preserve its statutory objectives"; and

- the Board "utilize[s] DW and TAF lending by the Reserve Banks as a safety valve in relieving liquidity strains for individual depository institutions and the banking system, and

to complement open market operations in achieving the target
federal funds rate."

(Br. 26.) Further, the Board's Brief also makes clear that the precise lending programs that are

the subject of Bloomberg's FOIA requests constitute action by the Board in pursuing

governmental monetary policy. (See Br. 3 ("In response to the current financial crisis, the Board

has authorized the Federal Reserve Banks to initiate a number of additional, temporary special

credit and liquidity facilities . . . to relieve severe liquidity strains in the market, reduce risks to

financial stability, and strengthen the effectiveness of monetary policy in addressing risks to the

outlook for growth and inflation."), 26 (noting the Board's "authority under section 13(3) of the

[Federal Reserve Act] to permit lending by the Reserve Banks to individuals, partnerships or

corporations to address 'unusual and exigent circumstances' in the domestic economy" and its

ability "to utilize DW and TAF lending by the Reserve Banks as a safety valve in relieving

liquidity strains for individual depository institutions and the banking system").)

The Board seems to concede that the NY Fed was acting in furtherance of Board

policy in connection with the lending at issue here, but argues that the Loan Records and Bear

Records held by the NY Fed are nonetheless not Board records because they do not "relate to a

Board function performed by a Reserve Bank acting under 'delegated authority' from the

Board." (Br. 41.) But the Board cites no authority for this creative but unfounded gloss on the

definition of "Records of the Board" set out in the Code of Federal Regulations.[8]

In addition, the Board's delegated authority argument is based on a false premise.

The Board contends that the NY Fed's lending activities do not constitute "delegated authority"

because they are mere "commercial activities" in which the Board did not authorize it to engage,

---

[8] Where an agency's interpretation of its regulations is inconsistent with the plain language of
that regulation, the Court owes it no deference. See Christensen v. Harris County, 529 U.S. 576,
588 (2000); Lin v. U.S. Dep't of Justice, 459 F.3d 255, 262 (2d Cir. 2006).

and therefore they cannot be the subject of delegated authority from the Board. (Br. 41.) But as discussed above, the Board concedes that the Loan Records and Bear Records reflect action by the NY Fed in connection with the implementation of the Board's monetary policy – a governmental, and not commercial, action. And, regardless of whether the documents relate to actions by the NY Fed "on behalf of" the Board, they clearly relate to "the transaction of official business" by the NY Fed. Thus, the documents not only relate to actions by the NY Fed on behalf of the Board, they also relate to the transaction of official business by the NY Fed. They therefore come squarely within each of the two prongs of the Board's definition of "Records of the Board" set forth in the C.F.R. See 12 C.F.R. § 261.2(i)(1)(ii).

B.    Reserve Banks Are Agencies And Therefore
      Their Records Are Subject To FOIA.

The Board's argument that the NY Fed's records are not "agency" records proves too much because it would mean that the actions of Reserve Banks – which, as the Board recognizes, perform critical governmental functions under Congressional grant – are immune from public scrutiny under FOIA. But the Board provides no explanation for why Reserve Banks should be exempt from FOIA's reach. In fact, Reserve Banks fit squarely within FOIA's definition of "agency," and are therefore subject to its provisions.[9]

---

[9] Indeed, even if the NY Fed were considered a private party, the records it has that are responsive to Bloomberg's request would be subject to FOIA because the NY Fed was acting on behalf of the Board. If a government contractor performs a task on behalf of the government, the records relating to the task are "agency records." See Burka v. U.S. Dep't of Health and Human Services, 87 F.3d 508, 515 (D.C. Cir. 1996); Defense of Animals v. National Institute of Health, 543 F. Supp. 2d 70, 77 (D.D.C. 2008) ("[R]ecords need not be generated by an agency, or in the actual possession of an agency, for the records to be considered 'owned or obtained' by an agency."). The Board's argument, if accepted, would allow agencies to evade their FOIA obligations by outsourcing their day-to-day activities to third-party contractors. Then, in response to FOIA requests, the agency could refuse to produce the records, claiming, as the Board does, that the third party "administers" the program and is "solely responsible for operating" it on a "day-to-day" basis (Br. 12-13, 43-44), that the agency had not "created[,] obtained[, or] relied upon" the responsive records (Br. 36), and that "an agency has no FOIA

FOIA's central premise is that if an entity is an "agency," it must make information publicly available in accordance with the statute's terms. 5 U.S.C. § 552(a). FOIA defines an "agency" as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency . . . ." 5 U.S.C. § 551(1). In 1974, in the context of expanding FOIA's definition of "agency," Congress noted that the term was intended to include entities that "perform governmental functions and control information of interest to the public." H.R. Rep. No. 93-876, at 8-9 (1974), reprinted in 1974 U.S.Code Cong. & Admin. News at 6267, 6274. Thus, Congress added a section to FOIA to clarify that the term "agency" includes any "Government controlled corporation," which "would include a corporation *not* owned by the Federal Government." Id. (emphasis in original).

The Board cannot seriously maintain that the NY Fed does not "perform governmental functions and control information of interest to the public." Id. As the Board acknowledges, Congress created the Reserve Banks as the "monetary and fiscal agents of the United States." (See Br. 38-39 (citing Fasano v. Federal Reserve Bank of New York, 457 F.3d 274, 277 (3d Cir. 2006)).) The Board also characterizes the Reserve Banks as the operational arm of the government's central banking system, and maintains that it accomplished its governmental objective by authorizing and overseeing Reserve Bank funding facilities. (See Br. 26, 33, 38-39.) Indeed, in a brief filed with the Third Circuit Court of Appeals in Fasano, the NY Fed described itself as "an instrumentality of the United States" which "execute[s] a quintessential central bank function on behalf of the United States government," "acts as the banker for the United States government," and "executes the monetary policy of the United

---

obligation to search records outside of its possession or control" (Br. 13, see also Br. 15).
Congress never intended to allow government agencies to arbitrarily keep their decisions and actions secret by outsourcing government business.

States." Brief for Appellant Federal Reserve Bank of New York, <u>Fasano v. Federal Reserve Bank of New York</u>, No. 05-4661, 2006 WL 5439217 (3d Cir. Jan. 26, 2006).

It is therefore clear that the NY Fed is an "agency" within the meaning of FOIA. Its records, therefore, are accessible under FOIA (unless an exemption applies). Given that the Secretary of the Board is deemed the custodian of such records (12 C.F.R. § 261.3(a)), and given that the NY Fed has not promulgated its own FOIA regulations, those records are accessible through requests to the Board, such as Bloomberg's Loan Records Request and Bear Request.

C.     The Board Should Not Be Allowed To Further Delay
        The Release Of The Loan Records Or Bear Records By
        <u>"Reserv[ing] Its Right" To Save Arguments For Later.</u>

In a footnote, the Board threatens to seek to further delay the disclosure of the materials Bloomberg seeks. In particular, the Board states that "should the Court conclude that [the NY Fed's] documents are subject to FOIA, the Board requests that the [NY Fed] be given an opportunity to intervene and assert its interests, and the Board reserves the right, if necessary, to submit additional evidence and argument regarding the application of exemptions 4 and 5 to responsive [NY Fed] documents." (Br. 34, n.10.) Bloomberg respectfully requests that the Board's suggestion be disregarded.

The Board's reservation is based on the disingenuous claim that it lacked the necessary access to the NY Fed records to marshal all the arguments regarding the application of Exemptions 4 and 5 to them:

> Because the documents have at all times been in the possession of
> the [NY Fed], the Board is unable to prepare a <u>Vaughn</u> index for
> [those documents], and has only included declarations and
> argument supporting the application of exemptions 4 and 5 to
> [those] documents to the extent it has this information available.

(<u>Id.</u>) In fact, the Board and the NY Fed have had a <u>full</u> opportunity to present the pertinent arguments regarding the NY Fed documents that Bloomberg seeks.

First, <u>since at the latest October 14, 2008</u>, the Board has been on notice of Bloomberg's position that the NY Fed records are "agency records." (Thro Decl., Ex. 8; <u>see also</u> Amended Compl. ¶¶ 40-43.) Second, the Board concedes that it has broad oversight responsibility and control over the NY Fed and has access to the relevant documents. (Br. 36-39; <u>see</u> <u>also</u> 12 U.S.C. § 248(j); 12 C.F.R. § 261.3(a).) Third, in response to the Bear Request, the Board stated that its "[s]taff has confirmed that documents responsive to [Bloomberg's] request are located at the [NY Fed]." (Thro Decl., Ex. 7.) Finally, the Board and the NY Fed have been working together on Bloomberg's FOIA requests and this case, and the NY Fed has been actively participating in these proceedings: the Board "consulted with [the NY Fed] staff, who confirmed that responsive [NY Fed] records regarding the Bear Stearns Loan were not Board records" (Br. 15), and three different NY Fed employees have submitted declarations arguing at length that the documents Bloomberg seeks should not be disclosed. (<u>See</u> McLaughlin Decl.; Logan Decl.; Mucciolo Decl.)[10] Therefore, the Board should not be allowed further to delay the disclosure of the Loan Records and Bear Records held by the NY Fed in the event the Court determines that they are subject to FOIA.

## II. THE REQUESTED INFORMATION IS NOT PROPERLY SECRET UNDER EITHER OF THE EXEMPTIONS ON WHICH THE FED RELIES.

To prevail on its motion for summary judgment, the Board must prove "that any responsive information that it withheld falls within one of FOIA's exemptions." <u>James v. U.S.</u> <u>Customs & Border Protection</u>, 474 F. Supp. 2d 154, 157 (D.D.C. 2007). "On the other hand, summary judgment is appropriate for a FOIA plaintiff when the requested material, even on the

---

[10] "McLaughlin Decl." refers to the Declaration of Susan E. McLaughlin sworn to on March 1, 2009, "Logan Decl." refers to the Declaration of Lorie K. Logan sworn to on March 2, 2009, and "Mucciolo Decl." refers to the Declaration of Helen E. Mucciolo sworn to on March 3, 2009, all filed in support of the Board's motion.

agency's version of the facts, falls outside the proffered exemption." Trulock v. U.S. Dep't of Justice, 257 F. Supp. 2d 48, 50 (D.D.C. 2003) (internal citations and quotations omitted).

The Board bears a "substantial" burden in showing the requested records fall within one of the specific exemptions set forth in FOIA. Lee v. Federal Deposit Ins. Corp., 923 F. Supp. 451 (S.D.N.Y. 1996). First, FOIA's exemptions are to be construed narrowly. Vaughn, 484 F.2d at 824; see also Nat'l Parks and Conservation Ass'n v. Kleppe, 547 F.2d 673, 687 (D.C. Cir. 1976) ("Congress enacted [FOIA] to ensure comprehensive public access to government records, limited only by certain narrowly-construed exemptions enacted to protect other important interests."). Second, the agency must show the application of an exemption with specific evidence; conclusory or speculative assertions in support of an exemption are insufficient. See Lee, 923 F. Supp. 451; Comstock Int'l (U.S.A.) Inc. v. Export-Import Bank, 464 F. Supp. 804, 807 (D.D.C. 1979). Moreover, an agency may not withhold entire documents, or broad categories of documents, when only a segregable portion is exempt from disclosure. See 5 U.S.C. § 552(b); Inner City Press/Cmty. On The Move v. Bd. of Governors of the Fed. Reserve Sys., 463 F.3d 239, 249 n.10 (2d Cir. 2006).

The Board argues that the Loan Records and Bear Records are exempt from disclosure under Exemptions 4 and 5 because they constitute confidential commercial information. As shown next, the Board's arguments simply wrong.

A.  The Board Cannot Show That Exemption 4, Covering
     Confidential Commercial Information, Applies Here.

Exemption 4 of FOIA exempts from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). Records are "confidential" if disclosure of the information is likely to: (1) impair the Government's ability to obtain necessary information in the future; or (2) cause substantial

harm to the competitive position of the person from whom the information was obtained. See Nat'l Parks and Conservation Ass'n v. Morton, 498 F.2d 765, 770 (D.C. Cir. 1974); American Airlines, Inc. v. Nat'l Mediation Bd., 588 F.2d 863 (2d Cir. 1978). In addition, some courts have recognized a third prong, called the "program effectiveness" theory, under which documents may be withheld if disclosure would detrimentally impact the agency's ability to fulfill its statutory responsibilities. See 9 to 5 Org. for Women Office Workers v. The Bd. of Governors of the Fed. Reserve Sys., 721 F.2d 1 (1st Cir. 1983).[11]

The Board claims – with no basis in fact other than a self-serving affidavit – that disclosure of the requested records would cause substantial competitive harm to borrowers and would impair the Fed's ability to effect monetary policy. The Board fails, however, to meet its burden of providing any concrete and specific evidence showing that either of those protected interests would likely be harmed. Instead, its arguments regarding those supposed harms are speculative and baseless. Exemption 4 does not provide a basis for withholding the requested documents.

1.      The Board Cannot Show That The Release Of The Requested Information Would Be Likely To Cause Substantial Competitive Harm To Borrowers.

FOIA obligates the Board to point to specific evidence substantiating its assertion that release of the materials would cause substantial competitive harm to borrowers. See PETA v. U.S. Dep't of Agric., No. Civ. 03 C 195-SBC, 2005 WL 1241141, at *5 (D.D.C. May 24, 2005) ("PETA"). Arguments based on remote or speculative injuries do not suffice. See, e.g., PETA, 2005 WL 1241141, at *6-7; Public Citizen Health Research Group v. FDA, 964 F. Supp.

---

[11] The Second Circuit has not yet adopted the "program effectiveness" prong. See Nadler v. Fed. Deposit Ins. Corp., 92 F.3d 93, 96 (2d Cir. 1996). In Nadler, after the district court had found that certain information was exempt under the competitive harm and program effectiveness interests, the Second Circuit affirmed based only on the competitive harm interest, and declined to address the "program effectiveness" prong. Id. at 96.

413, 415 (D.C. Cir. 1997); Silverberg v. HHS, No. 89-2743, 1991 WL 633740, at *4 (D.D.C. June 14, 1991). "Because conclusory and generalized allegations are unacceptable as a means of sustaining the burden of nondisclosure under the FOIA, specific factual or evidentiary material is required to support application of [Exemption 4]." Comstock, 464 F. Supp. at 807. Rather, the agency must provide "evidence that competitive harm is imminent should [the requested] information be disclosed." Iglesias v. CIA, 525 F. Supp. 547, 559 (D.D.C. 1981).

Moreover, the competitive harm "must flow[] from the affirmative use of proprietary information by competitors," not merely "any injury to competitive position, as might flow from customer or employee disgruntlement. . . ." Public Citizen Health Research Group v. FDA, 704 F.2d 1280, 1291 n.30 (D.C. Cir. 1983) (citation omitted).[12] And if the information in question is already available to the public, it cannot be exempt under the "confidential information" exemption. See Inner City Press/Cmty. on the Move v. Bd. of Governors of the Fed. Reserve Sys., 380 F. Supp. 2d 211, 221 (S.D.N.Y. 2005).

As discussed next, the Board's claims of competitive harm fail for several reasons. First, the Board's argument is based on speculation (not specific facts or evidence) of possible (not likely) harm. Second, the Board's argument is based on imaginary concerns about potential injury due to adverse publicity, and not from the use of proprietary information by competitors. Third, recent market activity shows that similar disclosures actually boosts public confidence in financial institutions. Further, the Board's argument is contrary to fundamental economic theory, which holds that more disclosure and greater transparency allow market participants to make more informed − and therefore more intelligent − choices. Fourth, at least

---

[12] Some courts have held that the competitive injury must be weighed against the public interest in the information. See, e.g., Worthington Compressors, Inc. v. Costle, 662 F.2d 45, 51 (D.C. Cir. 1981); Teich v. FDA, 751 F. Supp. 243, 253 (D.D.C. 1990); Gilmore v. U.S. Dep't of Energy, 4 F. Supp. 2d 912, 921 (N.D. Cal. 1998).

some of the information either is already public or should be public under SEC disclosure rules. Finally, the requested information was not obtained from a person, but rather is a record of government action.

a. The Board's Arguments Concerning
"Stigma" Are Entirely Speculative.

Rather than offer specific factual evidence of likely substantial competitive harm, the Board raises speculative arguments about the so-called "stigma" that <u>might</u> attach to borrowers if the requested information is disclosed. Thus, the Board speculates that release of the requested information "<u>can</u> fuel market speculation and rumors," which "<u>could</u> rapidly lead to a loss of public confidence in the institution, a sudden outflow of deposits (a 'run'), a loss of confidence by market analysts, a drop in the institution's stock price, a withdrawal of market sources of funding, acceleration of existing loans to the institution, and, in extreme cases, closure of the institution." (Br. 20-21 (internal citations omitted) (emphasis added).) Similarly, the Board speculates that "the fact that an institution is borrowing at the DW <u>can</u> fuel market speculation and rumors that the entity's liquidity strains stem from a financial problem at the institution that is not known by the public at large." (Br. 20 (emphasis added).) And the Board speculates that out of fear of these potential consequences, an institution "<u>may</u>" stop borrowing from the Fed, which "<u>could</u> quickly lead to its demise." (Br. 22 (emphasis added).)

Such unsupported speculation of the possibility of remote harm is insufficient to meet the Board's burden of offering specific facts to show that substantial competitive harm is likely to occur. See <u>City of Chicago v. U.S. Dep't of the Treasury</u>, No. 01 C 3835, 2002 WL 370216, at *2 (N.D. Ill. March 8, 2002) (Exemption 4 does not apply where competitive injury is remote or speculative); <u>PETA</u>, 2005 WL 1241141, at *7; <u>Comstock</u>, 464 F. Supp. at 807

("[C]onclusory and generalized allegations are unacceptable as a means of sustaining the burden of nondisclosure under the FOIA.").

The Board also argues that its own "understanding" with borrowers that the requested information will remain secret is evidence that release of such information would cause competitive harm. (Br. 20.) In fact, as discussed below, some borrowers actually have disclosed their participation in the Lending Facilities, and the Board has not presented a scintilla of evidence that any of those borrowers has experienced the harm about which the Board speculates. In any event, the Fed may not enter into an agreement with borrowers − explicit or otherwise − to disregard the Fed's disclosure obligations under FOIA. Cf. Teich v. FDA, 751 F. Supp. 243, 247 (D.D.C. 1990) ("If the FDA were permitted to assure confidentiality to those it regulates... the FOIA would be completely frustrated. . . . [The agency cannot] forge a Northwest passage around the FOIA.... by assert[ing] simply that it received the file under a pledge of confidentiality to the one who supplied it. Undertakings of this nature can not, in and of themselves, override the Act.") (citation omitted).

> b.  Recent Market Activity Shows That Disclosures Actually Boost, Not Damage, Public Confidence In The Financial Institutions.

The Board's speculation that disclosure of the information that Bloomberg seeks would lead to adverse investor reaction is also belied by recent history. Indeed, in similar contexts the market has reacted positively to news that an institution received government aid. See, e.g., Rose Decl., Exs. 47 (Bradley Keoun, Citigroup Gets U.S. Rescue From Toxic Losses, Capital Infusion, Bloomberg News, Nov. 24, 2008 (Citigroup Inc.'s stock surged 64% after the market learned that it received a "government rescue package that shields the bank from losses on toxic assets and injects $20 billion of capital")), 48 (Josh Fineman, E*Trade Shares Surge on Optimism Firm Will Get TARP Funding, Bloomberg News, Nov. 25, 2008 (E*Trade Financial

Corp.'s stock surged 42% after the company announced that it was "optimistic" that it would receive funds from the government's Troubled Asset Relief Program)), 49 (Jonathan Stempel & Kevin Krolicki, <u>GM, GMAC Ease Lending Rules to Entice Car Buyers</u>, Reuters, Dec. 30, 2008 (General Motors Corp.'s shares increased 5.6% after announcing that its GMAC funding affiliate would receive $6 billion in TARP funding)), 50 (Greg Sushinsky, <u>PNC Gobbles Up National City</u>, Investopedia, Nov. 4, 2008 (PNC Financial Services Group's stock price increased $2 to $58.58 when it announced a deal to acquire National City Corp. using $5.58 billion in funds PNC received through the TARP program)).[13]

To be sure, there may be many reasons that a publicly-traded company's share price jumps, but the historical facts here – a disclosure by banks of public fund assistance followed immediately by a share price increase – demonstrate the fallacy of the Board's speculative and unsupported allegations of harm and "stigma."

      c.    The Board's Arguments Reveal That The Supposed Competitive Harm Would Be Based On Adverse Public Reaction, Which Is <u>Insufficient As A Matter Of Law To Invoke Exemption 4.</u>

The Board's attempt to keep the requested information secret also fails because the Board's claim of potential harm to borrowers relates to the reaction by the <u>customers and</u>

---

[13] Here, the requested information would have little or no negative effect on the market because, while the information is very valuable to the public in assessing governmental action, the information is stale from the market's perspective. As explained above, the Board states that its lending facilities serve as a "back-up source of liquidity for depository institutions . . . on a short-term basis." (Br. 19.) The requested information contained in the Remaining Term Reports relates to short-term loans that were awarded in April and May 2008. Those loans range in duration from overnight up to 90 days. The requested information addresses loans that were made a year ago, and paid back well over six months ago. Further, the Board admits that an institution "may experience short-term liquidity shortfalls for a number of reasons, some of which do not indicate financial instability." (Br. 19.) Therefore, the release of the requested information would merely reveal whether around one year ago a borrower had a short-term liquidity shortfall, which may or may not have indicated financial instability. Accordingly, the withheld information has little or no relevance to the market today. On the other hand, it remains highly relevant to the public's ability to assess the government's actions in response to the current economic crisis.

shareholders of the borrowers, rather than to the use of that information by competitors of the borrowers. To be protected by Exemption 4, the competitive harm must flow from "the affirmative use of proprietary information by competitors." Public Citizen Health Research Group v. FDA, 964 F. Supp. 413, 415 n.2 (D.C. Cir. 1997) (internal quotations and citation omitted) (emphasis added). The exemption does not apply where the alleged harm would flow from adverse publicity, an adverse or alarmist public reaction, adverse customer reaction, or embarrassment. See Public Citizen Health Research Group v. FDA, 964 F. Supp. 413, 415 n.2, n.30 (D.C. Cir. 1997); CNA Fin. Corp. v. Donovan, 830 F.2d 1132, 1154, 1154 n.158 (D.C. Cir. 1987); Silverberg v. HHS, No. 89-2734, 1991 WL 633740, at *4 (D.D.C. June 14, 1991). But fear of embarrassing their borrowers is all the agency points to here.

As noted above, the Board speculates that the release of the requested information "can fuel market speculation and rumors" that "could rapidly lead to a loss of public confidence in the institution, a sudden outflow of deposits (a 'run'), a loss of confidence by market analysts, a drop in the institution's stock price, a withdrawal of market sources of funding, acceleration of existing loans to the institution, and, in extreme cases, closure of the institution." (Br. 20-21 (internal citations omitted).) These speculative injuries relate only to the reactions of customers, shareholders and other members of the public, and not to competitors' use of the borrowers' proprietary information to their advantage. (Br. 21-22.)

Indeed, the Board does not even contend that the borrowers' competitors would use the information in any way. In the absence of such a contention, the Board fails to satisfy its burden under Exemption 4.

     d. The Board's Argument That The Market Will Misconstrue
       The Information Is Contrary To Economic Theory And To
       The Full Disclosure Philosophy Of Our Securities Laws.

   The Board's "competitive injury" argument is, in essence, that the truth should be kept from the market because the market might misconstrue it to the borrowers' detriment. But this flies in the face of widely accepted economic theory, which holds that a better-informed market is a better-functioning market. It also belies the entire philosophy of our Federal law, which is based on the fundamental principal of transparency that investors are entitled to a wide range of information about the companies in which they invest.

     1. The Board's Alleged Speculative Harm Is Inconsistent
       With Fundamental Economic Theory.

   The Board's efforts to maintain the secrecy of the requested information, and the supposed stigma upon which the Board relies in support of its position, is also contrary to established economic theory, which recognizes that increased information in the market leads to better decision-making. (See Brown-Hruska Decl. ¶¶ 8, 22, 24, 35.)[14] First, objective expert research refutes the Board's speculation that disclosure might result in substantial competitive harm in the market for retail and commercial banking and for brokerage services. (See Brown-Hruska Decl. ¶¶ 6-14.) Indeed, research conducted by economists at the Fed shows that increased disclosure of information regarding troubled banks in times of crisis provides useful information that allows markets to adjust, without substantial or undue competitive consequences. (Id. ¶¶ 8-9.) For example, in one study, which focused on announcements of formal actions by the Fed that reflected that banks were "deeply troubled," the researchers (who were Fed economists) found that the disclosure provided "useful patterns of stock price

---

[14] References to "Brown-Hruska Decl." are to the Declaration of Dr. Sharon Brown-Hruska, sworn to on April 15, 2009 and filed herewith.

reaction," which did not cause severe problems, but instead represented "a repricing of reasonable magnitude." (Id. ¶ 9.)

Bloomberg simply seeks information regarding the extension of credit by the Fed, the composition of bank assets posted as collateral, and information regarding valuation by third parties. Because the information is heavily influenced by market conditions, such as the illiquidity of various assets posted as collateral, the disclosure would not be expected to have a competitive effect (especially given that many rival borrowers hold the same assets). (See Brown-Hruska Decl. ¶ 13.)

Second, the so-called "stigma" associated with borrowing at the discount window is inconsistent with the purposes of the facilities at issue. By the Board's own description of the programs, accessing credit from the discount window is not indicative of a troubled institution, but rather often is due to transitory or liquidity needs. Further, to the extent that there was any stigma associated with borrowing at the discount window (which the Board has failed to demonstrate beyond mere speculation), that stigma would be expected to be more pronounced in normal financial conditions, since the likelihood of using the facility might be more unusual. Thus, it is not surprising that these institutions are borrowing at the discount window in the current economic climate.

Third, the Fed's concern that revealing the names of counterparties would discourage other companies from doing business with those banks and institutions receiving funds from the programs is also contrary to economic theory. In general, financial decisions are based on a "risk-return" analysis – higher interest rates attract more deposits, and prospects of capital appreciation attract investors. (See Brown-Hruska Decl. ¶ 21.) Transaction costs, reputations, and relationships play a role in the attraction and maintenance of customers. (Id.)

Because the government has pledged to support these institutions, and has done so broadly, the risk to counterparties of default by these institutions is remote. (<u>Id.</u>)

Finally, the Board is concerned that financial analysts, customers, and competitors would draw adverse conclusions about borrowers which would lead to a loss of confidence in those institutions, which would in turn pose competitive harm to these institutions. The Board's concern is premised on the assumption that the market will necessarily draw adverse inferences about the borrowers, and that the market is not able to correctly internalize the information. However, economic theory and empirical studies suggest that markets are extremely efficient in processing information, both in direction and proportion. (<u>See</u> Brown-Hruska Decl. ¶ 24.) That research shows that:

- the markets fail when there is a high level of uncertainty, in effect when there is a <u>lack</u> of good information on which to base decisions (<u>Id.</u> ¶ 24);

- markets that are less efficient or that exhibit symptoms of market failure warrant <u>greater</u> levels of disclosure (<u>Id.</u> ¶ 24); and

- by the mechanics of the efficient market hypothesis, disclosure will result in <u>increases</u> in market efficiency (<u>Id.</u> ¶ 29).

In short, increased disclosure, such as the information sought by Bloomberg's FOIA requests, will eliminate the opacity that is creating significant uncertainty in the financial markets and in the economy overall. (<u>See</u> Brown-Hruska Decl. ¶¶ 32-42.) The benefits of additional disclosure include the following:

- The Fed's extension of credit to the borrowers makes the taxpayers "involuntary investors" in those institutions. As involuntary investors, the public needs to be able to "figure out what is happening with the money." (<u>Id.</u> ¶ 33.)

- As investors, all taxpayers should be accorded the knowledge of the risks associated with Fed lending activities, including the collateral and the terms of the lending to the institutions to which they have extended credit. (<u>Id.</u> ¶ 33.)

- Transparency in disclosure will help resolve uncertainty regarding the value of the assets used as collateral, as well as the scope and extent of the economic problem. With more information about those assets and the impact on the institutions holding them, the markets will be able to more accurately price the assets and the institutions. (Id. ¶ 34.)

- The Fed's disclosure of the requested information will give investors and the public necessary data to aid them in their investment decisions and guide their own economic choices. In short, information will not cause crisis, it will speed the resolution of uncertainty and promote a swifter recovery. (Id. ¶ 35.)

- Better disclosure of the banks' conditions generally would prevent the hiding or denial of problems which could result in a much slower recovery. Full disclosure of government support is a step in the direction of better disclosure. (Id. ¶ 42.)

History demonstrates the accuracy of economic theory about the benefits of greater transparency in disclosures.[15]

2. The Board's Argument That Borrowers' Shareholders Should Be Kept In The Dark Is Inconsistent With SEC Disclosure Rules.

A central premise of the Board's argument is that market analysts and investors should not be provided with the information that Bloomberg seeks because they might misconstrue its significance. (See Br. at 19-21.) This assertion is flatly inconsistent with the disclosure obligations of publicly-traded borrowers under the Securities Exchange Act of 1934 (the "'34 Act"). Indeed, publicly-traded borrowers are required to, and in fact do, disclose their participation in the loan programs that are the subject of Bloomberg's Loan Records Request. And there is no evidence that such disclosure has resulted in the "stigma" that the Board contends will result from providing the requested information.

---

[15] For example, in response to the banking and credit crisis in the early 1990s, the Japanese government discouraged disclosure of problems with the banking system, while Korea owned up to its problems more quickly. Not surprisingly, Japan's reaction resulted in a lost decade for Japan's economy, while Korea's economy bounced back more quickly. (See Brown-Hruska Decl. ¶ 41.)

Section 13 of the '34 Act empowers the SEC to adopt rules and regulations requiring publicly-traded companies to file with the SEC: (1) "[s]uch information and documents . . . as the [SEC] shall require to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to Section 12" and (2) "[s]uch annual reports . . . and such quarterly reports . . . as the [SEC] may prescribe." 15 U.S.C. § 78m(a). As the House Committee on Interstate and Foreign Commerce noted, "the hiding and secreting of important information obstructs the operation of the markets as indices of real value." H.R. Rep. 73-1383, at 11 (1934). The House Committee went on to highlight "the vital importance of true and accurate corporate reporting as an essential cog in the proper functioning of the public exchanges." Id. See also S. Rep. 73-1455, at 68 (1934) ("It is universally conceded that adequate information as to the financial structure and condition of a corporation is indispensable to an intelligent determination of the quality of its securities.").

Further, in adopting the '34 Act, Congress specifically rejected an argument raised by the Board in refusing to provide Bloomberg with the requested information. Opponents of the legislation argued, as the Board contends here, that disclosure would provide competitors with an unfair advantage. The House Committee responded that:

> the idea that a fair report of corporate assets and profits give[s] unfair advantage to competitors is no longer seriously entertained by any modern business man. The realistic corporate executive knows that his alert competitors have a pretty good notion of what his business is and if he is unable to compete with them it is because he is hopelessly behind in the keen competitive struggle.

H.R. Rep. 73-1383, at 13 (1934).

Pursuant to the '34 Act, the SEC adopted rules and regulations requiring regular and periodic disclosures by publicly-traded companies. These require, among other things, disclosure of loans and other commitments, such as the programs that are the subject of

Bloomberg's FOIA requests. For example, Regulation S-X requires banks that are subject to the '34 Act's reporting requirements to disclose short-term borrowings and unused lines of credit for short-term financing. <u>See</u> Regulation S-X, Item 9-03.13. Regulation S-X also requires disclosure of long-term debt, including the type of debt, rate of interest, maturity date, contingencies, and priority and conversion terms. <u>See</u> Regulation S-X, Item 9-03.16. Further, publicly-traded companies are required to include in the Management Discussion and Analysis ("MD&A") section of their public filings a disclosure of known trends, demands, commitments, events or uncertainties that will or are reasonably likely to result in material increases or decreases in liquidity. <u>See</u> Regulation S-K, Item 303(a)(1). Thus, a borrower subject to '34 Act periodic reporting requirements is required to disclose its credit facilities on its balance sheet and in its MD&A.

Consistent with those disclosure obligations, publicly-traded borrowers have disclosed their participation (or their eligibility to participate) in the Fed programs that are the subject of Bloomberg's requests. For example, many companies have disclosed their participation in the Term Auction Facility program, including the following:

- Bank of America Corporation (Rose Decl., Ex. 39, Form 10-K for the period ending Dec. 31, 2008 at 15) ("We are currently utilizing TAF and have pledged residential, commercial mortgage and credit card loans as collateral.");

- BOK Financial Corp. (Rose Decl., Ex. 40, Form 10-K for the period ending Dec. 31, 2008 at 51) ("In 2008, the subsidiary banks began borrowing funds under the Federal Reserve Bank Term Auction Facility program. . . . Funds borrowed under this program totaled $450 million at December 31, 2008.");

- Colonial Bancgroup Inc. (Rose Decl., Ex. 41, Form 10-K for the period ending Dec. 31, 2008 at 55) ("Short-term borrowings consist of . . . Federal Reserve Tem Auction Facility (TAF) funds. . . . from December 31, 2007 to December 31, 2008 . . . Colonial purchased $700 million in Federal Reserve TAF funds");

- Metlife Inc. (Rose Decl., Ex. 43, Form 10-K for the period ending Dec. 31, 2008 at 144) ("At December 31, 2008, MetLife Bank had borrowed $950 million under the Term Auction Facility for various short-term maturities.");

- Sterling Financial Corp. (Rose Decl., Ex. 42, Form 10-K for the period ending Dec. 31, 2008 at 67) ("Sterling is also eligible to participate in the Term Auction Facility . . . . Sterling has utilized this source of funds to the extent that these funds are more competitive than other sources."); and

- Comerica Inc. (Rose Decl., Ex. 44, Form 10-Q for the period ending Sept. 30, 2008 at 45) ("Short-term borrowings increased $818 million to $3.6 billion at September 30, 2008, from $2.8 billion at December 31, 2007, primarily due to borrowings under the Federal Reserve Term Auction Facility. . . .").

Borrowers also have disclosed their participation (or eligibility to participate) in the Primary Dealer Credit Facility ("PDCF") and the Term Securities Lending Facility ("TSLF"), including: Bank of America Corporation (Rose Decl., Ex. 39);Goldman Sachs Group Inc. (Rose Decl., Ex. 45); Merrill Lynch & Co. (Rose Decl., Ex. 46); and Morgan Stanley (Rose Decl., Ex. 38).

Thus, some publicly-traded borrowers already have disclosed at least some of the information that Bloomberg seeks through its FOIA request. These disclosures refute the Board's contention that there is an unwritten "agreement" between the Fed and the borrowers that neither will disclose the identity of the borrowers. Further, there is not a scintilla of evidence that these disclosures have caused the "stigma" that the Board contends will occur if the requested information is provided.

For these reasons as well, the Board cannot meet its burden of demonstrating that Exemption 4 applies to Bloomberg's request.

e.  The Requested Information Is Not Subject To Exemption 4
    To The Extent The Fed Did Not Collect It From A Third Party.

The Board's reliance on Exemption 4 also fails because the requested information

was not obtained from the borrowers, but rather from the NY Fed.  If that is the case, the

information would not come within the parameters of that exemption.[16]  Exemption 4 protects

from disclosure "trade secrets and commercial or financial information obtained from a person

and privileged or confidential."[17]  5 U.S.C. § 552(b)(4) (emphasis added); see also 5 U.S.C.

§ 551(2) (defining "person" as an "individual, partnership, corporation, association, or public or

private organization other than an agency") (emphasis added).  Here, by contrast, the Board

seeks to maintain confidentiality over the records of its own actions.

The decision in Buffalo Evening News, Inc. v. Small Bus. Admin., 666 F. Supp.

467 (W.D.N.Y. 1987) is instructive.  There, a newspaper had requested certain details about

loans made by the Small Business Administration ("SBA"), including the loan amounts, amounts

repaid, and the status of the loans.  The newspaper argued that "the [requested] information . . .

ha[d] been generated by the SBA . . . .[, and] that in no way d[id] the[] record[s] implicate any

financial information provided to the government by the borrower."  Id. at 468-469 (internal

quotations and citations omitted).  The agency argued that it "obtains information concerning the

status of [the] loan from the small business in itself, i.e., the action or inaction of the business in

paying its SBA loan obligation determines the loan's status.  SBA merely comp[iles] and records

---

[16] In fact, the Board takes inconsistent positions on this point depending on the exemption it is invoking.  In invoking Exemption 5, which covers "intra-agency or inter-agency communications," the Board claims that the information was provided by the NY Fed.  (Br. 32.) On the other hand, when the Board invokes Exemption 4, it claims that the information came from borrowers.

[17] The Board states that it obtained the information in question from the NY Fed (Br. 32) which, as discussed above, is an agency within the meaning of FOIA.

the data supplied by the business through its loan payment activity." Id. at 469 (internal quotations omitted). The court agreed with the newspaper and ordered disclosure.

The facts here are similar. The Board seeks to keep confidential its own records regarding its lending, not sensitive financial information obtained from the borrowers. The Board withheld the Remaining Term Reports, which apparently contain the names of borrowers, the type of institution, the originating Federal Reserve district, the type of credit extended, the origination and maturity dates of the loans, and the individual loan amounts. (Br. 16.) Such documents are not "obtained from a person," but rather are records of government action, and accordingly are not covered by Exemption 4.

2.     The Board Cannot Withhold The Requested Information
       Under The "Program Effectiveness" Theory.

The Board also claims that Exemption 4's so-called "program effectiveness" prong compels the secrecy of the requested information because disclosure "would impair the Board's ability − through Federal Reserve Bank funding facilities − to address strains in financial markets and to effectively pursue its statutory objectives." (Br. 26.) But even if the Court were inclined to recognize that theory, which has not been adopted by the Second Circuit, it would not apply here because the Board's evidence of impairment to its ability to fulfill its statutory obligation is speculative at best.

In essence, the Board argues that financial institutions' fear of negative public reactions to the disclosure of the Loan Records and Bear Records would cause those institutions not to avail themselves of the financing facilities in question. According to the Board, that, in turn, would interfere with the Board's ability to help those institutions through Reserve Bank lending. But, as discussed at length above, the Board's concerns about the competitive harm that would supposedly flow from disclosure is based on multiple levels of speculation, and is

contradicted by facts. In addition, the Board's argument makes no sense: the Board would have

the Court believe that a bank on the precipice of failure, and with no other funding available to it,

would rather fold for lack of funding than let its depositors and shareholders know that it is being

strengthened by the federal government. This simply cannot be the basis of secrecy.

In Buffalo Evening News, 666 F. Supp. 467, the court rejected a similar

argument. There, the newspaper had requested certain details about loans made by the Small

Business Administration ("SBA"), including the loan amounts, amounts repaid, and the status of

the loans. The government withheld the requested information under Exemption 4, arguing that

its release would "impair [its] interest in the effective operation of its loan assistance program."

Id. at 470. The newspaper countered that "disclosure of the status of the SBA loan will not cause

qualified borrowers to decline the benefits associated with obtaining an SBA loan. Instead, [the

newspaper argued] that it is more likely that borrowers will see such disclosure as a 'cost of

doing business' with the government." Id. at 470. The court agreed with the newspaper, stating

that it "d[id] not believe that disclosure in this case w[ould] harm the SBA's ability to conduct its

own business as intended by Congress." Id. at 471.

PETA, 2005 WL 1241141, at *7, is also on point. The plaintiff in that case

sought various records related to USDA-guaranteed loans by a bank to a private corporation.

The bank argued that Exemption 4 applied because its "business would suffer if the information

contained in the withheld documents [was] disclosed because bank customers would be

unwilling to participate in federal loan guarantee programs if their financial records may be

disclosed under FOIA." Id. The court held that the "testimony [was] too conclusory and

speculative to demonstrate substantial competitive injury." Id.

In support of its argument, the Board focuses on two cases: Comstock Int'l (U.S.A.) Inc. v. Export-Import Bank, 464 F. Supp. 804, 808 (D.D.C. 1979) and Clarke v. U.S. Dep't of the Treasury, No. 84-1873, 1986 WL 1234 (E.D. Pa. Jan. 28, 1986). The Board claims that those cases "have upheld the non-disclosure of information pertaining to loan agreements, the purchase of Treasury bonds or similar financial transactions with the government, where disclosure would hamper the effectiveness of the government's efforts to stabilize the economy or promote economic growth." (Br. 24-25.) However, in both of those cases, the agency disclosed all of the information necessary to understand the government's decision-making and action. See Comstock, 464 F. Supp. at 806 n.3 (agency disclosed "the amount of the loan, its term, the rate of interest, and the amount of fees charged. . . ., the identity, location, and scope of the project, members of the consortium, the responsibilities of individual consortium members, and the methods by which the objectives of the contract are to be achieved"); Clarke, 1986 WL 1234, at *3 (agency disclosed the amount the government borrowed and the interest rate; the withheld information was irrelevant to understanding the government's action). The Fed has failed to provide any such information here.

B.    Exemption 5 Does Not Apply.

The Board also argues that the requested materials should remain secret under Exemption 5, which protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The Board misconstrues this exemption.[18]

Exemption 5 applies only to the extent that the materials would be immune from discovery under a recognized privilege in civil litigation. Federal Open Mkt. Comm. of Fed.

---

[18] To the extent the Loan Records or the Board Records reflect information provided by borrowers, as the Board claims, those materials would not be covered by Exemption 5.

Reserve Sys. v. Merrill, 443 U.S. 340, 360 (1979) ("Merrill"). The Board suggests that Merrill recognized a broad exemption for confidential information generated by a governmental agency, but in fact the privilege recognized by Merrill was much narrower: it is limited to "confidential commercial information generated in the process of awarding a contract." Id. at 360. Nowhere does the Board suggest that the materials requested by Bloomberg fit within that narrow category.

Moreover, the exemption recognized by Merrill is temporary, and even if it applied here it would have expired months ago. In Merrill, the Federal Open Market Committee of the Federal Reserve System (the "FOMC") sought to withhold "certain monetary policy directives from the public during the month they [were] in effect" because releasing them during that month supposedly "would undermine the effectiveness of the agency's policy . . . ." Merrill, 443 U.S. at 343, 53. The FOMC was, however, willing to release the directives at the end of the month, "almost as soon as [they were] drafted and approved in final form . . ." Id. at 346. Consistent with this, the two other cases that the Board cites involve situations where the agency requested a slight delay in the release of very limited information because the agency was acting in the short term to complete a discrete task based on that information. See Government Land Bank v. General Servs. Admin., 671 F.2d 663 (1st Cir. 1982); Hack v. Dep't of Energy, 538 F. Supp. 1098 (D.D.C. 1982). The Board, on the other hand, seeks to keep secret, indefinitely, all aspects of the Loan Records and Bear Records.

## CONCLUSION

Because the Loan Records and Bear Records, to the extent housed at the NY Fed, are "agency records," and because the Board is unable to meet its burden of showing that any of these records fits into one of the narrow FOIA exemptions, Bloomberg respectfully requests that the Board's motion be denied, that Bloomberg's cross-motion be granted, and that this Court

order the Board to produce all Loan Records and Bear Records, whether held by the Board or the

NY Fed.

Dated:   New York, New York
         April 15, 2009

                                    WILLKIE FARR & GALLAGHER LLP


                                    By: _____
                                        Thomas H. Golden
                                        Scott S. Rose
                                        Jared E. Cohen

                                        787 Seventh Avenue
                                        New York, New York 10019
                                        (212) 728-8000
                                        tgolden@willkie.com
                                        srose@willkie.com
                                        jcohen@willkie.com

                                        Attorneys for Plaintiff Bloomberg L.P.

Of Counsel:

Charles J. Glasser, Jr., Esq.
Global Media Counsel, Bloomberg News
731 Lexington Avenue
New York, New York 10022
(212) 617-4529
cglasser@bloomberg.net

4585855