UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

BLOOMBERG L.P., :

                        Plaintiff, :

              - against - :

BOARD OF GOVERNORS OF THE :
FEDERAL RESERVE SYSTEM,

                     :

                Defendant.

------------------------------------------------------------ x

Case No. 08 CV 9595

**DECLARATION OF SHARON BROWN-HRUSKA**

I, SHARON BROWN-HRUSKA, declare as follows:

1.      I submit this declaration in support of Plaintiff Bloomberg L.P.'s ("Bloomberg") opposition to Defendant's Motion for Summary Judgment and in support of Bloomberg's Cross-Motion for Summary Judgment. I make this declaration on my own personal knowledge, except as to matters expressly stated to be upon information and belief, and as to those, I believe them to be true.

## I.      Presentation of Credentials and Experience in Government, Academia, and Economics

2.      I am a Vice President in the Securities and Finance Practice of National Economic Research Associates, Inc. ("NERA"). I am an expert in financial markets and their regulation, and I have taught, researched, and written extensively on topics related to the matters at issue here, specifically the effect of information disclosure on institutions, investors, and markets, and the effectiveness of regulatory agencies.

3.      In addition to my work on these issues as a research economist and a scholar, I served as Commissioner (2002-2006) and Acting Chairman (2004-2005) of the U.S. Commodity Futures

Dockets.Justia.com

Trading Commission ("CFTC"). As Acting Chairman of the CFTC, I served as a member of the

President's Working Group on Financial Markets with the Secretary of the Treasury, Chairman

of the Federal Reserve Board, and Chairman of the Securities and Exchange Commission

("SEC"). While at the CFTC, I testified before Congress on the function and regulation of the

U.S. futures and options markets. I also have addressed numerous governmental and financial

organizations and associations. Thus, I have a record of service and experience in overseeing

and ensuring the integrity of markets and market participants, and a deep appreciation for and

understanding of the charge of federal agencies to promote their efficient function while seeking

to maintain stability and confidence.

4.      I have also held faculty posts in academia and have taught courses in financial markets,

investments, derivatives, and international finance. I have published various articles and reports

on market transparency and the proprietary nature of market information. I hold a PhD and MA

in economics and a BA in economics and international studies from Virginia Polytechnic

Institute and State University in Blacksburg, Virginia. My Curriculum Vitae is attached as

Exhibit 1.

**II.      Discussion of the Information Sought in Bloomberg's FOIA Requests**

5.      Bloomberg reporters Craig Torres and Mark Pittman each submitted to the Board of

Governors of the Federal Reserve System (the "Fed") two separate document requests under the

Freedom of Information Act ("FOIA"). Craig Torres's request, dated April 7, 2008, sought

information on the portfolio of securities that supported the loan that the Fed extended in relation

to JP Morgan Chase & Co.'s acquisition of Bear Stearns Cos.[1]  Mark Pittman's request, dated

May 21, 2008, sought information on the securities that were posted as collateral to the Primary

---

[1] Letter from Craig Torres of Bloomberg News, dated April 7, 2008 (Exhibit 6 to Thro Declaration, February 26, 2009).

Dealer Credit Facility ("PDCF"), the discount window ("DW"), the Term Securities Lending

Facility ("TSLF"), and the Term Auction Facility ("TAF") in the period April 4, 2008 through

May 20, 2008. The request asked for various collateral details including names of the securities

posted as collateral, the dates when they were accepted or redeemed, the amount of the

borrowing compared to the face value of the securities (the "haircut"), whether the valuations or

the haircuts of the securities changed over time, the terms of the loans and the rates borrowers

must pay, databases that list or summarize the securities, and information regarding outside

entities used to price the securities.[2]

### III.  Discussion of the Fed's Arguments Against Disclosure of the Requested Information

####    A.      "Substantial Competitive Harm"

6.      In its motion for summary judgment, the Fed argues that disclosure of the requested

information would result in "substantial competitive harm" in the market for retail and

commercial banking and the market for securities brokerage services.[3] The Fed reasons that

disclosure of the information to the public might lead the market to conclude that a financial

institution accessing the liquidity facilities was experiencing liquidity strains, which could:

> [r]apidly lead to a loss of public confidence in the institution, a
> sudden outflow of deposits (a "run"), a loss of public confidence
> by market analysts, a drop in the institution's stock price, a
> withdrawal of market sources of funding, acceleration of existing
> loans to the institution, and, in extreme cases, closure of the
> institution.[4]

The agency posits that the disclosure would put the institution in a "weakened position vis-à-vis

its competitors," and that "rumors and speculation regarding the health of depository institutions

---

[2] E-mail from Mark Pittman of Bloomberg News, dated May 21, 2008 (Exhibit 1 to Thro Declaration, February 26, 2009).

[3] Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment ("Memorandum"), March 4, 2009, p. 18.

[4] Ibid., p. 21, citing to Madigan Declaration, ¶ 17, and McLaughlin Declaration, ¶ 21.

would quickly spiral into market turmoil."[5]  In my analysis, these conclusions are not supported by the evidence.

7.      While the Fed's efforts to provide liquidity have provided an important source of funds to these institutions, evidence provided in the testimony submitted by Fed staff does not support the conclusion of the negative competitive effects on those institutions who have revealed they have utilized the credit facilities set up by the Fed.  A review of studies by economists and recent experience provides convincing evidence that disclosure of policy actions and financial information with respect to individual banks has *not* resulted in a sudden outflow of deposits or a precipitous decline in bank stock prices.

8.      Research conducted by Jordan, Peek, and Rosengren (1999) and (2000) shows that increased disclosure of information regarding troubled banks in times of crisis provides useful information that allows markets to adjust without substantial or undue competitive consequences.[6]  The disclosures studied involved announcements of formal supervisory enforcement actions by the Fed that reflect the supervisor's assessment that banks "require immediate remedial action in order to avoid failure."[7]  The information that Bloomberg seeks to have the Fed disclose through its FOIA requests is not as dire as the disclosure of an enforcement action by the Fed, but rather is informative regarding the extension of collateralized credit, the composition of bank assets posted as collateral, and information regarding valuation by third parties.  Thus, the reaction to the disclosure of the supervisory actions studied in Jordan, et al., would be expected to be greater than that to the revelation of the FOIA information.

---

[5] Ibid., Madigan Declaration, ¶ 8, and McLaughlin Declaration ¶ 21.

[6] See John S. Jordan, Joe Peek, and Eric S. Rosengren, "The Impact of Greater Bank Disclosure Amidst a Banking Crisis," Working Paper (February 9, 1999); and "The Market Reaction to the Disclosure of Supervisory Actions: Implications for Bank Transparency," *Journal of Financial Intermediation* 9 (2000), pp. 298-319.

[7] Jordan, et al. (2000), p. 299.

9.      In the studies by Jordan, et al., disclosure was found to result in "moderate" effects on bank stock prices and on deposits, even during severe banking crises, with *no* evidence of a "run on the bank."  The markets in particular did not over-react to disclosures by the Fed, but rather exhibited "useful patterns in the stock price reaction" and a repricing of reasonable magnitude consistent with the information content of the disclosure.[8]  While small spillover effects occurred after disclosure for similar banks that operated in the same region or with similar exposures, such effects did not occur for most formal action announcements.

10.     Fed Chairman Ben Bernanke has stated that the loans extended to banks and primary dealers through the various credit facilities are "generally overcollateralized and made with recourse to the borrowing firm," as well as that "[t]he Federal Reserve has never suffered any losses in the course of its normal lending to the banks and, now, to primary dealers."[9]

11.     Many banks, recognizing the importance of disclosure to their shareholders, have provided information regarding their use of the liquidity facilities.  By the end of March 2009, many financial institutions which are eligible for participation in the special credit and liquidity facilities ("SCLFs") established by the Fed have already disclosed their use of these facilities. For example, Bank of America states in its 2008 Form 10-K filing that, "We are currently utilizing the TAF and have pledged residential, commercial mortgage and credit card loans as collateral."[10]  And Citigroup states that, "On December 31, 2008, Citigroup had funded $13.8 billion on a secured basis under this [Primary Dealer Credit Facility] program."[11]

---

[8] Jordan, et al. (1999), p. 22.

[9] Fed Chairman Ben Bernanke, "The Crisis and the Policy Response," Speech at the Stamp Lecture, London School of Economics, January 13, 2009.

[10] Bank of America, Corp., Form 10-K for the period December 31, 2008, filed February 27, 2009, p. 15.

[11] Citigroup Inc., Form 10-K for the period December 31, 2008, filed February 27, 2009, p. 98.

12. The Fed states that "institutions are likely to suffer substantial competitive harm if information that they borrowed at the DW, TAF, or SCLFs, or information regarding the size or term of loans made in specific Federal Reserve districts, is publicly disclosed," and "the likelihood of competitive harm intensifies during periods of financial distress."[12] One shortcoming of the Fed's arguments regarding the likelihood of competitive harm is that confirming it would require one to disentangle the problems experienced by individual banks due to their unique financial condition and the economic environment generally from the purported effects caused by the disclosure about their use of liquidity facilities provided by the Fed. The research on the positive effects of disclosure in various studies (to be discussed in more detail in Section 4 below) and the positive history of the Fed with collateralized borrowings does not support the contention that competitive harm will occur or that it is likely. In addition, economic logic suggests that the effect would be expected to be less intense in the current climate than in normal conditions, because the incidence of financial institutions using the Fed facilities is less unusual currently than under prior conditions in which credit from other sources was more abundant.

13. Under current conditions, because the information requested by Bloomberg regarding the collateral is influenced by market conditions, such as the illiquidity of various assets posted as collateral, the disclosure would not be expected to have a singular effect on any individual bank nor a competitive effect (particularly given that many rival banks hold similar types of assets). While many financial institutions have experienced stock price declines over the last two years, these declines were not caused by the banks' use of the liquidity facilities provided by the Fed or

---

[12] Memorandum, p. 19 and 21, respectively.

the disclosure thereof.  Market fundamentals acting upon the affected banks' balance sheets, rather than disclosure or use of Fed funding, has caused losses experienced by individual banks.

14.     In sum, research and recent experience indicates that disclosure of bank regulatory actions yields no evidence of a benefit to rivals; in effect, there is no evidence of competitive effects from disclosure of information regarding the use of the collateral facilities by individual banks, or banks in general.[13]

### B.     The "Stigma"

15.     The Fed contends that there has been a stigma associated with borrowing at the discount window, and this stigma, the Fed reasons, would result from the disclosure of both discount window information and information regarding the use of the other credit facilities.  The Fed provides a single example of a case from the early nineties when it was rumored that Citigroup accessed the discount window, which the Fed believes caused customers in Asia to withdraw funds.[14]  No specific facts or analysis of that situation were provided by the Fed, but a review of the news articles at the time suggests that the withdrawals were the result of several factors, and attributing them to "rumors that Citibank might be borrowing at the DW"[15] fails to consider other developments that caused them.  The Fed's Citibank example likely refers to a situation between August 7-9, 1991, with Citibank's Hong Kong branches.[16]  *Reuters* and *Wall Street Journal* articles point to two reasons for the problems that ensued for Citibank's Hong Kong branches: "near-hysteria" in Hong Kong "since the government closed Bank of Credit and Commerce Hong Kong (BCCHK) after authorities worldwide shut down its parent BCCI amid

---

[13] Jordan, et al. (1999), p. 20.

[14] Madigan Declaration, p. 12, ¶ 22.

[15] Ibid.

[16] The Hong Kong run on Citibank followed one in Pakistan from the previous Sunday, which "was linked to an incorrect newspaper report that Citicorp had filed for bankruptcy protection."  "Citicorp Called Sound Despite Panic at Asian Branches," *Reuters*, August 8, 1991.

allegations of widespread fraud,"[17] and concerns about Citibank's health sparked by a July 31, 1991 comment from the Chairman of the House Energy and Commerce Committee, Rep. John Dingell, who said that "Citicorp today is … technically insolvent, engaged in a painful retrenchment, struggling to survive and, I suspect, a major recipient of the largesse of the (borrowing) window at the Federal Reserve."[18] In fact, Citibank was not the only bank that had a bank run in Hong Kong in that period; Standard Chartered Bank had a similar experience in the same period, sparked by rumors that it lost its banking license.[19]

16.     By the Fed's own description, accessing credit from the discount window is not indicative of a troubled institution, but rather often due to transitory or seasonal liquidity needs.  Despite the Fed's acknowledgement that the discount window is a "back-up source of liquidity" that does not necessarily indicate a capital shortfall or liquidity strain, the Fed is concerned that disclosure of the dollar amounts of the loans could lead to speculation and "fuel market rumors" regarding an institution's liquidity.[20]

17.     The illiquidity that has plagued the financial markets and has led financial institutions to access Fed liquidity is largely systemic, due in part to uncertainty regarding the values of assets and liabilities, many of which are held by financial entities across various sectors and regions. Therefore, the signal sent when institutions access the funds is not idiosyncratic or particular to the financial institution for whom the information is disclosed.  The potential for a bank or a

---

[17] "H.K. Rumours, Fanned by BCCI, Start Run on U.S. Giant Citibank," *Reuters*, August 8, 1991.

[18] "Dingell Calls Citicorp Insolvent, Bank Denies It," *Reuters*, July 31, 1991.  See also "Citicorp Seen Sound Despite Overseas Rumors," *Reuters*, August 8, 1991; "Hong Kong Rumour Mill Plagues U.S. Giant Citibank for Third Day," *Reuters*, August 9, 1991; "Hong Kong Officials Move to Restore Confidence After Runs on Two Banks," *Wall Street Journal*, August 12, 1991.

[19] "H.K. Suspects BCCI Conspiracy as Panicking Crowds Besiege Bank," *Reuters*, August 9, 1991.

[20] Memorandum, p. 22.

primary dealer that accesses the liquidity facility to suffer a stigma is therefore less likely

because the cause is not as particular to the institution, but a condition of the market at large.

18.     The demand for borrowing via the discount window is also a function of the cost of

borrowing and restrictions imposed by the Fed that may have discouraged banks in the past.

Because of changes implemented by the Fed that have reduced the implicit cost of borrowing

and encouraged more routine use of the discount window by banks and financial institutions,

there is evidence that, to the extent there was a stigma to borrowing in the past, it has been

effectively reduced over time.[21]

19.     As discussed above, determining the likely effects of disclosure of financial institutions'

use of the Fed liquidity facilities must be considered in the context of current market conditions

and the information already available regarding those institutions.  Similarly, the possibility of a

stigmatic effect leading firms to avoid using the discount window or other credit facilities is

unlikely given the current environment in which so many firms have already disclosed that they

are using these facilities (see Exhibit 2).  In many respects, the information requested in the

Bloomberg FOIA requests is already embedded in creditors', depositors', and investors'

assessments.  While disclosure may improve the consistency and precision of those assessments,

it is unlikely to come as a surprise and may yield some economic benefits and improve public

confidence (as discussed below).

20.     Consideration of the economics at work suggests that the stigma, which the Fed describes

as having discouraged users of the discount window in the past, is consistent with regulatory and

market discipline, both of which encourage banks to avoid taking risks that expose them to

potential illiquidity in their operations and motivates banks to seek financing from other private

---

[21] See Erhan Artuç and Selva Demiralp, "Discount Window Borrowing after 2003: The Explicit Reduction in
    Implicit Costs," Working Paper (June 2007).

sources when it is available.  To the extent that banks may have avoided use of the discount

window in the past, it is evidence that the "lender of last resort" is a meaningful paradigm which

motivates responsible management by the institutions.  However, there is no evidence that a bank

would irrationally default on its funding obligations and risk failure rather than avail itself to

reasonably priced and accessible government funding sources.

21.     The Fed is also concerned that revealing the names of counterparties would discourage

other companies from doing business with those banks and institutions receiving government

assistance.  In general, however, financial decisions are made based on a "risk-return" analysis:

higher interest rates attract more deposits, and positive returns and the prospects of capital

appreciation attract investors.  Transactions costs, reputation, and relationships are also known to

play a role in the attraction and maintenance of customers in banking and financial services

industries.  Since the government has pledged to support these institutions to ensure their

stability, and has done so broadly, the risk to counterparties of default by these institutions is less

likely; credit risk has also been largely internalized by government guarantees and planned

purchases of troubled assets (under the Term Asset-backed Securities Lending Facility and the

Public Private Investment Partnership).

22.     As confidence increases that the credit risk of the bank is correctly priced (which would

be assisted by the disclosures outlined in the Bloomberg FOIA requests), customers and

counterparties will once again be able to make decisions based on those factors most important

to them (e.g., returns, competitive pricing, relationships).

## C. "Adverse Conclusions"

23. The Fed is concerned that "market participants, including financial analysts, customers, and competitors of the borrowing institution, would draw adverse conclusions,"[22] which would lead to loss of confidence in the institutions, which would in turn pose competitive harm to these institutions. The Fed presumes that the market will necessarily draw adverse inferences about the banks, and that the market is not able to correctly internalize the information (for example, a stock price over-reaction, or a run on the bank). According to the Fed, these adverse conclusions flow from the market following "rumors and speculation," which could "cause capital and liquidity strains" and lead to systemic consequences.[23]

24. In addition to the research by Jordan, et al., suggesting that disclosure does not cause such reactions or crises, economic theory and empirical studies suggest that markets are extremely efficient in processing information, both in direction and proportion.[24] Markets do not fail because of disclosure. Markets fail when there is a high level of uncertainty, in effect when there is a lack of good information on which to base decisions. Scholars and policymakers have argued that markets that are less efficient or that exhibit symptoms of market failure warrant *greater* levels of disclosure.[25]

25. The adverse inferences that the Fed fears are more likely to occur *without* the disclosure of information requested in the Bloomberg FOIA request. Rumors and speculation are commonly associated with market uncertainty, not full disclosure. For example, in Cordella and

---

[22] McLaughlin Declaration, p. 7, ¶ 20.

[23] Ibid., p. 8, ¶ 21.

[24] See Jordan, et al. (2000), as described above in ¶ 8-9, and Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance* 25 (1970), pp. 383–417, and "Short-Term Interest Rates as Predictors of Inflation," *American Economic Review* 65, no. 3 (June 1975), pp. 269-282.

[25] John C. Coffee, Jr., "Market Failure and the Economic Case for a Mandatory Disclosure System," *Virginia Law Review* 70 (1984), pp. 717-753.

Yeyati's (1998) research on what determines interest rates, the interest rate that a bank must pay is commensurate with its risk.[26]  If there is no disclosure, depositors infer that the bank is high risk (the banks' best strategy without disclosure), and this leads to higher interest rates.  Their model suggests that full disclosure of bank risk (as embodied in the collateral held by banks, in effect their capital) is accompanied by lower interest rates. Since banks have incentives to lower risks when their risks are disclosed, Cordella and Yeyati observe that increased public disclosure can reduce the likelihood of a banking crisis.

26.      The Fed's arguments regarding adverse effects on its ability to set short-term interest rates can be thought of in the context of how markets process information and arrive upon a price or an interest rate under conditions of uncertainty.  Interest rates are merely the price of borrowings. In economic models seeking to explain how interest rates and prices are determined, when the market is left to infer the information regarding supply and demand, it tends to back out a result based on what it believes to be the best strategy of the financial institutions (the so-called Nash equilibrium strategy).  In Cordella and Yeyati's model, depositors and investors recognize that the banks have incentives to choose high risk when a bank's portfolio is unobservable, and rates adjust accordingly.  Similarly, in the present case, financial market participants anticipate that banks posting collateral have incentives to post the lowest quality collateral that the Fed will accept since it is the collateral least acceptable to private lenders.  As a result, market prices and interest rates would be predicted by economic theory and practice to have already incorporated that risk.  The adverse inference thus occurs when information is *not* disclosed, not when it is disclosed.

---

[26] Tito Cordella and Eduardo Yeyati, "Public Disclosures and Bank Failures," *IMF Staff Papers* 45, no. 1 (March 1998), pp. 110-131.

27. In addition, economic analysis suggests that market prices would react only if the disclosure reveals news that is not already impounded into market prices. Uninformed trading, such as that emanating from speculation or rumor (referred to in the literature as "noise") is only expected to have temporary or short-term effects.[27] When markets are efficient, as has been demonstrated in various studies of securities markets, these temporary effects typically reverse themselves once the true nature of the information is revealed.

28. While the Fed has not performed an analysis of the effects of disclosure of the firms who are accessing the discount window or liquidity facilities, the experience of investment banks who purposely disclosed they were accessing the discount window on August 22, 2007, did not bear out the Fed's conjecture regarding the negative effects of disclosure. In that case, the four largest banks as measured by assets, Citigroup Inc., Bank of America Corp., J.P. Morgan Chase & Co., and Wachovia Corp., announced that they were borrowing from the discount window.[28] While the banks' stock prices experienced a momentary decline in prices on the day of disclosure (consistent with noise), the stock prices recovered that day and remained aloft for the remainder of that week.[29] While this could be due to a number of factors, including increased confidence injected by the banks' willingness to access the credit, none of the Fed's dire predictions came to pass. In this case and in various instances in which banks have disclosed their borrowings through Fed facilities, banks have represented their borrowings as aiming to promote Fed efforts to boost market confidence. As noted by the Chief Financial Officer of Morgan Stanley after

---

[27] See Fisher Black, "Noise," *Journal of Finance* 41, no. 3 (1986), pp. 529-544.

[28] See "Banks Step Up to Fed's Window – Four Biggest U.S. Lenders Borrow $2 Billion in Bid to Lift Market Confidence," *Wall Street Journal*, August 23, 2007, p. A3.

[29] Ibid.

accessing Fed credit, "We didn't need to, but I felt we should to show there was no stigma, and show support for what the Fed had done."[30]

29.     Full disclosure, such as that required under the securities law and supported by economic research, allows the investing public to sort out rumor from fact.  For that reason, disclosure of information that would be otherwise only available to insiders or subject to the surmise of anxious speculators and analysts, helps to increase market efficiency and by implication, the overall fairness of the marketplace for investors and the financial institutions who rely upon the capital markets for their existence.  By the mechanics of the efficient markets hypothesis, disclosure will result in more accurate inferences, not adverse ones.

30.     In various strands of literature, including that in the securities and banking industry, disclosures regarding the financial condition of intermediaries, the composition of their assets and liabilities, and material factors affecting them, are found to align incentives of those institutions with shareholders and other stakeholders.[31]  Conversely, not disclosing information decreases incentives for banks to reduce their risk exposure and to take steps (such as the recognition of losses or reorganization) that may have negative short-run or transitory effects, but that enhance the long-term prospects of the bank.

31.     Regulators, including the Fed, can encourage accountability among managers and executives in these institutions by increasing disclosure of a broader set of information such as that contemplated in the Bloomberg FOIA requests.  In Jordan, et al., investor reaction to Fed disclosures was found to relate to the extent to which the announcement was informative and

---

[30] "Stepping Up to the Fed's Window," *Wall Street Journal,* March 20, 2008, p. C1.

[31] Erlend Nier and Ursel Baumann, "Market Discipline, Disclosure and Moral Hazard in Banking," *Journal of Financial Intermediation* 15 (2006), pp. 332-361.

"the degree of disclosure that has already occurred."[32]  Research that has examined disclosure

required by the Securities Exchange Act has found that publicly-traded firms have inherent

incentives to disclose relevant information themselves as a necessary and beneficial component

of operating in a competitive capital market.[33]  When voluntary disclosure is present, such as is

often the case in the financial services industries (since uncertainty discourages the flow of

capital to opaque institutions in a competitive market), increased disclosures via government

sanction has little effect on prices or returns.[34]

**IV.    The Benefits of Disclosure**

32.     Opacity creates significant uncertainty in the financial markets and in the economy

overall.  This opacity extends beyond the assets on the books of financial institutions to the

institutions themselves, many of which are publicly traded and have a fiduciary responsibility to

their shareholders.  In addition, many of the banks and primary dealers in question are also

subject to securities laws requiring disclosure of material information.

33.     As noted by Alex Pollock in his testimony discussing the government's actions in the

Troubled Asset Relief Program ("TARP"), the extension of credit to these institutions, whether it

be in the form of direct purchase of equity, loans, or short-term lending, makes the U.S. taxpayer

an "involuntary investor."  As involuntary investors, the public needs to be able to "figure out

what is happening with the money."[35]  Similarly, with regard to the collateralized lending at issue

here, as involuntary investors, all taxpayers should be accorded the knowledge of the risks

---

[32] Jordan, et al. (1999), p. 14.

[33] See Douglas J. Skinner, "Why Firms Voluntarily Disclose Bad News," *Journal of Accounting Research* 32, no. 1 (Spring 1994), pp. 38-60, and Michael J. Fishman and Kathleen M. Hagerty, "Disclosure Decisions by Firms and the Competition for Price Efficiency," *Journal of Finance* 44, no. 3 (July 1989), pp. 633-646.

[34] George J. Benston, "Required Disclosure and the Stock Market: An Evaluation of the Securities Exchange Act of 1934," *American Economic Review* 63, no. 1 (1973), pp. 132-155.

[35] Testimony by Alex J. Pollock, re TARP Accountability and Oversight, to the Joint Economic Committee, U.S. Congress, March 11, 2009, p. 2.

associated with Fed lending activities, including the collateral, the rates, and the terms of the

lending to the firms to which they have extended credit as requested in the Bloomberg FOIA

request.

34.     Transparency will help resolve uncertainty regarding the value of the assets used as

collateral, as well as the scope and extent of the problem.  By allowing investors, both those who

have a stake in the company through their shares, and taxpayers, who now are significant

investors in many of the financial institutions accessing the Fed's programs, more information

regarding the assets and the impact on the banks holding them, the markets will be able to more

accurately price the assets.

35.     The Fed's disclosure of the information sought by Bloomberg in its FOIA requests will

give investors and the public necessary data to aid them in their investment decisions and guide

their own economic choices.  Rather than being presented with the scenario of a game show host

hocking an unknown quantity behind a mystery door, investors and the public will know what is

behind the door.  Information will not cause a crisis; rather, it will speed the resolution of

uncertainty and promote a swifter recovery.

36.     The Federal government has recognized that investors are critical to jumpstarting the

economy and that greater transparency will help speed recovery by ameliorating uncertainty and

giving investors and the public the confidence to return to the markets and invest.  According to

the White Paper on the Public-Private Investment Program,

> [t]he Public-Private Investment Program is designed to draw new
> private capital into the market for these assets by providing
> government equity co-investment and attractive public financing.
> This program should facilitate price discovery and should help,
> over time, to reduce the excessive liquidity discounts embedded in
> current legacy asset prices.  This in turn should free up capital and
> allow U.S. financial institutions to engage in new credit formation.
> Furthermore, enhanced clarity about the value of legacy assets

16

should increase investor confidence and enhance the ability of financial institutions to raise new capital from private investors.[36]

37.    Disclosure regarding the values ascribed to the collateral and assets held by these institutions improves transparency of assets and provides useful information regarding the value of those assets.  If the disclosures sought by Bloomberg would enable the market to derive Fed "sanctioned" fair values for various asset classes (given haircut levels and borrowing amounts by product class) then this could give the market better pricing/valuation confidence.  Thus, disclosure should improve the accuracy and consistency of marks on these assets.  Better pricing certainty could enhance liquidity and help the overall markets start functioning better (unfreeze).

38.    Seminal research on disclosure in securities markets reveals that increased disclosure associated with the 1934 Securities Exchange Act reduced the dispersion of asset prices.[37] Pricing services currently have a wide dispersion of pricing, even for high grade/low risk securitization positions.  Similarly, revealing the information requested in the Bloomberg FOIA requests has the potential to decrease dispersion of the prices of collateral underlying the extension of credit.  As the securities literature suggests, disclosure will help decrease the uncertainty associated with investing in these assets and reduce the variance (which is often a measure of risk in an investment), thereby increasing the willingness of private investors to invest in the assets.

39.    Various studies have investigated the effect of increasing transparency in securities markets, including equity, debt, and financial information generally, and these studies have demonstrated that investors experience lower costs as a result of the availability of transaction-

---

[36] Public-Private Investment Program, White Paper, available at http://www.treas.gov/press/releases/reports/ppip_whitepaper_032309.pdf, last accessed April 7, 2009.

[37] See, for example, George J. Stigler, "Public Regulation of the Securities Markets," *Business Lawyer* 19 (April 1964), pp. 721-753; Friend and Herman, "The SEC Through a Glass Darkly," *Journal of Business* 37, no. 382 (1964); and Friend, "Economic and Equity Aspects of Securities Regulation," University of Pennsylvania Working Paper 7-82 (1982).

level information like that requested under the Bloomberg FOIA requests.[38] By increasing available information about the assets, increased disclosure will increase liquidity.

40.     Analysis of historical and present conditions bear out the benefits of disclosures of the information sought in the Bloomberg FOIA requests.  Studies of the banking and credit crisis that struck in the early 1990s find that government attempts to shield banks from market forces only exacerbated credit and economic problems and delayed economic recovery.[39]  In their study of the response of the Japanese government to the crisis, Peek and Rosengren (2005) note that political concerns discouraged the government from disclosing problems with the banking system and allowed them to continue a policy of forbearance that prolonged the crisis. According to the authors, "the use of accounting gimmicks and the continuing lack of transparency allowed the forbearance policies to be implemented."[40]

41.     A lost decade for the economy (as in Japan) is risked if banking problems are masked and the stakeholders are allowed to assume the worst.  As a result of policies that allowed banks to provide their own estimates regarding the market value of their holdings, Japanese banks saw prolonged declines in valuations and variation in values (reflecting the uncertainty caused by non-disclosure).  On the other hand, Korea owned up to its problems more quickly and bounced back more quickly.[41]  As noted by Jordan, et al. (1999), "Improved disclosure, leading to a more

---

[38] See, for example, Venkat R. Eleswarapu, Rex Thompson, and Kumar Venkataraman, "The Impact of Regulation Fair Disclosure: Trading Costs and Information Assymmetry," *Journal of Financial and Quantitative Analysis* 39, no. 2 (June 2004): 209-225, which shows that Regulation Fair Disclosure helped to lower information asymmetry and lower trading costs; and Pankaj K. Jain, Jang-Chul Kim, and Zabihollah Rezaee, "Trends and Determinants of Market Liquidity in a Pre-and Post-Sarbanes-Oxley Act Periods," Working Paper (September 2006).

[39] See Joe Peek and Eric S. Rosengren, "Unnatural Selection: Perverse Incentives and the Misallocation of Credit in Japan," *American Economic Review* 95, no. 4 (September 2005), pp. 1144-1166.

[40] Ibid., p. 1165.

[41] See Suk H. Kim, "The Asian Financial Crisis of 1997: The Case of Korea," *Multinational Business Review* (Spring 2001).

accurate valuation of banks, would improve the efficient allocation of resources throughout the banking system."[42]

42. Better disclosure of the banks' conditions generally would prevent hiding or denial of problems which could result in a much slower recovery. Full disclosure of government support is a step in the direction of better disclosure, and could even serve as an example that will increase public confidence.

## V. Fed Effectiveness and Market Confidence

43. The Fed asserts that disclosure of the information requested by Bloomberg would harm its effectiveness, since banks and primary dealers would thus be discouraged from drawing upon these facilities even when they needed it. Under the Fed's theory, this would, in turn, harm the Fed's ability to provide a backup source of liquidity in unusual and exigent circumstances, and to perform its mission to maximize employment and stabilize prices and interest rates.

44. The Fed's collateral policies, designed to guide it in performing its lending consistent with its goals, suggests a more open and transparent approach that would accommodate the Bloomberg FOIA requests. As described by Chailloux, Gray, and McCaughrin (2008) in their comparison of central bank collateral principles, "Transparency and accountability are key priorities, which in the context of selecting eligible collateral means that the criteria should be based on objective and publicly available data, and not appear to favor any special interests."[43]

45. The Fed notes that it shares an "explicit understanding" of confidentiality with the banks it regulates, and that the disclosure would violate this trust.[44] However, the Fed is expected to protect the public trust above all; it is an independent agency with a charge to promote

---

[42] Jordan, et al. (1999), p. 22.

[43] Alexandre Chailloux, Simon Gray, and Rebecca McCaughrin, "Central Bank Collateral Frameworks: Principles and Policies," *IMF Working Paper* WP/08/222 (September 2008), p. 48.

[44] McLaughlin Declaration, p. 7, ¶ 18.

confidence in the banking system, not to protect individual banks from public scrutiny. Confidence in the banking system is enhanced by a strong and independent Fed, not one perceived to be shielding banks from competition or protecting banks it is charged with overseeing. The policy mandate for the Fed is not to protect individual banks from competition, or, in the Fed's words "competitive harm," but rather to ensure adequate liquidity and proper function of the banking system.

46.     The primary source of the Fed's power to provide liquidity and stabilize the market lies not in the willingness or proclivity of institutions to use the liquidity facilities, but rather in the fact that the Fed is there as the lender of last resort when necessary, and that it is astute about its offering and use of other of its tools for stabilizing the economy. Confidence in the Fed, its independence, and its judgment form the basis for its power, and has contributed to the unparalleled success of the U.S. economy.


Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct. Executed in Washington, D.C. on this 15th day of April, 2009.

Sharon Brown-Hruska

20