UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

BLOOMBERG L.P.,

          Plaintiff,

     v.

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM,

          Defendant.
------------------------------x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:
```

08 Civ. 9595 (LAP)

OPINION AND ORDER

LORETTA A. PRESKA, Chief United States District Judge

     This action concerns whether the Freedom of

Information Act ("FOIA"), 5 U.S.C. § 552, compels the Board

of Governors of the Federal Reserve System (the "Board"),

when responding to FOIA requests, to search for records

held at the Federal Reserve Bank of New York ("FRBNY") and

the applicability of FOIA Exemptions 4 and 5 to certain

records currently in the Board's possession.  This dispute

first arose when Bloomberg L.P. ("Bloomberg") reporters

Mark Pittman and Craig Torres each submitted FOIA requests

(the "FOIA Requests") to the Board requesting information

about the Federal Reserve System's extraordinary actions

taken in early 2008, during one of the worst financial

crises in the history of this nation.  In response to the

FOIA Requests, the Board conducted an internal search for

records held by the Board only, identified certain

documents as responsive to the FOIA Requests, but withheld those documents pursuant to FOIA Exemptions 4 and 5. Bloomberg sued to compel the disclosure of the documents and to require the Board also to search records held at the FRBNY.

Both Bloomberg and the Board now move for summary judgment on those issues [see dkt. nos. 10 and 18]. For the reasons set forth herein and as detailed below, Bloomberg's motion is GRANTED, and the Board's motion is DENIED.

I.    BACKGROUND

A.    Overview and Lead-Up to the FOIA Requests

A brief overview of the Federal Reserve System structure is helpful for understanding the circumstances of this action. The Federal Reserve System is the Central Bank of the United States. It is composed of the Board, located in Washington, D.C., and twelve regional Federal Reserve Banks (the "FRBs"). The Federal Reserve System: Purposes and Functions 3 (9th ed., June 2005) [hereinafter P&F]. Collectively, the Board and the FRBs fulfill the four overriding purposes of the Federal Reserve System: conducting the nation's monetary policy, supervising and regulating banking institutions, maintaining the stability

of financial systems and markets, and providing financial services to major financial actors. See id. at 1-2. The Federal Reserve System considers itself to be an independent central bank because its decisions do not require ratification by the President or executive branch officials. Id. at 3. The System is, however, subject to oversight by Congress. Id.

While together the Board and the FRBs comprise the Federal Reserve System, they have independent mandates and responsibilities. The Board is a federal agency tasked with, inter alia, supervising or regulating the operations of the FRBs, reviewing and approving changes to interest rates charged by the FRBs and overseeing loans among and by the FRBs. Id. at 4; see also 12 U.S.C. § 248. An additional component of the Federal Reserve System is the Federal Open Market Committee ("FOMC"), a separate governmental agency that shares offices with the Board. See 12 U.S.C. § 263. The FOMC is made up of the members of the Board, the president of the FRBNY, and presidents of four other FRBs, who serve on a rotating basis. P&F at 3. "The FOMC oversees open market operations, which is the main tool used by the Federal Reserve to influence overall monetary and credit conditions." Id.

The FRBs, on the other hand, are semi-autonomous institutions with private funding and independent corporate structures.[1] Congress chartered the FRBs and granted them distinct powers, apart from the powers granted to the Board, such as the power to sue and be sued in their own names, to make contracts, to appoint officers, hire and fire employees and prescribe bylaws through their boards of directors. See 12 U.S.C. §§ 341-361. FRBs do not receive appropriated funds from Congress but rather generate funds from stock issuances to depository institutions in their districts. See 12 U.S.C. §§ 222, 282, 321, 341. Each FRB has a nine member board of directors, six of whom are elected by shareholder banks within the FRB's district and three appointed by the Board. See 12 U.S.C. §§ 301-302. The FRBs' role within the Federal Reserve System is generally supportive of the Board, "carrying out a variety of System functions, including operating a nationwide payments system, distributing the nation's currency and coin, supervising and regulating member banks and bank holding companies, and serving as banker for the U.S. Treasury." P&F at 4. The FRBs give all revenue in excess of expenses to the U.S. Treasury. 12 U.S.C. § 289.

---

[1] Statues and regulations often refer to the FRBs as "fiscal agents" of the Government. See, e.g., 12 U.S.C. § 391; 31 C.F.R. § 210.7.

A central feature of the FRBs is their administration
of the discount window lending program ("DW"), meant to
relieve pressures on the interbank funds market and a means
for providing emergency liquidity to qualifying depository
institutions during times of systemic stress. (See Decl. of
Susan E. McLaughlin ¶ 5.) "Access to discount window
credit is established by rules set by the [Board], and
loans are made at interest rates set by the [FRBs] and
approved by the Board. Depository institutions decide to
borrow based on the level of the lending rate and their
liquidity needs." P&F at 31. While the Board regulates DW
lending, see 12 U.S.C. § 347b, the Board has no input or
involvement in the administration of specific DW loan
requests. (Decl. of Susan E. McLaughlin ¶ 8.) FRBs publish
DW interest rates, but information on the names of
depository institution borrowers, collateral pledged by the
borrowers, individual loan amounts, or the specific type of
DW program borrowed from is not publicly disclosed. (Id.
¶ 9.) At least with respect to the FRBNY, loan and
collateral documentation relating to each DW loan is
maintained at the bank, and that information is maintained
on a need-to-know basis. (Id.)

In 2007, the U.S. economy encountered a serious
financial crisis. In late 2007, responding to

deteriorating market conditions, the Board authorized the
FRBs to establish a new lending facility for depository
institutions called the Term Auction Facility ("TAF").
(Decl. of Brian F. Madigan ¶ 7.)  In March 2008, the Board
also authorized only the FRBNY to create additional lending
programs to give primary dealers access to liquidity: the
Primary Dealer Credit Facility ("PDCF") and the Term
Securities Lending Facility ("TSLF").  (Id.; Decl. of Susan
E. McLaughlin ¶ 10.)  The FRBNY does not publish any
information on PDCF loans, other than aggregate information
on PDCF borrowing. (Decl. of Susan E. McLaughlin ¶ 16.)
Information about the other lending programs is maintained
internally at the FRBNY or, in the case of TAF loans,
internally at each FRB. (Decl. of Brian F. Madigan ¶ 12.)

　　　In March 2008, Bear Stearns, one of the largest
securities firms in the United States, notified members of
the Federal Reserve that due to deteriorating market
conditions it would be unable to repay a large portion of
its obligations and thus faced the prospect of filing for
bankruptcy protection.  On Friday, March 14, 2008, in order
to avoid serious harm to the financial markets if Bear
Stearns collapsed, the Board authorized the FRBNY to extend
credit to Bear Stearns through JPMorgan Chase Bank, N.A.
("JPMC").  That day, the FRBNY made an overnight DW loan of

$12.9 billion to JPMC and took as collateral Bear Stearns
assets with a value of $13.8 billion.  On Monday, March 17,
2009, JPMC and Bear Stearns repaid the FRBNY the $12.9
billion loan in full with interest of nearly $4 million.[2]

The Board is subject to the Freedom of Information
Act, promulgates regulations regarding FOIA compliance, and
maintains designated personnel to respond to FOIA requests.
See 12 C.F.R. §§ 261.12-.17.  The FOMC also considers
itself a separate governmental agency for FOIA purposes and
publishes FOIA regulations. See 12 U.S.C. § 263; 12 C.F.R.
§§ 271.1-271.9.  The FRBs, however, consider themselves
private corporations and issue no published FOIA
regulations.


B.    The Loan Request

On May 21, 2008, Bloomberg reporter Mark Pittman
submitted to the Board a FOIA request (the "Loan Request")
seeking:

> For all securities posted between April 4,
> 2008 and May 20, 2008 as collateral to the
> Primary Dealer Credit Facility, the discount
> window, the Term Securities Lending

---

[2] See Press Release, Federal Reserve System, Report Pursuant
to Section 129 of the Emergency Economic Stablization Act
of 2008:  Bridge Loan to the Bear Stearns Companies Inc.
Through JPMorgan Chase Bank, N.A. (undated), available at
http://www.federalreserve.gov/monetarypolicy/files/129bears
tearnsbridgeloan.pdf.

Facility, and the Term Auction Facility (the "Relevant Securities"), we request copies of:

1. all forms and other documents submitted by the party posting the Relevant Securities as part of the application for the loan;
2. all receipts and other documents given to the party posting the Relevant Securities as part of the application for the loan;
3. records sufficient to show the names of the Relevant Securities;
4. records sufficient to show the dates that the Relevant Securities were accepted and the dates that the Relevant Securities were redeemed;
5. records sufficient to show the amount of borrowing permitted as compared to the face value, also known as the "haircut";
6. records sufficient to describe whether valuations or "haircuts" for the Relevant Securities changed over time;
7. records sufficient to show the terms of the loans and the rates that the borrowers must pay;
8. records sufficient to show the amount that the Federal Reserve has accepted of each of the Relevant Securities;
9. records sufficient to show which, if any, Relevant Securities have been rejected as collateral and the reasons for the rejections;
10. all databases and spreadsheets that list or summarize the Relevant Securities; and
11. records, including contracts with outside entities, that show the employees or entities being used to price the Relevant Securities and to conduct the process the lending.

(Decl. of Alison M. Thro ("Thro Decl.") ¶ 5, Ex. 1.) On

June 19, 2008, the Board sent Bloomberg a letter extending

the Board's period to respond to the Loan Request until

July 3, 2008, "in order to consult with another agency or

8

with two or more components of the Board having a
substantial interest in the determination of the request."
(Id. ¶ 6, Ex. 3.)

Alison M. Thro, Senior Counsel of the Board and a
member of its Legal Division, searched for documents
responsive to the Loan Request by contacting seven staff
members in the Board's division of Monetary Affairs ("MA"),
including the MA director, deputy director, senior
associate director and deputy associate director. The MA
provides the Board with information and analysis pertaining
to the FRBs' administration of the DW, TAF, PDCF and TSLF
lending programs. (Id. ¶ 8.) An MA staff member informed
Ms. Thro of the existence of a document potentially
responsive to item 11 of the Loan Request, identifying an
external firm from which the FRBs purchase pricing data.
(Id. ¶ 15.) Other MA staff members informed Ms. Thro that
during the Loan Request time period, the FRBs sent daily
data feeds (weekdays only) to the MA, consisting of
transaction-level information about the DW, TAF, PDCF and
TSLF programs. MA staff used this data to generate daily
reports (weekdays only) that listed outstanding extensions
of credit under the DW, TAF, PDCF and TSLF programs (the
"Remaining Term Reports").

The Remaining Term Reports consist of 231 pages of information and include the names of borrowers, the originating FRB district, individual loan amounts, the type of lending program borrowed from, and loan origination and maturity dates. (Id. ¶¶ 11, 13; Board's Local Rule 56.1 Stmt. ¶ 5.) The Remaining Term Reports do not identify the interest rates on the loans, specific items of collateral pledged for the loans, the haircuts applied to the collateral, or other information responsive to the Loan Request. (Thro Decl. ¶ 11.)

Ms. Thro also contacted six staff members in the Reserve Bank Operations and Payment Systems ("RBOPS") division of the Board, which oversees the FRBs' provision of financial services to depository institutions and other eligible borrowers. (Id. ¶ 17.) Ms. Thro found that the RBOPS staff members had no responsive documents, other than the Remaining Term Reports and the document potentially responsive to item 11 of the Loan Request. The MA and the RBOPS were the only two divisions of the Board Ms. Thro considered reasonably likely to have responsive documents "because no other division [of the Board] had responsibility directly to oversee the Reserve Banks' provision of DW, TAF[,PDCF and TSLF] services to eligible institutions or to provide data and statistics to Board

staff relating to" those lending programs. (Board's Local Rule 56.1 Stmt. ¶ 3; Thro Decl. ¶ 18.)

Ms. Thro also interviewed certain staff of the FRBNY but did not search any records at the FRBNY because she "determined that [] transaction-level documents at the FRBNY were not records of the Board subject to FOIA." (Thro Decl. ¶ 21.)

On December 9, 2008 (after Bloomberg filed its Complaint and Amended Complaint in this action), the Board sent Bloomberg a letter granting in part and denying in part the Loan Request. The Board stated that it located documents responsive to item 11 of the Loan Request and offered to provide those documents. The Board also stated that it had located approximately 231 pages of responsive documents (the Remaining Term Reports) but stated that it would withhold that information pursuant to FOIA Exemptions 4 and 5.[3] The Board also stated its view that documents held by the FRBNY are not subject to FOIA request made to the Board. (Id., Ex. 5.)

---

[3] The Board presumably also provided around this time an index describing the withheld documents and the exemptions invoked, in accordance with Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973). (See Thro Decl., Ex. 4.)

## C. The Bear Request

On April 7, 2008, Bloomberg reporter Craig Torres
submitted a FOIA request (the "Bear Request") to the Board
requesting "[a]ll documents reflecting or concerning the
portfolio of securities (listed on a security-by-security
basis, with CUSIP numbers if available), supporting the
loan extended by the Federal Reserve in connection with the
proposed acquisition of Bear Stearns Cos. by JP Morgan
Chase & Co." (Id. ¶ 22, Ex. 6.)

In planning a search for documents related to the Bear
Request, Ms. Thro was aware of an extant electronic
document repository that had been created after the Board's
March 14, 2008 authorization of the Bear Stearns loan. (Id.
¶ 23.)  The Board had created the document repository in
order to respond to other FOIA requests and Congressional
requests for information related to the Bear Stearns loan.
Before the Board received the Bear Request, the developers
of the document repository had already contacted
approximately 80 Board staff members in seven divisions
(MA, RBOPS, Office of Board Members, Office of Secretary,
Legal, International Finance, and Bank Supervision and
Regulation) who were identified as having been involved in
any aspect of the Bear Stearns loan matter.  By
interviewing core staff members involved in the Bear

Stearns loan matter and asking them to identify other individuals who were involved, Ms. Thro, who was among the developers of the document repository, was satisfied that she had identified all staff members likely to have relevant documents. By the end of June 2008, the document repository contained over 28,000 pages of information, and Ms. Thro considered it to be a comprehensive gathering of all documents related to the Bear Stearns matter. (Id. ¶¶ 24-25.) Staff members were also reminded of their continuing obligation to send to the repository any later-discovered documents related to the Bear Stearns matter. (Id. ¶ 24.)

In order to respond to the Bear Request specifically, Ms. Thro reviewed documents in the repository that came from Board members and Board staff members (approximately 34 in all) who she considered most likely to have had documents relating to securities pledged as collateral for the Bear Stearns Loan. Ms. Thro concluded that no repository records "contain[ed] any transaction-specific documents regarding securities posted as collateral for the Bear Stearns Loan." (Id. ¶ 25.) Ms. Thro also re-interviewed MA and RBOPS staff members about whether they had any additional documents related to the Bear Stearns matter but received no responsive documents. (Id. ¶ 26.)

Finally, Ms. Thro consulted with FRBNY staff members about documents they maintained regarding the Bear Stearns matter but concluded that any such documents "were proprietary records of the Reserve Bank, and not Board records subject to FOIA." (Id. ¶ 27.)

On September 30, 2008, the Board responded to the Bear Request by sending Bloomberg a denial letter, stating "Staff searched Board records and made suitable inquiries, but found no documents that are responsive to your request." (Id. ¶ 29, Ex. 7.) The denial letter also stated,

> Staff has confirmed that documents responsive to
> your request are located at the Federal Reserve
> Bank of New York. I have determined that these
> documents are not "records of the Board" under
> the Act. Nevertheless, even if they were deemed
> to be "records of the Board," I have confirmed
> that the documents would be exempt in full from
> disclosure under exemption 4 of the Act.

(Id. ¶ 29, Ex. 7.) On October 14, 2008, Bloomberg appealed the denial to the Board. On November 7, 2008, the Board responded to the appeal by sending Bloomberg a denial letter, stating,

> the [FRBNY] obtained the documents as part of its
> administration of a loan extended by the [FRBNY]
> to facilitate the acquisition of Bear Stearns by
> J.P. Morgan Chase & Co. (JPMC). Although the
> loan was made under emergency and other
> circumstances necessitating Board involvement,
> these circumstances did not convert an otherwise
> commercial action into a Board (agency) function.

14

> At no time did the Board or Board staff obtain,
> review, or rely upon these documents.
> Accordingly, I conclude that the documents are
> not 'records of the Board' subject to the Act.

(Id. ¶ 29, Ex. 7.) The denial letter also reiterated that

even if the documents at the FRBNY were considered records

of the Board, the Board considered them exempt under

Exemptions 4 and 5.

Bloomberg now sues the Board to force compliance with

the FOIA Requests.

II. DISCUSSION

A. Jurisdiction

Subject matter jurisdiction is proper pursuant to 28

U.S.C. § 1331 because this action arises under the laws of

the United States. Also, this Court has jurisdiction to

order injunctive relief against the Board pursuant to 5

U.S.C. § 552(a)(4)(B) because Bloomberg has its principal

place of business in this district and the Board has

improperly withheld agency records from Bloomberg, as

explained more fully below.

B. Legal Standards

When responding to a FOIA request, a federal agency

must (1) conduct an adequate search using reasonable

efforts, (2) provide the information requested, unless it
falls within a FOIA Exemption, and (3) provide any
information that can reasonably be segregated from the
exempt information. 5 U.S.C. §§ 552(a)(3), 552(b). FOIA
generally requires complete disclosure of requested agency
information unless the information falls into one of FOIA's
nine clearly delineated exemptions. 5 U.S.C. § 552(b); see
also Dep't of Air Force v. Rose, 425 U.S. 352, 360-61
(1976) (discussing the history and purpose of the FOIA and
the structure of FOIA exemptions). In light of FOIA's goal
of promoting a general philosophy of full agency
disclosure, the exemptions are construed narrowly. United
States Dep't of Justice v. Tax Analysts, 492 U.S. 136, 151
(1989); Associated Press v. United States Dep't of Defense,
554 F.3d 274, 283-84 (2d Cir. 2009).

As with all motions for summary judgment, summary
judgment in a FOIA action should be granted only if there
is no genuine issue as to any material fact and the moving
party is entitled to judgment as a matter of law. See Fed.
R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477
U.S. 317, 322-23 (1986). Summary judgment is the preferred
procedural vehicle for resolving FOIA disputes. See Amnesty
Int'l USA v. CIA, 07 Civ. 5435, 2008 WL 2519908, at *8
(S.D.N.Y. June 19, 2008). "[T]he strong presumption in

favor of disclosure places the burden on the agency to justify the withholding of any requested documents." United States Dep't of State v. Ray, 502 U.S. 164, 173 (2009). First, the agency has the burden to show that it conducted an adequate search for responsive records. Carney v. United States Dep't of Justice, 19 F.3d 807, 812 (2d Cir. 1994). A search will be considered adequate if it was reasonably calculated to uncover all relevant documents. Reasonableness does not demand perfection, and a reasonable search need not uncover every document extant. Grand Cent. Partnership, Inc. v. Cuomo, 166 F.3d 473, 489 (2d Cir. 1999).

The agency's burden to show it conducted an adequate search may be satisfied by submitting affidavits or declarations "indicating that the agency has conducted a thorough search and giving reasonably detailed explanations why any withheld documents fall within an exemption." Carney, 19 F.3d at 812. "Affidavits submitted by an agency are accorded a presumption of good faith; accordingly, discovery relating to the agency's search and the exemptions it claims for withholding records generally is unnecessary if the agency's submissions are adequate on their face." Id. (internal quotation marks and citation omitted). However, such declarations must be non-

conclusory.[4]  Once the agency satisfies its burden of

showing that it conducted an adequate search, the burden

shifts to the plaintiff to make a showing of bad faith

sufficient to impugn the agency's showing. Id.; see also

Triestman v. United States Dep't of Justice, 878 F. Supp.

667, 672 (S.D.N.Y. 1995).

An agency also bears the burden of showing that

withheld responsive information falls within one of FOIA's

nine exemptions. 5 U.S.C. § 552(a)(4)(B).  "FOIA specifies

that a district court must conduct de novo review of an

agency's claims to exemptions," Lee v. Fed. Deposit Ins.

Corp., 923 F. Supp. 451, 453 (S.D.N.Y. 1996), which "are to

be narrowly construed with all doubts resolved in favor of

disclosure," Grand Cent., 166 F.3d at 478 (internal

quotation marks omitted).  An agency must show with

"reasonable specificity" that withheld information falls

within a FOIA exemption; conclusory or speculative

assertions in support of an exemption are insufficient.

Halpern v. F.B.I., 181 F.3d 279, 286, 293 (2d Cir. 1999);

see also Part II.E.i.b, infra, at pp. 38-39 (discussing an

agency's burden of showing that FOIA Exemption 4 applies).

---

[4] "Supporting and opposing affidavits shall be made on
personal knowledge, shall set forth such facts as would be
admissible in evidence, and shall show affirmatively that
the affiant is competent to testify to the matters stated
therein." Fed. R. Civ. P. 56(e).

18

"[S]ummary judgment in favor of the FOIA plaintiff is appropriate [w]hen an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption.'" New York Times Co. v. United States Dep't of Defense, 499 F. Supp. 2d 501, 509 (S.D.N.Y. 2007) (internal quotation marks omitted). Finally, an agency may not withhold entire documents or broad categories of documents when only a segregable portion is exempt from disclosure. 5 U.S.C. § 552(b).

## C. Adequacy of the Board's Searches

Bloomberg does not contest the adequacy of the Board's search of its own records in response to the FOIA Requests. Rather, Bloomberg argues that by not searching any records at the FRBNY, the Board's search was inadequate because (i) Board regulations qualify certain records held at the FRBNY as agency records of the Board and (ii) the FRBNY was acting on behalf of the Board, thus qualifying all FRBNY records as constructively obtained and controlled by the Board. Additionally, Bloomberg contends that the FRBNY is itself an agency for FOIA purposes.

The Board concedes that the regulations qualify at least some records held at the FRBNY as agency records of the Board but interprets the regulations so narrowly that

no records held at the FRBNY would be responsive to the
FOIA Requests.  Next, the Board disputes the application of
Bloomberg's constructive obtainment and control theory.
Finally, the Board argues that the question of whether the
FRBNY is an agency for FOIA purposes is not relevant to
this action and need not be decided.

As explained more fully below, the Board regulations
specify that certain records kept at the FRBNY are agency
records of the Board.  Those records must be searched.
Bloomberg's constructive obtainment and control theory is
rejected.  Finally, the Court agrees that the FRBNY's
status as an agency for FOIA purposes is irrelevant to the
issue of the adequacy of the Board's search.

## (i)  Board Regulations Establish that Certain Records at the FRBNY are Agency Records of the Board.

FOIA empowers district courts to order the production
of (1) improperly (2) withheld (3) agency records, in
response to a FOIA request. 5 U.S.C. § 552(a)(4)(B).
Unless each of the three § 552(a)(4)(B) criteria are met,
"a district court lacks jurisdiction to devise remedies to
force an agency to comply with the FOIA's disclosure
requirements." Tax Analysts, 492 U.S. at 142; see also
Grand Cent., 166 F.3d at 478.

The Board concedes that certain records at the FRBNY qualify as agency records of the Board. (See Board Br. at 40 ("By regulation, a very narrow category of documents located at the [FRBs] are 'Board Records' subject to FOIA.").) Thus, the central inquiry at this stage is to determine which records at the FRBNY qualify as agency records of the Board so as to be within the scope of records potentially responsive to the FOIA Requests. The Supreme Court has articulated a two-part test for determining what records constitute "agency records" for FOIA purposes: (1) records either created or obtained by the agency to which the FOIA request was made and (2) records under that agency's control at the time the FOIA request is made. Tax Analysts, 492 U.S. at 144-45. Regulations promulgated by an agency may be helpful in determining what constitutes the agency's "agency records" for FOIA purposes.[5]

---

[5] The parties have not brought to this Court's attention any authority explaining the extent to which an agency's FOIA regulations may impact the agency's statutorily imposed FOIA obligations. It seems beyond cavil that an agency may promulgate regulations expanding the scope of information that FOIA would otherwise define as the agency's "agency records." But because district courts are tasked with resolving FOIA controversies upon de novo review, determining the province of an agency's "agency records" falls ultimately to the courts. See 5 U.S.C. § 552(a)(4)(B).

Regulations promulgated by the Board, in order to comply with the Board's FOIA obligations (the "Regulations"),[6] state that the "Secretary of the Board [] is the official custodian of all Board records, including records that are in the possession or control of the Board, any Federal Reserve Bank, or any Board or Reserve Bank employee." 12 C.F.R. § 261.3(a) (emphasis added). The plain language definition of "custodian" is "one that guards and protects or maintains." Webster's Third New International Dictionary Unabridged (2009); see also Oxford English Dictionary (2009) ("One who has the custody of a thing."). Thus, according to the plain language of its own Regulations, the Board, by way of the Secretary of the Board, obtains and controls records in the possession or control of the FRBs, and those records qualify as "agency records" for purposes of FOIA requests addressed to the Board.

However, not all records at the FRBs are within the custody of the Secretary of the Board because the Regulations elsewhere limit the scope of "Board records," as used in § 261.3(a), to a subset of documents in the possession or control of the FRBs. The Regulations use the

---

[6] See 12 C.F.R. § 261.1(c)(2) ("[T]his [sub]part implements the Freedom of Information Act (FOIA).").

22

terms "Board records" and "Records of the Board"

interchangeably, thus the Court looks to the definition of

"Records of the Board" for purposes of defining Board

records.   "Records of the Board" are defined as:

> (i) In written form, or in nonwritten or machine-
> readable form; all information coming into the
> possession and under the control of the Board,
> any Board member, any Federal Reserve Bank, or
> any officer, employee, or agent of the Board or
> of any Federal Reserve Bank, in the performance
> of functions for or on behalf of the Board that
> constitute part of the Board's official files; or
>
> (ii) That are maintained for administrative
> reasons in the regular course of business in
> official files in any division or office of the
> Board or any Federal Reserve Bank in connection
> with the transaction of any official business.

12 C.F.R. § 261.2(i)(1) (emphasis added).

Although hardly a model of grammatical clarity,

§ 261.2(i)(1) certainly establishes criteria for

determining which records at FRBs qualify as Records of the

Board--viz., records (1) constituting a part of the Board's

official files and (2) maintained in the performance of

functions for or on behalf of the Board (§ 261.2(i)(1)(i)),

or records (1) maintained for administrative reasons, (2)

in the regular course of business, (3) in the Board's

official files, and (4) in connection with the transaction

of any official business (§ 261.2(i)(1)(ii)).   "[O]fficial

files," as used in §§ 261.2(i)(1)(i) and 261.2(i)(1)(ii),

23

is defined as "the Board's central records." 12 C.F.R. § 261.2(a).

In this action, instead of focusing on the "official files" criterion, the parties spar over the "for or on behalf of the Board" criterion. The Board contends that "for or on behalf of" actually means "under delegated authority from the Board." (Board Br. at 41-46 & n.13; Board Reply. Br. at 8; Supp. Thro Decl. ¶¶ 3-5.) Bloomberg disagrees and contends that the Board's idiosyncratic interpretation should not be adopted. Ultimately, this disagreement need not be resolved because if a record is kept in the Board's official files at a FRB, the Secretary of the Board is its official custodian, regardless of its subject matter, and thus it qualifies as a Board "agency record." See 12 C.F.R. § 261.3(a).[7]

The Board has not conducted an adequate search of its agency records because the Board did not search any FRBNY records. In other words, the Board improperly withheld agency records in response to a FOIA request by conducting an inadequate search. 5 U.S.C. § 552(a)(4)(B). The Board

_____

[7] While of course the Court strives to attach significance to each 12 C.F.R. § 261.2(i)(1) criterion, a plain language interpretation of § 261.2(i)(1) leads to the only logical conclusion that so long as a record is maintained in Board official files, anywhere, the purpose or subject matter of that record is immaterial for purposes of qualifying it as a Board record.

shall search forthwith records at the FRBNY that constitute "Records of the Board" within the meaning of 12 C.F.R. § 261.2(i)(1). So long as records at the FRBNY satisfy the plain language meaning of § 261.2(i)(1), they qualify as agency records of the Board and are subject to FOIA requests. The parties shall confer following their review of the results of the search and inform the Court by letter no later than September 14, 2009 how they propose to proceed.

## (ii) Constructive Obtainment and Control Theory

Bloomberg also argues that all FRBNY records are agency records of the Board because "[i]f a government contractor performs a task on behalf of the government, the records relating to the task are 'agency records.'" (Bloomberg Br. at 17 n.9.) Bloomberg includes this argument in the section of its Memorandum titled "Reserve Banks Are Agencies And Therefore Their Records Are Subject To FOIA" but apparently assumes, for the sake of this argument, that the FRBNY is a "private party." Id. Thus, for purposes of this argument, this Court assumes that the FRBNY is not an agency. For a more complete discussion of that issue, see Part II.D, infra, at pages 30-31 and especially note 11.

Bloomberg cites Burka v. United States Dep't of Health and Human Servs., 87 F.3d 508, 515 (D.C. Cir. 1996), and In Defense of Animals v. Nat'l Inst. of Health, 543 F. Supp. 2d 70, 77 (D.D.C. 2008), which it contends recognized a constructive obtainment and control theory for purposes of classifying agency records under FOIA.[8] Briefly, the theory is rooted in the notion that an agency may exercise such supervision or control over another entity that the entity's records constructively become the agency's records, irrespective of whether the agency actually obtained or availed itself of the records. Burka, 87 F.3d at 515. The theory incorporates a four-factor analysis: "(1) the intent of the document's creator to retain or relinquish control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record system or files." Id. (internal quotation marks omitted). Bloomberg also states, without supporting authority, that "Congress never

_____

[8] Although not cited by Bloomberg, the Court notes that the Northern District of Illinois has also considered Burka and applied a constructive creation and control theory. See Chicago Tribune Co. v. United States Dep't of Health and Human Servs., No. 95 C 3917, 1997 WL 1137641, at *13 (N.D. Ill. March 28, 1997). This Court considered that decision in reviewing Bloomberg's arguments.

26

intended to allow government agencies to arbitrarily keep
their decisions and actions secret by outsourcing
government business." (Bloomberg Br. at 17-18 n.9.)

While Bloomberg implies that FOIA compels the
acceptance of the constructive obtainment and control
theory and that the theory is consistent with the Supreme
Court's two-part agency records test, as set forth in Tax
Analysts, 492 U.S. at 144-45, Bloomberg cites no decisions
from this Circuit applying the Burka theory.  Tax Analysts
teaches that agency records are (1) records either created
or obtained by the agency to which the FOIA request was
made and (2) records under that agency's control at the
time of the FOIA request.  The obtainment prong includes a
broad swath of materials because "agencies routinely avail
themselves of studies, trade journal reports, and other
materials produced outside the agencies both by private and
governmental organizations." Id. at 144.  While the Supreme
Court has declined to "categorize what agency conduct is
necessary to support a finding that [the agency] has
'obtained' documents," it has determined that an agency's
right to obtain another entity's documents and an agency's
mere supervision over a federally-funded entity are
insufficient findings to satisfy the obtainment prong of
the test. Forsham v. Harris, 445 U.S. 169, 186 & n.17

(1980). Rather, "FOIA applies to records which have been in fact obtained." Id. at 185-6 (emphasis in original).[9] As to the control prong of the test, the Supreme Court held, "[b]y control we mean that the materials have come into the agency's possession in the legitimate conduct of its official duties." Tax Analysts, 492 U.S. at 145 (emphasis added). That is not to say that mere physical presence within an agency is insufficient to qualify a record as an agency record, see Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. 136, 157 (1980), but possession is certainly a prerequisite.

Burka, on the other hand, involved an instance where the responding agency never had possession or availed itself of an entity's records, yet the court qualified them as agency records for FOIA purposes. Specifically, the court held that data tapes created and possessed by a non-agency government contractor qualified as agency records because the contractor "acted on behalf of [the responding agency] in creating the tapes," evidenced by "the extensive supervision and control exercised by the agency over

---

[9] It must also be noted that the Supreme Court has said, "[r]ecords of a nonagency certainly could become records of an agency as well," but the Supreme Court provides little guidance for determining when and how this might occur. See Forsham, 445 U.S. at 181; see also Tax Analysts, 492 U.S. at 144 (quoting Forsham).

collection and analysis." 87 F.3d at 515. The court
concluded that the agency had "constructive control" of the
data tapes. Id.[10]

The Supreme Court's teachings in Tax Analysts,
Forsham, and Kissinger certainly do not compel adoption of
the constructive obtainment and control theory, and thus
this Court declines to do so under the facts presented
here. Accordingly, this Court rejects the theory that all
records in the possession or control of the FRBNY qualify
as agency records of the Board merely because the FRBNY may
have acted on the Board's behalf. As described above, the
Board shall search only those records in the possession or
control of the FRBNY that qualify as Board records pursuant
to Board Regulations. See Part II.C.i, supra.

## D.  The FRBNY as FOIA Agency

Bloomberg also raises the question of whether the
FRBNY is an agency for FOIA purposes. (Bloomberg Br. at 17-

---

[10] Bloomberg also contends that NIH embraces the
constructive creation and control theory. But that case
involved different factual circumstances from Burka.
There, the responding agency actually owned the facilities
where the requested records were stored and the agency
hired a contractor to create and maintain records
concerning studies on chimpanzees owned by the agency. NIH,
543 F. Supp. 2d at 77. Thus, while NIH purportedly relied
on Burka, the constructive creation and control theory was
only of marginal significance in that decision. Id.

19; Bloomberg Supp. Br. 1-5.) The Board, on the other
hand, adamantly maintains that that question is not
relevant and need not be decided. (Board Reply. Br. at 9;
Board Supp. Br. at 1.) Bloomberg contends that the
question is relevant because "the [FRBNY] is an agency and
has not promulgated its own FOIA regulations, [thus] those
documents [at the FRBNY] are accessible through requests to
the Board." (Bloomberg Reply Br. at 3.)

Bloomberg's logic is flawed. Bloomberg does not
explain how the FRBNY's status as a FOIA agency implicates
the Board's search of its agency records. FOIA imposes on
each federal agency an obligation to search only its own
agency records. 5 U.S.C. § 552(a)(3)(a). Bloomberg did not
serve a FOIA request on the FRBNY. And Bloomberg does not
contend that the FRBNY and the Board are actually one-and-
the-same agency. As such, this Court agrees with the
Board; Bloomberg's argument that the FRBNY is an agency for
FOIA purposes has no bearing on the issue of the adequacy
of the Board's search of its own agency records.

On the other hand, it seems that the question of the
FRBs' status as agencies is indeed relevant to the
applicability of the two FOIA exemptions invoked by the
Board in this action. See pp. 33 n.12 (in the context of
Exemption 4), 43 (in the context of Exemption 5), infra.

Nevertheless, as explained more fully below, answering that question is ultimately not necessary to determine this action.[11]

## E.   The Remaining Term Reports were Improperly Withheld Under FOIA Exemptions 4 and 5.

As noted above, in its December 9, 2008 Letter and Vaughn Index, the Board informed Bloomberg that it had located documents (the Remaining Term Reports) responsive to the Loan Request but that those documents were being withheld pursuant to FOIA Exemptions 4 and 5.  Bloomberg contends that the Remaining Term Reports were improperly withheld because FOIA Exemptions 4 and 5 do not apply. Specifically, Bloomberg argues that invocation of Exemption 4 fails because the Board cannot meet its burden of showing that it obtained the Remaining Term Reports from a person or that their disclosure would cause substantial

---

[11] In some instances, in order to reach a dispositive issue, it may be appropriate to assume that the FRBs are agencies. Other Courts in this district have assumed, without deciding, that FRBs are agencies in order to evaluate the enforceability of a FOIA request. See, e.g., Sibille v. Federal Reserve Bank of New York, 770 F. Supp. 134, 137-38 (S.D.N.Y. 1991) (assuming that the FRBNY is an agency but determining that an FRBNY's employee's logs were not used by the agency and thus were not within the scope of the FRBNY's agency records).  However, it is inappropriate to assume without deciding that a FRB is an agency if the applicability of a FOIA exemption necessarily depends on a determination of that question. See, e.g., n.12, infra.

competitive harm to Federal Reserve System borrowers. Bloomberg argues that invocation of Exemption 5 fails because the Board has pointed to no recognized privilege in civil discovery that would protect the Remaining Term Reports from disclosure. The Board contends, not surprisingly, that the Remaining Term Reports were properly withheld under FOIA Exemptions 4 and 5. As explained below, neither exemption applies to the Remaining Term Reports, and they shall be produced.

### (i) FOIA Exemption 4

For Exemption 4 to apply, the withheld record must (1) contain information that is a "trade secret" or "commercial or financial" in character, (2) be "obtained from a person," and (3) be "privileged or confidential." 5 U.S.C. § 552(b)(4); see also Inner City Press/ Community on the Move v. Board of Governors of the Federal Reserve System, 463 F.3d 239, 244 (2d Cir. 2006). The parties here concede that the Remaining Term Reports qualify as commercial and financial in character. The parties disagree over whether the Remaining Term Reports were obtained from a person and whether they are privileged or confidential. The Remaining Term Reports do not satisfy either requirement.

## (a) Exemption 4:  Obtained from a "Person" Requirement

The Board contends that the FRBNY obtained the
information contained in the Remaining Term Reports from
the borrowers, who unquestionably qualify as "people" for
FOIA purposes. (Board Br. at 16.)[12]  The parties have not
brought to the Court's attention any standard, other than
one based on plain language meaning, for determining when
information is obtained from a person.  As such, applying
the plain language meaning of obtain,[13] the Court disagrees
with the Board's characterization of the information as
"obtained from" the borrowers.

---

[12] The Board also suggests that it obtained the information
contained in the Remaining Term Reports from a person
because the Board obtained the information from the FRBNY
and the FRBNY qualifies as a person. (Board Br. at 16.)
But the only way the FRBNY could qualify as a person is if
this Court determined that the FRBNY does not qualify as an
agency because FOIA defines "person" as an "individual,
partnership, corporation, association, or public or private
organization other than an agency." 5 U.S.C. § 551(2)
(emphasis added).  The Board has adamantly maintained
throughout the course of this action that the question of
whether the FRBNY is an agency is not relevant and need not
be decided. (Board Reply Br. at 9; Board Supp. Br. at 1.)
Thus, in light of this inconsistency, the Court cannot help
but conclude that the Board intended to abandon its
argument that it obtained the information contained in the
Remaining Term Reports from a person because it obtained
the information from the FRBNY.

[13] See Oxford English Dictionary (2009) ("To come into the
possession of; to procure; to get, acquire, or secure.");
Webster's Third New International Dictionary Unabridged
(2009) ("[T]o gain or attain possession or disposal of
usually by some planned action or method.").

The only information in the Remaining Term Reports that the FRBNY and other FRBs could possibly have obtained from the borrows is the borrowers' names; the FRBs generated all the other information from internal data regarding their lending programs. It is evident from the Board's own testimony that the bulk of the information contained in the Remaining Term Reports was generated by the FRBNY and other FRBs operating DW programs. When borrowers applied to the FRBs for loans, the borrowers provided certain financial information including, inter alia, identification information, pledged collateral, and requested loan amounts. However, none of this information is contained in the Remaining Term Reports, other than borrower names. Rather, the Remaining Term Reports describe the originating FRB districts of the loans, individual loan amounts extended by the FRBs, the types of FRB lending program borrowed from, and loan origination and maturity dates. (Thro Decl. ¶¶ 11, 13; Board's Local Rule 56.1 Stmt. ¶ 5.) The FRBNY and FRBs generated this information from statistics they kept concerning the DW, TAF, PDCF and TSLF lending programs. For DW loans, "Reserve Bank staff would review the request, verify collateral and, if approved, enter the loan in the Reserve Bank's loan and accounting systems." (See Decl. of Brian F.

34

Madigan ¶ 11.)  For PDCF and TSLF loans, the Board

determined the maximum amount of funds to be provided, and

the FRBNY then administered auction mechanisms to determine

the actual loan amounts and terms. (See id. ¶ 8, 10.)

The fact that the FRBs themselves generated the

information contained in the Remaining Term Reports is

sufficient to vitiate the applicability of Exemption 4 with

respect to that information. C.f. Buffalo Evening News,

Inc. v. Small Bus. Admin., 666 F. Supp. 467, 469 (W.D.N.Y.

1987) ("I find that all of the information sought by

plaintiff here has been generated by the defendant SBA in

the course of its involvement with its borrowers. . . .

[T]his information in no way implicates any of the

financial information provided by the borrowers to the

government.").[14]  The information in the Remaining Term

Reports relates more to the FRBNY's decisions to lend than

to the information provided by the borrowers.  While the

---

[14] The Board incorrectly characterizes the holding of
Buffalo Evening News as dependant on the fact that the SBA
borrowers' names were publicly available prior to the FOIA
request in that action. (Board Reply Br. at 15.)  Buffalo
Evening News states clearly that the agency's act of
generating information was the motivating factor in the
decision; it does not discuss the significance of the fact
that the names were publicly available. 666 F. Supp. at
469.  In any event, the Board does not explain how the
availability of information in the public domain has any
bearing on whether an agency obtained that information from
a person.  The two concepts are not mutually exclusive.

Remaining Term Reports certainly include information about the FRBs' interactions with the borrowers, it is a <u>non sequitur</u> to say that information <u>about</u> a person is obtained <u>from</u> that person.

The Board has not met its burden of showing that the information, other than the borrowers' names, in the Remaining Term Reports was obtained from a person and, indeed, has raised no material issue of fact. But, as explained below, the information constituting borrowers' names--and, for that matter, <u>all</u> the information contained in the Remaining Term Reports--is not confidential, and thus falls outside the scope of Exemption 4.

(b) Exemption 4: "Privileged or Confidential" requirement

As to the third Exemption 4 requirement, the Board contends that the information contained in the Remaining Term Reports is confidential. (Board Br. at 18-23.) Bloomberg contends that it is not. (Bloomberg Br. at 21-35.) In <u>Continental Stock Transfer & Trust Co. v. S.E.C.</u>, 566 F.2d 373, 375 (2d Cir. 1977), the Court of Appeals adopted a two-part test, formulated by the District of Columbia Court of Appeals, in <u>National Parks & Conservation Association v. Morton</u>, 498 F.2d 765 (D.C. Cir. 1974), for determining whether information is confidential for

purposes of Exemption 4. "The test states that information is confidential for the purposes of Exemption 4 if its disclosure would have the effect either: '(1) of impairing the government's ability to obtain information--necessary information--in the future, or (2) of causing substantial harm to the competitive position of the person from whom the information was obtained.'" Inner City Press, 463 F.3d at 244 (quoting Cont'l Stock, 566 F.2d at 375). The Board has not argued that disclosure of the Reports will affect its ability to obtain necessary information in the future. (See Board Br. at 15-30.) Instead, the Board contends that disclosure will cause substantial harm to the competitive position of Federal Reserve System borrowers. Accordingly, only that part of the test will be considered.[15]

---

[15] Some courts have recognized a third governmental interest that may qualify information as confidential for purposes of Exemption 4, referred to as the "program effectiveness" test, and the Board urges this Court to apply it in this action. (See Board Br. at 17, 23-30.) The program effectiveness test is derived from a footnote in National Parks that "express[ed] no opinion as to whether other governmental interests are embodied in [Exemption 4]," such as "program effectiveness." See National Parks, 498 F.2d at 770 n.17. In adopting the National Parks formulation of Exemption 4, the Court of Appeals has explicitly stated that its "adoption did not encompass the speculation regarding 'program effectiveness' in footnote 17 of National Parks." Nadler v. F.D.I.C., 92 F.3d 93, 96 & n.2 (2d Cir. 1996). Nevertheless, at least one district court in this Circuit has imported the program effectiveness test. (continued . . .)

Because the Court of Appeals has imported the National
Parks confidentiality test from the D.C. Circuit,
consulting the D.C. Circuit's burden standard in this
regard is appropriate. An agency must point to specific
evidence substantiating an assertion that release of a
record would cause substantial competitive harm to the
person from whom the information was obtained. See Public
Citizen Health Research Group v. F.D.A., 704 F.2d 1280,
1291 (D.C. Cir. 1983) ("Conclusory and generalized
allegations of substantial competitive harm, of course, are
unacceptable and cannot support an agency's decision to
withhold requested documents."). The agency must provide
evidence that if the requested information is disclosed,
competitive harm would be "imminent." Iglesias v. C.I.A.,
523 F. Supp. 547, 559 (D.D.C. 1981). And the specific
evidence must show that the competitive harm will result

---

(. . . continued) See, e.g., Fox News Network, LLC v. Board
of Governors of The Federal Reserve System, -- F. Supp. 2d
--, 2009 WL 2345097, at *14-15 (S.D.N.Y. July 30, 2009).
See also Critical Mass Energy Project v. Nuclear Regulatory
Comm'n, 975 F.2d 871, 879 (D.C. Cir. 1992); 9 to 5 Org. for
Women Office Workers v. Board of Governors of the Federal
Reserve System, 721 F.2d 1, 10 (1st Cir. 1983).
    In light of the strong presumption in favor of
interpreting FOIA exemptions narrowly, not to mention the
Court of Appeals's guidance that the program effectiveness
test constitutes "speculation," Nadler, 92 F.3d at 96 n.2,
this Court will not import or apply the program
effectiveness test in this action.

from the affirmative use of the information by competitors
of the person from whom the information was obtained, not
merely injuries to that person's competitive position in
the marketplace or "embarrassing publicity attendant upon
public revelations." Public Citizen, 704 F.2d at 1291 n.30.

     The Board has not met its burden of proving that
disclosure of the information contained in the Remaining
Term Reports will cause substantial harm to the competitive
position of the borrowers and has failed to raise an issue
of fact.  The Board submits affidavits from Board employees
describing how borrowers may be stigmatized if their
utilization of the Federal Reserve lending programs is
disclosed.  For example, Brian F. Madigan, Director of the
MA and an economist, posits that,

> I have observed that depository institutions that
> may potentially borrow at the DW recognize that
> their customers, lenders and other
> counterparties, market analysts, and news media
> organizations, among others, may draw adverse
> inferences from their decision to borrow from the
> Federal Reserve Banks.  This stigma . . . can
> quickly place an institution in a weakened
> condition vis-à-vis its competitors by causing a
> loss of public confidence in the institution, a
> sudden outflow of deposits (a "run"), a loss of
> confidence by market analysts, a drop in the
> institution's stock price, and a withdrawal of
> market sources of liquidity.

(Decl. of Brian F. Madigan ¶ 17 (emphasis added); see
also Decl. of Susan E. McLaughlin ¶¶ 20-22 ("If the

name of an institution that borrowed from the [DW]
were to be made public, there is a real concern that
market participants, including financial analysts,
customers, and competitors of the borrowing
institution, would draw adverse conclusions about the
borrowing depository institution that were based on
conjecture and speculation.").)

These affidavits are insufficient to carry the
Board's burden of showing that disclosure of the
Remaining Term Reports will cause the borrowers to
suffer imminent competitive harm from the affirmative
use of the disclosed information by their competitors
or to raise an issue of fact on this question.   In
fact, they say nothing about how borrowers'
competitors will affirmatively use the information
that the borrowers participated in the Federal Reserve
lending programs.   At best, the proffered affidavits
suggest that the borrowers' competitors may use the
knowledge that a borrower participated in a Federal
Reserve lending program in order to determine when the
borrower is "in a weakened condition" and spread that
information to the borrowers' shareholders or the
market in general.   But the risk of looking weak to
competitors and shareholders is an inherent risk of

market participation; information tending to increase
that risk does not make the information privileged or
confidential under Exemption 4. The Board would
seemingly sweep within the scope of Exemption 4 all
information about borrowers that anyone throughout the
entire marketplace might consider to be negative. The
Exemption cannot withstand such inflation.[16]

Nor does the Board point to an immediate risk of
competitive harm that will result from disclosure of
the Remaining Term Reports. The Board essentially
speculates on how a borrower might enter a downward
spiral of financial instability if its participation
in the Federal Reserve lending programs were to be
disclosed. (See, e.g., Decl. of Brian F. Madigan ¶ 20
(the borrower "could be forced to pay very high rates
to borrow and might be limited in its ability to issue
longer-term debt").) Conjecture, without evidence of
imminent harm, simply fails to meet the Board's burden
of showing that Exemption 4 applies. Accordingly, I
find that the Board improperly invoked Exemption 4

---

[16] Additionally, the Court finds that the Board's implied
"understanding" with borrowers that certain information
will remain secret constitutes insufficient evidence to
show that the borrowers will suffer competitive harm. An
agency's promise that information will remain confidential
certainly does not, ipse dixit, make it so for purposes of
Exemption 4.

with respect to all the information in the Remaining
Term Reports.

(ii) FOIA Exemption 5

Exemption 5 protects "inter-agency or intra-agency
memorandums or letters which would not be available by law
to a party other than an agency in litigation with the
agency." 5 U.S.C. § 552(b)(5).  The Board contends that
"there can be little doubt that the Remaining Term Reports
are 'inter-agency or intra-agency memorandums or letters,'
under 5 U.S.C. § 552(b)(5) as they are prepared by Board
staff using data supplied by the [FRBs] and distributed to
Board staff (with copies to the FRBNY) for use in
formulating monetary policy and for Reserve Bank
supervision purposes." (Board Br. at 32.)  In light of this
statement, the Board's position with respect to the status
of the FRBs is unclear.  The Board's position in this
context impliedly concedes that the FRBs are agencies, thus
satisfying the inter-agency memorandums requirement of
Exemption 5, but the Board has also maintained throughout
the course of this action that the issue of whether the
FRBs are agencies is irrelevant (and in supplemental
briefing requested by the Court, the Board has even argued
that the FRBs are not agencies).  In the end, resolution of

42

this quandary is not necessary to determine the applicability of Exemption 5 to the Remaining Term Reports because Bloomberg does not dispute that the Remaining Term Reports qualify as inter-agency or intra-agency memorandums. (Bloomberg Br. at 38-39; Bloomberg Reply Br. at 8.)

The parties disagree primarily over whether the Remaining Term Reports would or would not "be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The Supreme Court has interpreted this requirement to mean that Exemption 5 "simply incorporates civil discovery privileges." United States v. Weber Aircraft Corp., 465 U.S. 792, 799 (1984) (recognizing incorporation of the so-called "Machin privilege"); see also F.T.C. v. Grolier, Inc., 462 U.S. 19, 26-27 (1983) (recognizing incorporation of the work product privilege); Fed. Open Mkt. Comm. of the Fed. Reserve Sys. v. Merrill, 443 U.S. 340, 354 (1979) (recognizing incorporation of a quasi-confidential commercial information privilege); N.L.R.B. v. Sears, Roebuck & Co., 421 U.S. 132, 152-154 (1975) (recognizing incorporation of the pre-decisional deliberative process privilege and attorney work product privilege).

The Board contends that the Remaining Term Reports
would be privileged in civil discovery under the privilege
recognized in Merrill.  The Board contends that Merrill
recognized "a privilege analogous to the qualified
privilege for confidential commercial information available
in civil discovery under Fed. R. Civ. P. 26(c)(7)." (Board
Br. at 31.)  The Board's reading of Merrill in this regard
is correct; Merrill indeed adapted a privilege from the
then-extant Federal Rule Civil Procedure 26(c)(7).
However, seizing on Merrill's dicta, the Board also
suggests that Exemption 5 protects "'sensitive information
not otherwise available . . . immediate release of [which]
. . . would significantly harm the Government's monetary
functions or commercial interests . . . .'" (Board Reply
Br. at 23 (quoting Merrill, 443 U.S. at 363); see also
Board Br. at 31, 33.)  The Board is mistaken; Merrill's
holding was not so broad.

Merrill considered whether FOIA Exemption 5 allowed
the FOMC to withhold Domestic Policy Directives, monthly
statements of policy from the FOMC to a senior account
manager at the FRBNY indicating the FOMC's tolerance ranges
for growth in the money supply and the federal funds rate.
443 U.S. at 344-45.  The Merrill Court "conclude[d] that
Exemption 5 incorporates a qualified privilege for

confidential commercial information, at least to the extent
that this information is generated by the Government itself
in the process leading up to awarding a contract." Id. at
360.    The Supreme Court then determined, by way of a
concededly inexact analogy, that the FOMC Domestic Policy
Directives may well fall within the scope of Exemption 5
because they were similar to confidential commercial
information generated by the Government in the process
leading up to awarding a contract. Id. at 361.    Ultimately,
however, the Court left the determination of whether the
FOMC Domestic Policy Directives actually fell within the
scope of Exemption 4 for the district court. Id. at 364.

         The Merrill Court certainly did not intend to create a
sweeping new privilege for any sensitive information, the
immediate release of which would significantly harm the
Government's monetary functions or commercial interests.
Merrill does not support such a reading, and that purported
privilege is not incorporated into Exemption 5. See id. at
362 ("'[T]here is no absolute privilege for trade secrets
and similar confidential information.'" (quoting 8 Charles
Alan Wright & Arthur R. Miller, Federal Practice and
Procedure § 2043 (1970)).    Other Courts have recognized the
limited nature of Merrill's holding. See, e.g., Shermco
Indus., Inc. v. Sec'y of the Air Force, 613 F.2d 1314, 1319

n.11 (5th Cir. 1980); Anderson v. Dep't of Health and Human
Servs., 907 F.2d 936, 945-946 (10th Cir. 1990).

Nor would analogizing the Remaining Term Reports to
confidential commercial information generated by the
Government in the process leading up to awarding a contract
be fruitful for the Board in this action. The Remaining
Term Reports consist of aggregate information about
participants in the FRBs' lending programs. And while the
Remaining Term Reports were circulated to Board and FRBNY
staff, the Reports do not contain any information remotely
similar to the type of information discussed in Merrill:
information that provides guidance or directives. Instead,
they provide historic data.

Accordingly, the Board has not met its burden of
showing that the Remaining Term Reports would not be
available by law to a party other than an agency in
litigation with the agency. As such, Exemption 5 does not
permit the Board to withhold the Remaining Term Reports.[17]

---

[17] Finally, the Board cites no authority from this Circuit
supporting its theory that Exemption 5 "protects the
government when it enters the marketplace as an ordinary
buyer or seller." (Board Br. at 32 (internal quotation
marks omitted).) Accordingly, that theory is rejected.

III. CONCLUSION

For the reasons set forth herein, the Board's Motion for Summary Judgment [dkt. no. 10] is DENIED, and Bloomberg's Motion for Summary Judgment [dkt. no. 18] is GRANTED. Specifically,

1. The Board shall produce forthwith the Remaining Term Reports within five business days of the date hereof;

2. The Board shall search forthwith records at the FRBNY that constitute "Records of the Board" within the meaning of 12 C.F.R. § 261.2(i)(1); and

3. The parties shall confer following their review of the results of the search and inform the Court by letter no later than September 14, 2009 how they propose to proceed.


SO ORDERED

Dated:     August 24, 2009
           New York, New York

_Loretta A. Preska_

LORETTA A. PRESKA
Chief U.S.D.J.