UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

BLOOMBERG L.P.,                                        :

                                   Plaintiff,          :

                      - against -                      :

BOARD OF GOVERNORS OF THE                              :
FEDERAL RESERVE SYSTEM,

                                                       :

                                   Defendant.
------------------------------------------------------- x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

Case No. 08 CV 9595 (LAP)

## STIPULATION AND ORDER
## STAYING ORDER OF AUGUST 24, 2009

WHEREAS, defendant Board of Governors of the Federal Reserve System (the "Board")
and motion for stay
has moved, by order to show cause filed herewith, for an order staying the Court's August 24,

2009 order (the "August 24th Order") directing the Board to produce certain documents; and

WHEREAS, the Court heard argument from the parties on August 27, 2009 concerning

the Board's motion, and

WHEREAS, the Board has represented to the Court and to Plaintiff Bloomberg L.P.

("Bloomberg") that an additional search of the Board's "official files" (as it construes that term)

located at the Federal Reserve Bank of New York ("FRBNY") pursuant to 12 C.F.R. §

261.2(i)(1) would be unlikely to identify any additional documents responsive to Bloomberg's

FOIA requests subject to this action, and

WHEREAS, based on the Board's representation, and pending the outcome of the

anticipated appeal of the August 24th Order, Bloomberg is willing to forego such additional

search as described above of the Board's "official files" as the Board construes that term,

provided however that Bloomberg reserves its right to dispute the Board's interpretation of the

term "official files" for future purposes;

NOW, THEREFORE, the parties agree as follows: *accompanied by an emergency stay application*

1.     The Board shall file its notice of appeal within three (3) business days after it is *but in no event later than September 30, 2009, based on the Board's undertaking to obtain a decision on authorization no later than September 25, 2009* authorized to do so, and shall notify the Court and Bloomberg promptly if it does not obtain

authorization to pursue an appeal or otherwise decides not to pursue an appeal.

2.     The Board will not oppose a motion filed by Bloomberg under Rule 2 of the Federal

Rules of Appellate Procedure for a suspension of the applicable rules for the purpose of

expediting the Court of Appeals' decision.

3.     The Court's August 24th Order is hereby stayed *pending the outcome of the emergency stay application in the Court of Appeals.*

*4. At the time it files its notice of appeal and emergency stay application in the Court of Appeals, the Board shall seek expedited treatment of the appeal.*

SO ORDERED this 28th day of August, 2009.

*Loretta A. Preska*

LORETTA A. PRESKA
Chief U.S.D.J.

4

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| BLOOMBERG L.P., | ) ) ) ) |  |
| Plaintiff, | ) ) | DECLARATION OF YVONNE F. MIZUSAWA |
| v. | ) ) | Civ. No. 08 CV 9595 (LAP) |
| BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, Defendant. | ) ) ) ) ) ) |  |

Pursuant to 28 U.S.C. § 1746, YVONNE F. MIZUSAWA declares under penalty

of perjury as follows:

1.     I am Senior Counsel at the Board of Governors of the Federal Reserve System (the

"Board"). I make this Declaration in support of the Motion by the Board, pursuant to Fed. R.

Civ. P. 62(c), for a stay of the Court's Order dated August 24, 2009 pending appeal.

2.     The Court has ordered the Board to release within five business days confidential

commercial and financial information concerning financial institutions that have borrowed from

credit facilities established by the Board. The immediate release of these documents will cause

irreparable harm to Board because it will effectively moot the Board's opportunity to seek

appellate review. In addition, it will cause irreparable harm to the institutions whose information

is disclosed and to the Board's ability to effectively manage the current, and any future, financial

crisis. Disclosure will also affect the effective execution of the Board's statutory responsibilities.

3.    Once the records are disclosed, a successful appeal will be unable to reverse the damage. As such, the Board's right to meaningful review of the disclosure order will become moot unless a stay is granted before the Court's deadline for disclosure arrives.

4.    In light of the timeframe involved, the Board respectfully submits that its only option was to proceed by Order to Show Cause.

5.    No prior request for this relief has been sought or made.

I declare under penalties of perjury that the foregoing is true and correct.

Executed on:   August 26, 2009

/S/ Yvonne F. Mizusawa
Yvonne F. Mizusawa

2

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| BLOOMBERG L.P., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 08 CV 9595 (LAP) |
| | ) |
| BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, | ) |
| Defendant. | ) |

### DEFENDANT BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A STAY PENDING APPEAL

Defendant, the Board of Governors of the Federal Reserve System ("Board"), plans to appeal the Court's August 24, 2009 Opinion and Order ("Order") as soon as permitted, and respectfully submits this memorandum of law in support of its motion to stay the Order pending appeal.

The Order directs the Board to disclose, within five business days, confidential reports identifying the names of, and amounts of loans obtained by, financial institutions that have borrowed from emergency Federal Reserve credit facilities during one of the worst financial crises in the history of this nation. The immediate disclosure of these documents will irreparably harm the Board by effectively mooting its opportunity for appeal, and may cause irreparable harm to the institutions named. The Order raises serious legal issues going to the merits, the Board would suffer irreparable injury in the absence of a stay because disclosure would

1

effectively moot an appeal, possible injury to the plaintiffs does not raise the risk of irreparable harm, and the public interest favors a stay.

## I.      THE BOARD MEETS THE TEST REQUIRED FOR ENTRY OF A STAY PENDING APPEAL

In this Circuit, courts considering a request for a stay pending appeal look to the following factors: (1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect of substantial injury to the party opposing the stay if the court grants the stay; and (4) the public interest in granting the stay. Mohammed v. Reno, 309 F.3d 95, 100 (2d Cir. 2002); LaRouche v. Kezer, 20 F.3d 68, 72 (2d Cir. 1994); Cuomo v. United States Nuclear Regulatory Comm'n, 772 F.2d 972, 974 (D.C. Cir. 1985) (citing Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977)).

These factors are not prerequisites to be met, but rather considerations to be balanced. "The [p]robability of success is inversely proportional to the degree of irreparable injury evidenced." Cuomo, supra, 772 F.2d at 974. Thus, "[a] stay may be granted with either a high probability of success and some injury, or *vice versa*." Id. Where the movant has established substantial irreparable harm and the balance of harms weighs heavily in its favor, it need only raise "'serious legal questions going to the merits'" to obtain a stay pending appeal. Population Inst. v. McPherson, 797 F.2d 1062, 1078 (D.C. Cir. 1986) (quoting Washington Metro. Area Transit Comm'n, supra, 559 F.2d at 844); accord Providence Journal Co. v. FBI, 595 F.2d 889, 890 (1st Cir. 1979) (where "the denial of a stay will utterly destroy the status quo, irreparably harming appellants, but the granting of a stay will cause relatively slight harm to appellee, appellants need not show an absolute probability of success in order to be entitled to a stay"). Indeed, in FOIA cases, where compliance with an order to disclose assertedly exempt

2

information would effectively moot any appeal, "stays are routinely granted." Center for National Sec. Studies v. Department of Justice, 217 F. Supp. 2d 58, 58 (D.D.C. 2002).

## A. <u>There Are Serious Legal Questions on the Merits</u>

Here, whether the Board properly withheld the names and loan amounts of financial institutions obtaining loans at the Discount Window ("DW"), Term Auction Facility ("TAF"), Primary Dealer Credit Facility ("PDCF"), and Term Securities Lending Facility ("TSLF") under FOIA exemptions 4 and 5 raises "serious legal questions going to the merits." The Board has argued, and submitted declarations demonstrating, that public disclosure is likely to cause substantial competitive injury to these financial institutions including the loss of public confidence in the institution, runs on banks, and possible failure of some institutions. The Board's declarations also provided evidence that disclosure would impair the Board's ability to perform important statutory functions in a time of economic upheaval, including authorizing lending by the Reserve Banks to alleviate severe liquidity strains, achieving the desired level of short term interest rates, maximum employment, and stable prices through monetary policy, and enabling Reserve Banks to provide liquidity to depository institutions and the banking system at the DW. Finally, the Board provided evidence that the withheld documents contain sensitive information not otherwise available, release of which would harm the government's monetary functions or commercial interests.

Much of the Board's evidence and arguments presented here were accepted by another judge in this Court Fox News Network, LLC v. Board of Governors of the Federal Reserve System, No. 09 Civ. 272 (AKH), 2009 WL 2345097 (S.D.N.Y., July 30, 2009). While this does not by itself suggest that this Court's conclusions were incorrect, it does indicate that there is a substantial legal question for review. Where a FOIA disclosure order "centers on a novel and

'admittedly difficult legal question,'" the equities "weigh in favor of a stay." Center for International Environmental Law v. Office of U.S. Trade Representative, 240 F. Supp. 2d 21, 22 (D.D.C. 2003) (quoting Washington Metro. Area Transit Comm'n, supra, 559 F.2d at 844).

## B.    The Board And Others Will Suffer Irreparable Harm in the Absence of a Stay

Second, there can be no question that compliance with the Court's Order will irreparably harm the Board. The Court has ordered the Board to release within five days confidential commercial and financial information concerning financial institutions that the Board believes is protected from disclosure under exemptions 4 and 5. The Board will suffer an identifiable, concrete and irreparable harm as a result of the Court's Order because the immediate release of these documents will effectively destroy the Board's claims of exemption and right of appellate review. Where, as here, the denial of a stay will "entirely destroy [a defendant's] rights to secure meaningful review," the irreparable injury standard for obtaining a stay is satisfied. Providence Journal, supra, 595 F.2d at 890; Center for National Sec. Studies, supra, 217 F. Supp. 2d at 58 (granting stay of FOIA order requiring release of identities of individuals detained in connection with law enforcement investigation where disclosures "would effectively moot any appeal"); see also National Council of La Raza v. Dep't of Justice, 411 F.3d 350, 355 n.3 (2d Cir. 2005) (granting stay on appeal of order requiring disclosure under FOIA without discussion); Ferguson v. FBI, 957 F.2d 1059, 1060 (2d Cir. 1992) (noting, without discussion, that panel of Second Circuit granted motion for stay pending appeal of district court's order directing government to disclose information under FOIA).

As the court noted in Maine v. Dep't of the Interior, No. Civ. 00-122, 2001 WL 98373 at *3 (D. Me. Feb. 5, 2001), "the [agency's] right to meaningful review of the disclosure order will become moot upon disclosure of the documents because 'confidentiality will be lost for all time'

and '[t]he status quo could never be returned.'" (quoting Providence Journal, 595 F.2d at 890).

Moreover, release of the documents in this case would not only destroy the claimed exemptions

and the Board's right of appellate review, but would trigger the competitive harms and harms to

the Board's ability to perform its statutory functions that exemptions 4 and 5 are designed to

prevent. The gravity of these harms amply justifies a stay of the Court's order pending a

possible appeal.[1]

    In addition to the irreparable harm to the Board, the institutions whose names and

information would be disclosed will also suffer irreparable harm in the absence of a stay. As

Judge Hellerstein wrote in the Fox News case in finding that FOIA exemption 4 applied to

similar documents,

> The Board's concerns, that rumors are likely to begin and runs on banks are likely to
> develop, cannot be dismissed. Similarly, the Board's concern is real that disclosure
> would reveal proprietary trading information of borrowers, their trading strategies and the
> size and nature of their portfolios of assets. The national economy is not so out of
> danger, and the frailty of banks so different now than when their Discount Window
> borrowing began, as to make the Board's concern academic.

Fox News Network, supra. Judge Hellerstein's observation has been borne out in the real world,

as evidenced by the run on Northern Rock plc, a United Kingdom bank, following news reports

that the bank had asked for and received emergency financial support from the Bank of

England.[2] In its report on the run on Northern Rock, the House of Commons quoted the

Chancellor of the Exchequer who stated unequivocally that the run on Northern Rock was

---

[1] The Board is seeking authorization from the Solicitor General to pursue an appeal. See 28
C.F.R. Pt. 0, Subpt. Y, App. § 5.

[2] See House of Commons Committee Report, The run on the Rock, at ¶ 1, available at
http://www.publications.parliament.uk/pa/cm200708/cmselect/cmtreasy/56/56i.pdf.

precipitated by "the fairly dramatic news that a fairly well-known bank had gone to the Bank of England for help."[3]

The Clearing House Association L.L.C ("The Clearing House"), an association representing the leading commercial banks in the world, shares the Board's concerns about the competitive impact of the disclosure ordered by the Court.  As Norman R. Nelson, the General Counsel of The Clearing House states, "[p]ublic speculation that a financial institution is experiencing liquidity shortfalls—which would be a natural inference from having tapped emergency funds—has caused financial institutions' customers to withdraw deposits, counterparties to make collateral calls and lenders to accelerate loan repayment or refuse to make new loans." Declaration of Norman R. Nelson dated August 26, 2009, attached hereto as Exhibit A, at ¶ 5 ("Nelson Decl.").  Moreover, Nelson notes, "[t]he competitive harm to institutions that are publicized as needing to access the Emergency Programs is not "speculative", but demonstrated by multiple failures and near failures of financial institutions whenever there is information that the institution is having funding difficulty." Id. ¶ 12.  In addition to Northern Rock, Mr. Nelson points to Bear Stearns, Wachovia, Lehman Brothers, Washington Mutual and AIG as examples of institutions that failed, or nearly failed, when information about their funding difficulties became public.  Id. note 2.

Here, the Court has ordered the Board to release within 5 days confidential commercial and financial information concerning financial institutions that have borrowed from credit programs established by the Central Bank of the United States.  The immediate release of these documents will cause irreparable harm to these institutions and to the Board's ability to effectively manage the current, and any future, financial crisis.  Disclosure will impact the

---

[3]  Id. at ¶ 149.

effective execution of the Board's statutory responsibilities. FOIA exemptions 4 and 5 were designed to prevent just these types of harm.

Once the records are disclosed, a successful appeal will be unable to reverse the damage. As Mr. Nelson explains, competitors could affirmatively use the information to advertise or publicize that they were more sound because they had not needed to participate in the Federal Reserve's lending Programs. Id. ¶ 12.

### C.    The Plaintiff Will Not Suffer Irreparable Harm

By contrast, the harm to the plaintiff is no greater than the delay occasioned by any appeal and do not constitution irreparable injury. John Doe Agency v. John Doe Gov't Corp., 488 U.S. 1306, 1309 (1989) (granting stay of court of appeals' mandate and district court FOIA disclosure order pending disposition of petition for writ of certiorari, and finding that respondent's "interest in receiving this information immediately, while significant if [respondent's] interpretation of FOIA is correct, poses no threat of irreparable harm"). The documents at issue are being preserved and will be available at the conclusion of the appeal process.

### D.    The Public Interest Favors a Stay

Finally, the public interest favors a stay. The Board has presented evidence regarding significant harms that could befall not only private companies, but the economy as a whole, if the withheld information is disclosed. Accordingly, the public interest is coextensive with the Board's interest in that the harms the Board is seeking to prevent inure to the benefit of the U.S. economy as a whole. In sum, the balance of harms clearly weighs in favor of a stay pending resolution of a possible appeal.

## CONCLUSION

For the foregoing reasons, the Board's motion for a stay pending a possible appeal should

be granted.

Dated: Washington, D.C.
       August 26, 2009

/s/Yvonne F. Mizusawa
Katherine H. Wheatley (KW7931)
Associate General Counsel
Yvonne F. Mizusawa (YM5081)
Senior Counsel
Board of Governors of the Federal
  Reserve System
20th and C Streets, N.W.
Washington, D.C. 20551
Ph: (202) 452-3436
Fax: (202) 736-5615

8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

BLOOMBERG L.P.,

                              Plaintiff,

                                                  Case No. 08 CV 9595 (LAP)

-against-

BOARD OF GOVERNORS OF THE FEDERAL
RESERVE SYSTEM,

                              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

DECLARATION OF NORMAN R. NELSON

I am Executive Vice President and General Counsel of The Clearing

House Association L.L.C. ("The Clearing House"). I submit this declaration on behalf of

The Clearing House in support of the motion of the Board of Governors of the Federal

Reserve System for a stay of this Court's order, dated August 24, 2009 ("Order"), in the

above-captioned matter.

1.      The Clearing House is an association of leading commercial

banks.[1]  The Clearing House banks are among the most important participants in the

---

[1]      The members of The Clearing House are: ABN Amro Bank N.V., Bank of
America, National Association; The Bank of New York Mellon; Citibank, N.A.;
Deutsche Bank Trust Company Americas; HSBC Bank USA, National
Association; JPMorgan Chase Bank, National Association; UBS AG; U.S. Bank
National Association; and Wells Fargo Bank, National Association.

international banking and payments systems and among the world's principal intermediaries in interbank funds transfers.

2.      I am familiar with the function of the New York Fed's role as a lender of last resort to depository institutions. Our member banks are entitled to borrow emergency funds from the New York Fed.

3.      The Clearing House submits this declaration because the Court's Order threatens to impair the ability of our members to access emergency funds through the New York Fed's Discount Window without suffering the severe competitive harm that public disclosure of their identity will cause.

4.      Our members have accessed the New York Fed's Discount Window with the understanding that the Fed will not publicly disclose information about their borrowing, especially their identity.   Industry experience, including very recent and searing experience, has shown that negative rumors about a bank's financial condition—even completely unfounded rumors—have caused competitive harm, including bank runs and failures.

5.      If the names of our member banks who borrow emergency funds are publicly disclosed, the likelihood that a borrowing bank's customers, counterparties and other market participants will draw a negative inference is great.  Public speculation that a financial institution is experiencing liquidity shortfalls—which would be a natural inference from having tapped emergency funds—has caused bank customers to withdraw deposits, counterparties to make collateral calls and lenders to accelerate loan repayment

-2-

or refuse to make new loans. When an institution's customers flee and its credit dries up, the institution may suffer severe capital and liquidity strains leaving it in a weakened competitive condition.

6.      Banks are different from other businesses. Survival can depend on the ephemeral nature of public confidence. The maintenance of public confidence has been a primary goal of bank regulation for more than a century. As far back as the banking crises of the 1930s, President Roosevelt cautioned that the most important element in our banking system is "the confidence of the people." *A Brief History of Deposit Insurance in the United States,* International Conference on Deposit Insurance (September 1998). That banking cirsis—where bank runs were common and thousands of banks closed—led to the creation of the FDIC and a host of extraordinary measures to restore public confidence in the banking system.

7.      As the Court noted, "[i]n 2007, the U.S. economy encountered a serious financial crisis." Order at 5. This crisis, the worst since the Great Depression, resulted in a series of new and unprecedented Federal Reserve lending programs (the "Emergency Programs"). These Emergency Programs were designed to address market conditions in which the ability of major financial institutions to borrow under normal market conditions and terms was completely lost, or, in some cases, severely limited.

8.      There are numerous examples of financially sound institutions collapsing or suffering further financial deterioration from the loss of public confidence. Experience in the banking industry has shown that when customers and market participants  hear negative rumors about a bank, negative consequences inevitably flow.

-3-

For example, speculation and runs of liquidity crises arising at Bear Sterns and Lehman Brothers, Inc. caused the stocks of both companies to drop to record lows, and when the British Broadcasting Corporation reported on September 13, 2007 that Northern Rock had asked for and received emergency financial support from the Bank of England, customers lost confidence and the report triggered the first run on a U.K. bank since the 1860s. *See* Jeff Kearns & Yalman Onaran, *Bear Stearns Shoes Fall on Liquidity Speculations* (Mar. 10, 2008), available at http://www.bloomberg.com/apps/news?pid=20670001&sid=aawpC8wcg; Yalman Onaran & Lorraine Woellert, *Fuld Blames Lehman's Fall on Rumors* (Oct. 6, 2008), available at http://www.bloomberg.com/apps/news?pid=20670001&sid=aFhhYZ85GOeM; House of Commons Treasury Committee, *The Run on the Rock* (Jan. 26, 2008), available at http://www.publications.parliament.uk/pa/cm200708/cmselect/cmtreasy/56/56i.pdf.

9.    In its decision, the Court referred to the collapse of Bear Stearns, "one of the largest securities firms in the United States," that had "notified members of the Federal Reserve that due to deteriorating market conditions it would be unable to repay a large portion of its obligations and thus faced the prospect of filing for bankruptcy protection." Order at 6. The rapid collapse of Bear Stearns, and subsequently other major financial institutions, demonstrated the incredible rapidity which a loss of public confidence from negative publicity about its funding, can cause, including the demise of a sound institution.

-4-

10.    Press reports indicate that several healthy financial institutions participated in the Troubled Asset Relief Program at the suggestion of The U.S. Dep't of the Treasury to mitigate the stigma associated with participation in the program, recognizing that rumors and speculation about the health of financial institutions can quickly spiral into market turmoil. *See* Damian Paletta, Jon Hilsenrath, and Deborah Solomon, *At Moment of Truth, US Forced Big Bankers to Blink,* Wall Street Journal (Oct. 15, 2008).

11.    The Clearing House believes, based on the experiences of its members, that publicly releasing information about a financial institution's participation in the Emergency Programs can cause significant competitive harm. It is difficult to imagine information that is more competitively sensitive or harmful to a financial institution than information that it has lost the independent ability to fund itself fully in the marketplace, even momentarily or for reasons other than its own financial soundness. This harm would be specific and imminent. As experience with Bear Stearns demonstrated, an institution can lose access to funding in the marketplace, even on a secured basis, and the willingness of counterparties to continue to deal with it, both of which leave the institution in a weakened position relative to its competitors.

12.    In sum, our experience differs from the factual conclusions the Court appears to have reached about the nature of competition in the banking industry:

- The competitive harm to institutions that are publicized as needing emergency funding is not "speculative," but demonstrated by the recent multiple failures and near failures of financial institutions whenever information about their funding difficulty has been disclosed.

- The disclosure does not involve mere "embarrassing publicity," but information that could result in the immediate demise of an institution.

- The disclosure would not merely "stigmatize [ ]" the institution or make it "look[] weak," but goes to its very viability.

- The disclosure of accessing emergency funding is not an "inherent risk" of market participation, but an extraordinary risk in extraordinary circumstances.

- Competitors can use the disclosure to advertise or publicize that they are financially stronger because they don't need emergency funding.

- As the D.C. Circuit Court of Appeals noted in *Public Citizen Health Research Corp.* v. *Interim,* 704 F.2d 1280 (D.C. Cir. 1983), upon which the Court heavily relied, there need not be a showing of "actual competitive harm"; the "likelihood of substantial competitive injury" is the legal standard.

13.    Our experience in this industry differs from the factual assumptions the Court appears to have reached about the competitive impact of disclosing a borrower's participation in the New York Fed's emergency funding programs. Our concern is not with information that "anyone throughout the entire marketplace might consider to be negative." Order at 41. We respectfully submit that this is information virtually everyone would consider potentially disastrous.

I declare under penalty of perjury that the foregoing is true and correct. Executed in New York, New York, on this 26th day of August 2009.

_Norman R. Nelson_
Norman R. Nelson